**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| USAMA JBOOR, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REPLIMUNE GROUP, INC., SUSHIL PATEL, EMILY HILL,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Usama Jboor ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Replimune Group, Inc. ("Replimune" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

**NATURE OF THE ACTION**

---

[1] Unless otherwise stated, all emphasis is added.

1

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Replimune securities between November 22, 2024 and July 21, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Replimune securities during the Class Period and was economically damaged thereby.

7.      Defendant Replimune describes itself as follows:

> [Replimune] was founded in 2015 with the mission to transform cancer treatment by pioneering the development of novel oncolytic immunotherapies. Replimune's proprietary RPx platform is based on a potent HSV-1 backbone intended to maximize immunogenic cell death and the induction of a systemic anti-tumor immune response. The RPx platform is designed to have a unique dual local and systemic activity consisting of direct selective virus-mediated killing of the tumor resulting in the release of tumor derived antigens and altering of the tumor microenvironment to ignite a strong and durable systemic response. The RPx product candidates are expected to be synergistic with most established and experimental cancer treatment modalities, leading to the versatility to be developed alone or combined with a variety of other treatment options.

8. Pertinent to this action is the Company's IGNYTE trial, the purpose of which is to treat skin cancer.

9. RP1, as mentioned below, is described by the Company as follows:

> RP1 (vusolimogene oderparepvec) is Replimune's lead product candidate and is based on a proprietary strain of herpes simplex virus engineered and genetically armed with a fusogenic protein (GALV-GP R-) and GM-CSF, intended to maximize tumor killing potency, the immunogenicity of tumor cell death, and the activation of a systemic anti-tumor immune response.

10. Defendant Replimune is incorporated in Delaware and its head office is located at 500 Unicorn Park Drive, Woburn, Massachusetts 01801.

11. Replimune's common stock trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "REPL".

12. Defendant Sushil Patel ("Patel") has served as the Company's CEO at all relevant times.

13. Defendant Emily Hill ("Hill") has served as the Company's Chief Financial Officer ("CFO") at all relevant times.

14. Defendants Patel and Hill are collectively referred to herein as the "Individual Defendants."

15. Each of the Individual Defendants:

  (a) directly participated in the management of the Company;

  (b) was directly involved in the day-to-day operations of the Company at the highest levels;

  (c) was privy to confidential proprietary information concerning the Company and its business and operations;

  (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

  (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

  (f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

  (g) approved or ratified these statements in violation of the federal securities laws.

16. Replimune is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Replimune under *respondeat superior* and agency principles.

18. Defendant Replimune and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Materially False and Misleading
Statements Issued During the Class Period**

19. On November 21, 2024, after the market closed, the Company issued a press release entitled "Replimune Receives Breakthrough Therapy Designation for RP1 and Submits Biologics License Application to the FDA under the Accelerated Approval Pathway." The press release stated, in pertinent part:

> [Replimune] today announced that it has submitted a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen. The submission was made under the Accelerated Approval pathway. The Company also announced that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting.
>
> Breakthrough Therapy designation is intended to expedite the development and review of therapies for serious diseases *when preliminary clinical evidence indicates that the therapy may provide substantial improvement over existing available therapies* on one or more clinically significant endpoints. *This Breakthrough Therapy designation is based on the safety and clinical activity observed in the anti-PD1 failed melanoma cohort of the IGNYTE clinical trial.*

20. The press release quoted Defendant Patel as stating that "[t]oday is an important milestone for Replimune and for the melanoma community *as we are one step closer to having another potential treatment available* for patients who have limited options after progressing on anti-PD1 containing regimens[.]"

21. The statements in ¶¶ 19 and 20 were materially false and misleading at the time they were made because Defendants knew or should have known that the biologics license application ("BLA") submitted to the FDA for RP1 would not be approved as a result of omitted material issues, such as that the IGNYTE trial was not "an adequate or well-controlled clinical investigation."

5

22. On February 12, 2012, the Company filed with the SEC its quarterly report for the period ended December 31, 2024, (the "Q3 2025 Report"). Attached to the Q3 2025 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Patel and Hill attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

23. The Q3 2025 Report contained the following statement:

> ***Our leading clinical trial of RP1 is our IGNYTE trial***, a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. ***The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma***. The anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140 patients who received RP1 plus nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the U.S. Food and Drug Administration, or FDA. Responses from baseline were highly durable with 85% of responses lasting more than 12 months. The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. In September 2024, we presented the independently reviewed data from the IGNYTE clinical trial, including key secondary endpoints and subgroup analyses as a late-breaking abstract during an oral session at the European Society for Medical Oncology, or ESMO. Data presented at ESMO showed activity across all subgroups, including patients who had prior anti-PD1 and anti-CTLA-4 treatment had an ORR of 27.7% and patients who had primary resistance to anti-PD1 had an ORR of 35.9% by modified RECIST v1.1. In November 2024, we announced submission of a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the Accelerated Approval pathway. We recently announced the FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act goal date of July 22, 2025.

24. The statement in ¶ 23 was materially false and misleading at the time it was made because Defendants knew or should have known that the biologics license application ("BLA") submitted to the FDA for RP1 would not be approved as a result of omitted material issues, such as that the IGNYTE trial was not "an adequate and well-controlled clinical investigation."

25. On May 22, 2025, after market hours, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended March 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were certifications pursuant to SOX signed by Defendants Patel and Hill attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

26. The 2025 Annual Report contained the following statement:

*__Our leading clinical trial of RP1 [or vusolimogene oderparapvec] is referred to as the IGNYTE trial__*, which is a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, *__and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1__*.

The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma. The anti-PD-1 failed melanoma cohort from the IGNYTE trial includes 140 patients who received RP1 in combination with nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the FDA. *__Responses from baseline were highly durable with 85% of responses lasting more than 12 months.__* The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. In September 2024, we presented the independently reviewed data from the IGNYTE trial, including key secondary endpoints and subgroup analysis as a late-breaking abstract during an oral session at the European Society for Medical Oncology, or ESMO. Data presented at ESMO showed activity across all subgroups, including patients who had prior anti-PD-1 and anti-CTLA-4 treatment had an ORR of 27.7% and patients who had primary resistance to anti-PD-1 had an ORR of 35.9% by modified RECIST v1.1. In November

7

2024, we presented a late-breaking abstract featuring the IGNYTE trial primary analysis that had been selected for oral presentation at the 39th Annual Meeting of the Society for Immunotherapy of Cancer (SITC 2024). The data presented at SITC 2024 included further clinical subgroup and initial biomarker data from the IGNYTE trial.

***In November 2024, we announced submission of a biologics license application, or BLA, to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma*** who have previously received an anti-PD-1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the accelerated approval pathway. ***The FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act, or PDUFA, goal date of July 22, 2025. The FDA recently completed their late-cycle review meeting and all manufacturing inspections for the BLA and we believe we remain on track for the July 22, 2025 PDUFA date.***

27. The statement in ¶ 26 was materially false and misleading at the time it was made because Defendants knew or should have known that the biologics license application ("BLA") submitted to the FDA for RP1 would not be approved as a result of omitted material issues, such as that the IGNYTE trial was not "an adequate and well-controlled clinical investigation."

28. On May 22, 2025, the Company held its earnings call for the 4th quarter of fiscal 2025 (the "Q4 2025 Call"). The Q4 2025 Call included the following exchange:

**Analyst**: Hi, guys. Good morning. Thanks for taking the questions. Congrats on the progress and for hosting what I believe is your first earnings call. First question, can you discuss the impact you're seeing from the recent regulatory changes and provide any color on recent FDA interactions?

And then on second question on [IGNYTE], can you discuss the translation of response rate into metrics like PFS and OS? And what benchmarks are you pointing to for PFS and OS in the anti-PD1 field melanoma setting? Thank you.

**Defendant Hill**: Thanks, Jonathan. This is Emily. I'll take the first segment of your question. So just as a reminder for those on the call, we received breakthrough through designation late last year and then submitted our BLA for RP1 and PD1 failed melanoma. Our BLA was accepted in January with a priority review. ***And since that 6 January, we've been responding to information requests from the FDA in a timely and thorough manner***.

We're very grateful to have seen committed and consistent engagement from our review team, and we haven't seen any changes to the cadence of that commitment. Having

8

recently completed both our late-cycle meeting with the FDA and our manufacturing inspections. *We're very pleased with the outcome of those interactions, and we believe there are no impediments. We're on track for our July 22 PDIFA*.

**Defendant Patel**: And Jonathan, just to address your second question. And yes, you're right, it's the first call, which we're very excited about. So, in terms of the data that we've seen for IGNYTE, just as a reminder, we've seen around patient 1/3 of patients achieved durable responses, which you look at median duration response of more than 20 months. This is a single-arm study, as you're aware. And so obviously, there are some limitations of PFS and OS in this study. *However, we've seen a PFS of around 4 months and the overall survival, which I think is actually very impressive*, where we've seen more than about 55% of patients still alive at 3 years. And so, we think that's going to be very meaningful relative to other options in this space.

You asked about the benchmarks we should be using. *And I think it is important to remember that the IGNYTE did use a very strict criteria for anti-PD1 failure*, and there is an exact apples-to-apples comparisons. But if you think about some of the other studies and assets or molecules used in this space, such as ipi/nivo or Opteolag having failed either ipi/nivo or Opteolag in the frontline setting, you see about a 12% response rate. And typically, physicians and KOLs will tell you would not expect to see median overall survival of more than 12 months.

So, I think that's a reasonable benchmark that most people use. Further checkpoint inhibition after failure of prior checkpoint inhibition really only results in a response rate of 6% or 7% with very modest overall survival benefits.

29.     The Q4 2025 Call also included the following, separate exchange:

**Analyst**: Good morning. Thanks, guys, for taking my question. Just on the confirmatory IGNITE3 trial, I think you initiated dosing of patients last summer. So, could you just talk to your experience to date with that trial and what you're seeing in terms of enrollment, opening of trial sites and things like that. And just expectations on a time line for completing enrollment. Any color there would be helpful.

And second, could you talk to your expectations on the potential label or label discussions for RP1? And just what gives you confidence in a broad label and achieving broad access? Thank you.

**Defendant Patel**: *So, just in terms of IGNYTE* or IGNYTE3, just as a reminder for people, *this is a large randomized study[,]* a confirmatory Phase III trial with 400 patients where we're combining RP1 with nivolumab versus limited dealers' choice, which includes [indiscernible], chemotherapy or single-agent checkpoint inhibition*. This is a trial that's going to have more than 100 sites globally. And as you can imagine, we've been providing the agency the updates on the timelines for the overall study and enrollment updates on a regular basis*.

9

> ***We expect the trial to take a couple of years to complete enrollment given the study population and size of the study***. But -- and as you can imagine, right now, we're ***intentionally focusing on enrolling in U.S. sites given the upcoming PDUFA, and when we realize that at approval patients will not want to be randomized into the control arm***. So, given that we're really focusing our efforts and driving enrollment in the U.S., it's going very well. There's a lot of excitement around the trial. And what we're actually now doing is spending a lot of time on the rest of world expansion.
>
> So, at PDUFA, we would continue to see enrollment in that study in countries such as The U.K, Australia and Europe. And again, there's equally high-level excitement from ex U.S. Investigators around the trial. We look forward to speaking to many of them at the upcoming ASCO meeting. And then you asked the second question, I believe, on the broad label. Is that correct?
>
> Analyst: Yes.
>
> Defendant Patel: [. . .] Just as a reminder, ***IGNYTE, we enrolled a real-world population, which included really pretty much every type of anti PD1 felt presentation. We saw consistent benefit across all the subgroups.***
>
> So, we would expect the label and as you know, now that we finished the late cycle meeting, we'll be going into labeling discussions to very much reflect the study population that we investigated in the INITRAL and would expect a label to reflect that broad population.

30. The statements made by Defendants Hill and Patel in ¶¶ 28 and 29 were materially false and misleading at the time they were made because Defendants Patel and Hill knew or should have known that the biologics license application ("BLA") submitted to the FDA for RP1 would not be approved as a result of omitted material issues, such as that the IGNYTE trial was not "an adequate and well-controlled clinical investigation."

31. The statements contained in ¶¶ 19, 20, 23, 26, and 28-29 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants recklessly overstated the IGNYTE trial's prospects, given material issues that Defendants knew or should have known of,

which resulted in the FDA deeming the IGNYTE trial inadequate and not well-controlled; and (2) as a result, Defendants' statements about Replimune's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

32. On July 22, 2025, before the market opened, Replimune issued a press release entitled "Replimune Receives Complete Response Letter from FDA for RP1 Biologics License Application for the Treatment of Advanced Melanoma." It stated the following:

> [Replimune], a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced that the U.S. Food and Drug Administration (FDA) has issued a Complete Response Letter (CRL) regarding the Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of advanced melanoma.
>
> ***The CRL indicates that the FDA is unable to approve the application in its present form.*** The FDA has indicated ***that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness***. Furthermore, the FDA said the trial cannot be adequately interpreted due to the heterogeneity of the patient population. ***The CRL also states that there are items related to the confirmatory trial study design which need to be addressed, including contribution of components. Importantly, no safety issues were raised***.
>
> The Company will request a Type A meeting ***and expects it will be granted within 30 days.*** Replimune plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of RP1 without which the development of RP1 for advanced cancer patients with limited options will not be viable.

33. On this news, the price of Replimune stock plummeted by $9.52 per share, or 77.24%, to close at $2.80 per share on July 22, 2025.

34. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Replimune securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Replimune, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Replimune securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Replimune;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Replimune to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Replimune securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Replimune shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, Replimune filed periodic public reports;

- Replimune regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Replimune's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Replimune was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

42. Based on the foregoing, the market for Replimune securities promptly digested current information regarding Replimune from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

44. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Replimune securities during the Class Period.

48. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Replimune were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

15

These defendants by virtue of their receipt of information reflecting the true facts of Replimune, their control over, and/or receipt and/or modification of Replimune's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Replimune, participated in the fraudulent scheme alleged herein.

49. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Replimune personnel to members of the investing public, including Plaintiff and the Class.

50. As a result of the foregoing, the market price of Replimune securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Replimune securities during the Class Period in purchasing Replimune securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

51. Had Plaintiff and the other members of the Class been aware that the market price of Replimune securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Replimune securities at the artificially inflated prices that they did, or at all.

52. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

53. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Replimune securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

54. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. During the Class Period, the Individual Defendants participated in the operation and management of Replimune, and conducted and participated, directly and indirectly, in the conduct of Replimune's business affairs. Because of their senior positions, they knew the adverse non-public information about Replimune's business practices.

56. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Replimune's financial condition and results of operations, and to correct promptly any public statements issued by Replimune which had become materially false or misleading.

57. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Replimune disseminated in the marketplace during the Class Period concerning Replimune's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Replimune to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling

persons" of Replimune within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Replimune securities.

58. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Replimune.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 24, 2025　　　　　　　　　　　　**THE ROSEN LAW FIRM, P.A.**
/s/ Joshua Baker
Joshua Baker, Esq. (BBO # 695561)
101 Greenwood Ave., Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com

        Phillip Kim, Esq. (*pro hac vice* to be submitted)
        Laurence M. Rosen, Esq. (*pro hac vice* to be submitted)
        275 Madison Avenue, 40th Floor
        New York, NY 10016
        Telephone: (212) 686-1060
        Fax: (212) 202-3827
        Email: philkim@rosenlegal.com
               lrosen@rosenlegal.com

*Counsel for Plaintiff*