# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| USAMA JBOOR, Individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>REPLIMUNE GROUP, INC., SUSHIL PATEL, EMILY HILL,<br><br>      Defendants. | **Case No: 25-cv-12085-JEK**<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Kevin Bond and Plaintiffs Timothy Schirmer and Gaurav Jain ("Plaintiffs"), individually and on behalf of persons or entities who purchased or otherwise acquired publicly traded Replimune common stock between May 19, 2022 and July 21, 2025, inclusive (the "Class Period") and were damaged thereby, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Replimune Group, Inc. ("Replimune" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

---

[1] Unless otherwise stated, all emphasis is added.

1

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a securities fraud class action arising from Defendants' systemic concealment of a make-or-break regulatory reality: that the commercial viability of the Company's lead drug candidate, RPI, hinged entirely on a single, high-risk FDA approval pathway. Throughout the class period, Defendants publicly suggested that this optional, high-risk pathway—*i.e.*, the "Accelerated Approval" pathway—was merely **one** of several potential options available for Replimune's leading drug candidate, RP1. Privately, however, Defendants knew—and failed to disclose—that the accelerated pathway was the **only** path through which Replimune could develop and commercialize its experimental, new anti-cancer treatment. When the truth finally emerged and the market learned the true extent of Replimune's regulatory risks, Replimune's share price cratered, resulting in massive financial losses for the investors.

2.    Replimune is a development stage biotechnology company with the singular mission of developing and commercializing its proprietary immunotherapy platform called RPx. The RPx platform is engineered to selectively kill certain cancer cells, and Replimune's leading drug candidate using this platform is RP1—a drug claimed to have promising results with respect to treatment-resistant melanomas.

3.    Since at least May 2022, Replimune told investors that it would attempt to expedite the regulatory approval process for RP1 by using the U.S. Food and Drug Administration's "Accelerated Approval" pathway. This pathway allows biotech companies to obtain conditional approval of their drugs based on preliminary data, with the expectation that they will complete confirmatory studies while the drug is marketed. In simple terms, companies allowed to use the accelerated approval pathway can get their new drugs to market faster.

4.      Defendants repeatedly suggested to investors that the accelerated approval pathway was one pathway that Replimune was seeking to obtain necessary regulatory approval. Additionally, in many public statements, Defendants specifically told investors that the FDA may not allow Replimune to use the accelerated approval pathway for RP1, and the impact that decision would have on RP1, including the possible need for additional testing before a potential commercial release.

5.      However, despite their frequent and detailed public statements on RP1's regulatory prospects, Defendants repeatedly concealed from investors a crucial fact—that Accelerated Approval was not only an advantageous pathway, it was the ***only*** way that RP1 could be viable. This material omissions misled investors and violated Defendants' obligations to fully disclose the significance of the risks that faced the company. Defendants—including Replimune's chief corporate executives whose core duties involved overseeing RP1's regulatory development and funding runway, and commented frequently on these topics—studiously concealed from investors the fact that RP1 would not be viable without Accelerated Approval throughout the class period.

6.      Defendants only revealed this crucial truth on July 21, 2025. That day, the Company announced that the FDA had rejected Replimune's accelerated approval application. In the same press release announcing this news, the Company reported for the first time that without "the timely accelerated approval of RP1 … the development of RP1 for advanced cancer patients with limited options will not be viable."

7.      On this news, the price of Replimune stock plummeted by $9.52 per share, or 77.24%, to close at $2.80 per share on July 22, 2025, and harming investors.

8.    As a result of Defendants' material misrepresentations and omissions, which caused the Company's artificially inflated stock price to collapse upon the revelation of the truth, Plaintiffs and the Class have suffered damages for which this action seeks redress.

## II.    JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

12.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Named Plaintiffs

13.    Lead Plaintiff Kevin Bond, as set forth in the previously filed certification, incorporated by reference herein, purchased Replimune common stock during the Class Period and was economically damaged thereby.

14.     Plaintiff Timothy Schirmer as set forth in the previously filed certification, incorporated by reference herein, purchased Replimune common stock during the Class Period and was economically damaged thereby.

15.     Plaintiff Gaurav Jain, as set forth in the certification attached as Exhibit A, purchased Replimune common stock during the class period and was damaged thereby.

### B.    <u>Corporate Defendant</u>

16.     Defendant Replimune describes itself as follows:

[Replimune] was founded in 2015 with the mission to transform cancer treatment by pioneering the development of novel oncolytic immunotherapies. Replimune's proprietary RPx platform is based on a potent HSV-1 backbone intended to maximize immunogenic cell death and the induction of a systemic anti-tumor immune response. The RPx platform is designed to have a unique dual local and systemic activity consisting of direct selective virus-mediated killing of the tumor resulting in the release of tumor derived antigens and altering of the tumor microenvironment to ignite a strong and durable systemic response. The RPx product candidates are expected to be synergistic with most established and experimental cancer treatment modalities, leading to the versatility to be developed alone or combined with a variety of other treatment options.

17.     Pertinent to this action is the Company's IGNYTE trial, the purpose of which is to treat skin cancer.

18.     RP1, as mentioned below, is described by the Company as follows:

RP1 (vusolimogene oderparepvec) is Replimune's lead product candidate and is based on a proprietary strain of herpes simplex virus engineered and genetically armed with a fusogenic protein (GALV-GP R-) and GM-CSF, intended to maximize tumor killing potency, the immunogenicity of tumor cell death, and the activation of a systemic anti-tumor immune response.

19.     Defendant Replimune is incorporated in Delaware and its head office is located at 500 Unicorn Park Drive, Woburn, Massachusetts 01801.

20.     Replimune's common stock trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "REPL".

21.     Since Replimune's inception, the development and commercialization of its RPx platform, including RP1, has been of the utmost importance to the company. As Replimune's SEC filings confirm, to date, the company has brought no products to market. Instead, "[a]ll of [its] product candidates are in research or development." Moreover, to date, the Company has "never generated any revenue from product sales and may never be profitable." This is because Replimune's "ability to generate any revenues from the sale of [its] product candidates will depend heavily on the successful development, regulatory approval and commercialization of one or more of these product candidates using our RPx platform."

22.     Additionally, Replimune has stated multiple times that, even though the Company expects to be funded through at least the middle of 2026, it "will require additional financing to achieve [its commercialization]" goals. To that end, throughout the Class Period, Replimune has multiple registration statements for the purpose of raising money through the sale of Replimune securities. In June 2022, for example, the Company filed a Form S-3 to notify its intent to sell up to $400 million worth of securities. In November 2025, the Company reported having nearly $323.6 million in cash-on-hand, enabling the Company to fund its "operating expenses and capital expenditure requirements through at least 12 months." Additionally, the Company filed an amended registration statement, allowing the Company to offer and sell up to $250 million worth of securities instruments, for further funding.

### C.    **Individual Defendants**

23.     Defendant Sushil Patel ("Patel") has served as the Company's CEO since April 1, 2024. Prior to that time, he served as the Company's Chief Strategy Officer from January 2023 to April 2024 and Chief Commercial Officer from May 2021 to January 2023. Prior to joining

Replimune, Patel served as VP, Franchise Head for Lung, Skin, Tumor Agnostic, and Rare Cancers at Genentech, Inc. since April 2018.

24.     Defendant Emily Hill ("Hill") has served as the Company's Chief Financial Officer ("CFO") since September 2023. Before that time she served as the Chief Financial Officer of PTC Therapeutics, Inc. since June 2019, and previously held various positions of increasing responsibility at PTC Therapeutics, Inc. since 2013.

25.     Defendant Phillip Astley-Sparke is one of Replimune's co-founders and also serves as the Executive Chairman of its Board—a position he transitioned to in April 2024 after serving as Replimune's CEO from January 2020 to April 2024. From 2016 until June 2021, Mr. Astley-Sparke served as Chairman of uniQure N.V., a Nasdaq-listed gene therapy company. From 2013 to 2015, Astley-Sparke served as uniQure N.V.'s President of U.S. operations, where he established its U.S. infrastructure. Mr. Astley-Sparke served as Vice President and General Manager at Amgen, Inc. until December 2011, following Amgen Inc.'s acquisition of BioVex Group, Inc. in March 2011. Astley-Sparke was previously President and Chief Executive Officer of BioVex Group, Inc. Prior to BioVex Group, Inc., Mr. Astley-Sparke was a healthcare investment banker at Chase H&Q and qualified as a Chartered Accountant with Arthur Andersen LLP.

26.     Defendant Robert Coffin is one of Replimune's co-founders and served as its Chief Research and Development Officer from 2020 to April 1, 2024. Previously, Coffin was Founder & CTO of BioVex Inc., a spin-out from his research group at University College London in 1999. BioVex was acquired by Amgen in 2011, where Coffin served as the Vice President of Global Development until 2013, before co-founding Replimune in 2015.

27.     Defendants Patel, Hill, Astley-Sparke, and Coffin are collectively referred to herein as the "Individual Defendants."

28.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

29.     Replimune is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

30.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Replimune under *respondeat superior* and agency principles.

31.    Defendant Replimune and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.    FACTUAL BACKGROUND

### A.    The Drug Development Process

32.    As described by the FDA, the development of a successful drug is a multistep process.

33.    **Step 1: Discovery and Development.** The first step in drug development is the discovery of the new drug it. Researchers can discover new drugs through several mechanisms, including through new research insight, testing new molecular compounds, or observing unanticipated effects by pre-existing drug treatments. At the discovery stage, a drug company could be experimenting with thousands of compounds as potential candidates for development as medical treatments. After early testing, the drug company will typically narrow its focus to a small number for detailed experimentation.

34.    **Step 2: Preclinical Research.** Before testing a new drug in humans, researchers must first assess its potential to cause harm in preclinical testing. The two primary types of preclinical research are in vitro and in vivo research. In vitro preclinical research tests potential drugs or treatments on cells, tissues, or microorganisms in a controlled lab setting. In vivo preclinical research involves testing new drugs, therapies, or devices in whole, living organisms (like animal models.)

35.    **Step 3: Clinical Research.** When preclinical research supports that a new drug may be safe for humans, a drug developer may then begin testing how the drug interacts with actual human bodies. Clinical research refers to the broad collection of studies done on actual people. Researchers will design clinical trials to answer specific research questions related to

the new medical drug. As part of this design process, they will decide, among other things: (i) who can participate in the studies; how long the study will last; whether there will be a control group or other ways to limit bias; and how data will be collected.

36.    As shown in the chart below, the clinical research step involves multiple phases:



37.    **Step 4: FDA Review.** If a drug developer has evidence from its early tests and preclinical and clinical research that a drug is safe and effective for its intended use, the company can file an application to market the drug. As discussed in the next section, a drug developer can seek approval of their new drug along several regulated pathways.

38.    **Step 5: FDA Post-Market Safety Monitoring.** Despite the rigorous steps in the process of drug development, limitations exist. Therefore, FDA reviews reports of problems with prescription and over-the-counter drugs and can decide to add cautions to the dosage or usage information, as well as other measures for more serious issues.

**B.    FDA Accelerated Approval Pathway**

39.     The U.S. Food and Drug Administration ("FDA") administers an Accelerated Approval pathway that permits earlier approval of certain drugs and biologics intended to treat serious or life-threatening conditions for which there is an unmet medical need.

40.     Under a normal approval process, a product can only be approved based on evidence of actual clinical benefit, established by a Phase III trial. Under Accelerated Approval, the FDA may approve a product based on evidence from early- or mid-stage clinical trials demonstrating an effect on a "surrogate endpoint"[2] or an intermediate clinical endpoint that is "reasonably likely to predict clinical benefit," rather than on direct evidence of improvement in survival or other definitive clinical outcomes.

41.     In practice, accelerated approvals are frequently based on data from Phase II clinical trials, including single-arm or non-randomized studies, or from early Phase III trials that have not yet demonstrated statistically significant results on traditional clinical endpoints. The Accelerated Approval pathway was initially adopted in 1992, in part to expedite access to treatments for HIV/AIDS, and has since been codified by Congress and incorporated into the FDA's broader framework of expedited review programs.

42.     For drug manufacturers, Accelerated Approval provides a regulatory mechanism to obtain FDA approval and begin commercial marketing prior to completion of traditional Phase III confirmatory trials. Under the FDA's standard drug development framework, Phase I trials primarily assess safety and dosing, Phase II trials evaluate preliminary efficacy and continued safety in a limited patient population, and Phase III trials are designed to confirm clinical benefit

---

[2] A "surrogate endpoint" refers to an objective measure that is not directly a measure of a medical benefit, but is reasonably likely to predict a medical endpoint. For instance, lowered cholesterol could be considered a surrogate endpoint for reduced heart attack risk.

in larger, typically randomized and controlled studies. Accelerated Approval allows sponsors to rely on Phase II data or interim Phase III data to secure approval, significantly shortening development timelines and permitting earlier revenue generation while more definitive trials remain ongoing.

43.     While Accelerated Approval allows a drug to be marketed before completion of Phase III trials, it does not eliminate the need for them. Rather, it allows companies to market drugs while mandatory post-marketing confirmatory trials are ongoing. These are typically conducted as Phase III or Phase IV studies. These trials are intended to verify and describe the anticipated clinical benefit suggested by the surrogate or intermediate endpoint relied upon at approval. If the required confirmatory trials fail to demonstrate clinical benefit, are not completed with due diligence, or yield negative results, the FDA retains authority to withdraw approval or modify the drug's labeling. Accordingly, Accelerated Approval represents a conditional regulatory determination, dependent on the successful completion of later-stage clinical trials demonstrating actual patient benefit.

44.     At the same time, failure to obtain Accelerated Approval does not preclude a drug from proceeding through the FDA's conventional approval pathway. A sponsor that is unable to secure Accelerated Approval may continue clinical development, including completion of traditional Phase III trials designed to demonstrate direct clinical benefit, and may ultimately seek approval under the FDA's standard review process. As a result, absent specific disclosures to the contrary, a reasonable investor would not necessarily understand Accelerated Approval to be existential to a company or its product candidate, but rather as a potential means of expediting market entry and advancing commercialization timelines. In the absence of clear warning, investors would reasonably assume that the conventional approval pathway remained available if

Accelerated Approval were delayed or denied, and would therefore view representations concerning Accelerated Approval in the context of timing, risk, and interim valuation rather than as determinative of a product's ultimate approvability.

### C.    Company Background

45.    Replimune Group, Inc. is a clinical-stage biotechnology company focused on the research, development, and commercialization of oncolytic immunotherapies--that is, human altered viruses designed to selectively target and destroy tumor cells while stimulating anti-tumor immune responses. The Company is organized with a single operating purpose—bringing its proprietary technology platform, referred to as the RPx platform, to market. This platform is based on a genetically engineered herpes simplex type 1 virus (HSV-1).

46.    To date, the company has brought no products to market. Instead, "[a]ll of [its] product candidates are in research or development." Moreover, to date, the Company has "never generated any revenue from product sales and may never be profitable."  This is because Replimune's "ability to generate any revenues from the sale of [its] product candidates will depend heavily on the successful development, regulatory approval and commercialization of one or more of these product candidates using our RPx platform."

### D.    Development of RP1

47.    Replimune's lead product candidate has been RP1, also known as vusolimogene oderparepvec, which has been evaluated in melanoma and other solid tumors.

48.    Replimune advanced RP1 through a series of clinical studies collectively referred to as the IGNYTE program, which evaluated RP1 as a standalone therapy and in combination with nivolumab, an existing cancer treatment. From a regulatory perspective, the IGNYTE studies constituted late Phase 1 and Phase 2 clinical development, meaning they were primarily designed to evaluate safety, dosing, and preliminary evidence of anti-tumor activity, rather than to

definitively establish clinical benefit. In practical terms, these studies addressed whether RP1 could be administered safely and whether it caused tumors to shrink, not whether it improved survival compared to alternative treatments.

49.    Before November 21, 2024, the most important clinical data Replimune had reported for RP1 came from a specific group of patients treated in a so-called "registrational cohort" within the broader IGNYTE clinical trial program. This cohort was treated and analyzed over several years leading up to mid-2024 and was identified by Replimune as the principal evidentiary basis for its regulatory strategy.

50.    The registrational cohort functioned as a Phase 2, single-arm clinical study, meaning that all enrolled patients received RP1 (in combination with nivolumab) and that no control or comparison group was included. The study was therefore designed to assess preliminary anti-tumor activity—such as whether tumors shrank and how long any responses lasted—rather than to definitively determine whether RP1 improved survival or outperformed other available treatments.

51.    The patients enrolled in this cohort had advanced melanoma and had already experienced disease progression after treatment with prior anti-PD-1 therapies. In other words, these patients had exhausted other treatment options.

52.    A single-arm study means that all enrolled patients received RP1 in combination with nivolumab and that no control or comparator group was included. The primary endpoint of this cohort was objective response rate (ORR), assessed using modified RECIST 1.1 criteria, which measures the percentage of patients whose tumors shrink by a predefined amount. See ClinicalTrials.gov, NCT03767348; Replimune Press Release, June 6, 2024, available at

https://ir.replimune.com/news-releases/news-release-details/replimune-announces-positive-topline-primary-analysis-data.

53.    Because the registrational cohort was a single-arm study without a comparator, it was not designed to compare RP1 to another therapy or to a standard of care. As a result, the study could not generate measures of statistical significance demonstrating superiority or inferiority relative to another treatment. Instead, the reported outcomes consisted of descriptive statistics, such as observed response rates and duration of response, rather than statistically significant comparative results.

54.    By mid-2024, Replimune reported that approximately one-third of patients in the registrational cohort experienced an objective tumor response and that those responses were often durable, lasting several months or longer. While these findings were presented as evidence of anti-tumor activity in a heavily pretreated population, the study did not demonstrate improved overall survival or other definitive clinical outcomes, nor did it establish comparative efficacy versus other therapies through randomized or statistically controlled analysis.

55.    Based on these Phase 2-level, single-arm results, Replimune pursued a regulatory strategy focused on Accelerated Approval. At the same time, Replimune initiated IGNYTE-3, a Phase 3, randomized, controlled clinical trial intended to evaluate whether RP1 plus nivolumab improves meaningful clinical outcomes, including overall survival, compared to other treatment options.

56.    Since at least 2021, Replimune told investors that it was seeking to obtain approval of RP-1 through an accelerated approval pathway. Crucially, however, at no point prior to the failure of accelerated approval did Replimune admit to investors that, without accelerated approval, RP1 would become economically unviable for Replimune. This gave investors the false

and misleading impression that while accelerated approval would be advantageous to Replimune, it was not life-or-death for the development of RP1, and that in the absence of accelerated approval, Replimune could still ultimately obtain approval of RP1 upon completion of its Phase 3 trial.

### E.    Required Reporting of Risk Factors under Item 105

57.    17 CFR § 229.105 requires issuers of securities to provide "under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 CFR § 229.105. In addition, issuers are required to "[c]oncisely explain how each risk affects the registrant or the securities being offered."

58.    While Defendants disclosed that there was a risk that RP1 might not receive Accelerated Approval, they wholly misrepresented how that risk would affect Replimune. Rather than acknowledge that, without accelerated approval, development of RP1 would not be viable, Replimune falsely stated that failure to obtain Accelerated Approval would merely require them to conduct additional clinical trials. This materially misled investors as to the severity of the risk inherent in their pursuit of the Accelerated Approval pathway.

## V.    Materially False and Misleading Statements Issued During the Class Period

### A.    2022 Annual Report

59.    On May 19, 2022, Replimune filed its annual report for the fiscal year ended March 31, 2021 with the SEC on form 10-K (2022 10-K). The 2022 10-K was signed by Defendants Astley-Sparke and Coffin.

60.    In its risk disclosures, the 2022 Annual Report stated, in pertinent part, that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in

granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

61.     The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

62.     In addition, the 2022 10-K stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

63.     The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**B.     Q1 2023 Quarterly Report**

64.     On August 4, 2022, Replimune filed its quarterly report for the quarter ended June 30, 2022 with the SEC on Form 10-Q ("Q1 2023 10-Q). The Q1 2023 10-Q was signed by Defendant Astley-Sparke.

65.     In its risk disclosures, the Q1 2023 10-Q stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide

17

sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

66.     The foregoing statement was misleading because they materially misrepresented

the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1,

characterizing the consequence of that risk merely requiring more trials, when in reality, a failure

of Accelerated Approval would render development of RP1 unviable.

67.     In addition, the Q1 2023 10-Q stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

68.     The foregoing statement was misleading because it failed to disclose the risk that

if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**C.      Q2 2023 Quarterly Report**

69.     On November 3, 2022, Replimune filed its quarterly report for the quarter ended

September 30, 2022 with the SEC on Form 10-Q ("Q2 2023 10-Q). The Q2 2023 10-Q was signed

by Defendants Astley-Sparke.

70.     In its risk disclosures, the Q2 2023 10-Q also stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies**. By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

71.     The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

72.     In addition, the Q1 2023 10-Q stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

73.     The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**D.     Q3 2023 Quarterly Report**

74.     On February 9, 2023, Replimune filed its quarterly report for the quarter ended December 31, 2022 with the SEC on Form 10-Q ("Q3 2023 10-Q). The Q3 2023 10-Q was signed by Defendant Astley-Sparke.

75.     In its risk disclosures, the Q3 2023 10-Q stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

76.     The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1,

characterizing the consequence of that risk merely requiring more trials, when in reality, a failure

of Accelerated Approval would render development of RP1 unviable.

77.     In addition, the Q3 2023 10-Q stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable,
additional clinical trials, analyses, reports, data, or preclinical trials, or we may
abandon product development programs. By example, the FDA may determine that
larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical
trials designed to replicate results found in our registrational or pivotal trials are
required before we may file a BLA or before the FDA will approve a marketing
application;

78.     The foregoing statement was misleading because it failed to disclose the risk that

if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**E.     2023 Annual Report**

79.     On May 18, 2023, Replimune filed its annual report for the fiscal year ended March

31, 2023 with the SEC on form 10-K (2023 10-K). The 2023 10-K was signed by Defendants

Astley-Sparke and Coffin.

80.      In its risk disclosures, 2023 10-K stated that:

**the FDA may decide that our intended pathways, including accelerated
approval, are not appropriate for our product candidates, requiring that we
conduct additional studies.** By example, in recent years the accelerated approval
pathway has come under significant FDA and public scrutiny. Accordingly,
depending on the results of our studies, the FDA may be more conservative in
granting accelerated approval or, if granted, may be more apt to withdrawal
approval if clinical benefit is not confirmed. Even if accelerated approval is
granted, payors, including governmental payors, may be less welling to provide
sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

81.     The foregoing statement was misleading because they materially misrepresented

the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1,

characterizing the consequence of that risk merely requiring more trials, when in reality, a failure

of Accelerated Approval would render development of RP1 unviable.

82.     In addition, the 2023 10-K stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

83.     The foregoing statement was misleading because it failed to disclose the risk that

if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

F.     **Q1 2024 Quarterly Report**

84.     On August 3, 2023, Replimune filed with the SEC its quarterly report for the

quarter ended June 30, 2023 with the SEC on Form 10-Q ("Q1 2024 10-Q). The Q1 2024 10-Q

was signed by Defendant Astley-Sparke.

85.     In its risk disclosures, the Q1 2024 10-Q stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

86.     The foregoing statement was misleading because they materially misrepresented

the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1,

characterizing the consequence of that risk merely requiring more trials, when in reality, a failure

of Accelerated Approval would render development of RP1 unviable.

87.     In addition, the Q1 2024 10-Q stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable,

additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

88.    The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**G.    Q2 2024 Quarterly Report**

89.    On November 7, 2023, Replimune filed its quarterly report for the quarter ended September 30, 2023. with the SEC on Form 10-Q ("Q2 2024 10-Q). The Q2 2024 10-Q was signed by Defendants Astley-Sparke and Hill.

90.    In its risk disclosures, the Q2 2024 10-Q stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

91.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

92.    In addition, the Q2 2024 10-Q stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical

trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

93.    The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**H.    Q3 2024 Quarterly Report**

94.    On February 8, 2024, Replimune filed its quarterly report for the quarter ended December 31, 2023 with the SEC on Form 10-Q ("Q3 2024 10-Q). The Q1 2024 10-Q was signed by Defendants Astley-Sparke and Hill. The Q1 2024 10-Q.

95.    In its risk disclosures, the Q3 2024 10-Q stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

96.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

97.    In addition, the Q3 2024 10-Q stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

98.     The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**I.     2024 Annual Report**

99.     On May 16, 2024, Replimune filed its annual report for the fiscal year ended March 31, 2023 with the SEC on Form 10-K (2024 10-K). The 2024 10-K was signed by Defendants Patel, Hill, and Astley-Sparke.

100.    In its risk disclosures, the 2024 10-K stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

101.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

102.    In addition, the 2024 10-K stated, in pertinent part, that

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

103.    The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**J.    Q1 2025 Quarterly Report**

104.    On August 8, 2024, Replimune filed its quarterly report for the quarter ended June 30, 2024 with the SEC on form 10-Q ("Q1 2025 10-Q). the Q1 2025 10-Q was signed by Defendants Patel and Hill.

105.    In its risk disclosures, the Q1 2025 10-Q stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

106.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

107.    In addition, the Q1 2025 10-Q stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**K.**    **Q2 2025 Quarterly Report**

108.    On November 12, 2024, Replimune filed its quarterly report for the quarter ended September 30, 2024 (Q2 2025 Quarterly Report). The Q2 2025 Quarterly Report was signed by Defendants Patel and Hill.

109.    In its risk disclosures, the Q2 2025 10-Q stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

110.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

111.    In addition, the Q2 2025 10-Q stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

112.    The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**L.    Q3 2025 Quarterly Report**

113.    On February 12, 2025, Replimune filed its quarterly report for the quarter ended December 31, 2024 with the SEC on Form 10-Q ("Q3 2025 10-Q"). The Q3 2025 10-Q was signed by Defendants Patel and Hill.

114.    In its risk disclosures, the Q3 2025 10-Q stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

115.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

116.    In addition, the Q1 2025 10-Q stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application;

117.    The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

M.    **2025 Annual Report**

118.    On May 22, 2025, Replimune published its annual report for the fiscal year ended March 31, 2024. Therein, Replimune repeated the same false or misleading statements it made in its May 2024 Annual Reports.

119.    In its risk disclosures, the 2025 10-K stated that:

**the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

(emphasis added)

120.    The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

121.    In addition, the 2025 10-K stated, in pertinent part, that:

we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve or maintain a marketing application;

122.    The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

## VI.    Additional Allegations in Support of Scienter

123.    Numerous additional facts give rise to a strong inference that Replimune and the Individual Defendants knew, or were deliberately reckless in not knowing, that their statements about RP1's regulatory pathways were false and misleading or omitted material facts necessary to make them not misleading when made.

### A.    Additional Facts in Support of Defendant Patel's Scienter

124.    ***Patel was directly and extensively involved in developing and obtaining regulatory approval for RP1.*** Throughout the Class Period, Defendant Patel was one of the primary executives of Replimune and was one of the ultimate decision makers on matters vital to RP1's development, regulatory approval, and commercialization. Since April 1, 2024, he has served as Replimune's CEO. He also sits on Replimune's Board of Directors. Before becoming CEO, Patel served as Replimune's Chief Commercial and Chief Strategy Officers. Over the course of his career, he has aggregated more than 20 years of experience in the biotech industry, including the specific areas of pre- and post-launch commercialization strategy and execution in both the U.S. and global markets. As chief commercial officer, Patel lead Replimune's commercial team including launch readiness initiatives and play a key role in the development and execution of the Company's "go to market" strategy. In announcing this appointment, the Company celebrated Patel's "wealth of experience in immuno-oncology and an incredible track record of success in defining and implementing launch strategies." And Patel himself noted RP1's registration-directed clinical trials as the groundwork for his plans to "build an innovative and comprehensive commercial strategy." Similarly, in the press announcing his appointment as CEO, Patel specifically noted he would be focusing on data collection for RP1 and Replimune's subsequent license application submission for RP1. Since becoming CEO, he has demonstrated

his commitment to and knowledge of the development goal in his multiple public statements, including multiple, detailed interviews he has given with science media outlets like Biotech TV about RP1 and its clinical data. These highly knowledgeable statements, presumably from personal knowledge or reports, assured investors that Patel (and his subordinates) were hands-on managers who were actively involved in RP1's development and regulatory approval pathways.

125.    ***Patel acknowledged that regulatory approval of RP1 was core to Replimune' s ongoing operations.*** As discussed above, in the press release announcing his appointment as CEO, Likewise, in November 2024, in a press release announcing that Replimune had filed its BLA for RP1 under the accelerated approval pathway, Patel remarked that effort was "an important milestone for Replimune."

126.    ***Patel's repeated statements to the public about RP1's development and regulatory history demonstrate his knowledge or recklessness.*** In addition to false statements identified above, Patel has frequently fielded questions about RP1's timeline and history, and given detailed answers in response. He also provided such information in interviews with media outlets. As just one example, on July 23, 2025, shortly after Replimune received a CRL from the FDA, Patel provided a 20-minute interview to Biotech TV, during which he walked through the decisions behind the design of RP1's clinical studies and its interactions with the FDA. He also demonstrated his extensive knowledge of RP1's science by commenting, for example, on minor changes that Replimune could implement to its IGNYTE studies to remedy issues identified by the FDA. His public statements on these matters further reinforce the inference that they were intimately involved in directing and/or overseeing Replimune's strategy for regulatory approval and were involved in and/or knowledge of Replimune's interactions with the FDA.

127. ***Patel was informed at internal meetings and had access to internal contemporaneous reports and data that contradicted his statements to investors***. By signing and authorizing SEC filings and press releases that directed investors to the Company's website for more information about Replimune and its platform, Patel represented that he had reviewed, approved of, and authorized the statements made on the website. Because of this position of control and authority, his ability to exercise power and influence over Replimune' s conduct and his access to material inside information about RP1 during the Class Period, RP1, at the time of the wrongs alleged herein, Patel was a controlling person within the meaning of Section 20(a) of the Exchange Act. Due to Patel's participation in interacting with the Board of Directors and keeping it informed, he had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Through his position, Patel also attended meetings, as well as received, reviewed and had access to reports and data relevant to the material and omitted fact that Replimune could not develop RP1 without access to the accelerated approval pathway.

128. **As CEO and Replimune's Chief Operating Decision Maker ("CODM"), Defendant Patel was acutely aware of, and the chief decisionmaker on decisions relating to, the long-term financial viability of RP1.** As CEO and CODM, Patel served as the most senior person at Replimune charged with managing the Company's operating cash flows to develop and market its RPx platform over a multi-year window. In those roles, Patel steered the Company through cash-raising events, including a public offering in November 2024—the same month Replimune filed its BLA for RP1. Patel spoke publicly about the Company's finances, including in a January 2025 call with investors. And he signed quarterly SEC reports disclosing the Company's present and near-term financial circumstance. According to Replimune's Annual

Reports, before these SEC filings were submitted, Patel "reviews consolidated operating results, and uses the Company's consolidated net income (loss), in order to monitor actual results as compared to the budget, and to determine how best to allocate the Company's operating and capital resources, specifically as it relates to the Company's development programs."

129.     Indeed, Replimune and Patel confirmed Patel's acute awareness of RP1's viability after the fact. Specifically, after the truth emerged that the development of RP1 may not be viable without the accelerated approval pathway, Replimune began disclosing in multiple places in its SEC filings (signed by Patel) that the financial estimates in the SEC filings (which Patel had reviewed prior to signing "were based on assumptions that may prove to be wrong, including the assumption that the development of RP1 will remain viable, and the Company could utilize its available capital resources sooner than expected." Additionally, Patel personally affirmed that RP1's viability was contingent on Accelerated Approval in a September 2025 press release, in which he said "We remain steadfastly committed to patient access while we work with the FDA to secure regulatory approval for RP1, however, without accelerated approval based on the current application, continuation of the RP1 program in advanced melanoma, including the phase 3 confirmatory trial, will not be viable."

### B.      Additional Facts in Support of Defendant Hill's Scienter

130.     ***Hill understood that regulatory approval of RP1 was core to Replimune's ongoing operations.*** Defendant Emily Hill has served as Replimune's chief financial officer since 2023. Before, she worked as the CFO of PTC Therapeutics, where she supported the company's growth from clinical to commercial stage. Before PTC, she worked in several investor relations roles and as an equity researcher. In the press release announcing her joining Replimune, Defendant Hill noted that the Company was "on the cusp of major value inflection points with

data from two [anticipated] potentially registrational trials" and noted her focus would be in "applying [her] expertise and experience to help Replimune continue its growth and make the transition from a clinical to commercial stage company."

131. ***Hill was informed at finance meetings and had access to internal contemporaneous reports and data regarding RP1's development prospects with and without accelerated approval.*** Replimune has no revenue, has no marketed products, and is singularly focused on the development and potential commercialization of its single segment—the RPx platform. As CFO, Defendant Hill was acutely aware of these facts. Each year at Replimune, she was one of three executive signatories for Replimune's regular SEC filings, representing that she had reviewed, approved of, and authorized the statements made in those filings. Those filings confirmed what Hill also knew as the Company's CEO—Replimune generated no revenues. Additionally, they confirmed that the Company's "ability to generate any revenues from the sale of our product candidates will depend heavily on the successful development, regulatory approval and commercialization of one or more of these product candidates using our RPx platform." And as chief financial officer—that is, the executive managing Replimune's financial health, forecasting, and financial planning—she would have also been acutely aware of the material information that Defendants' omitted—i.e., that the Company could not viably develop RP1 without access to the accelerated approval pathway—through the Company's financial planning and analysis process—in public companies, a process generally under the purview of the CFO.

132. **As CFO, Defendant Hill's paramount responsibility involved tracking the cash flows necessary for the viable development and commercialization of Replimune's RPx platform over a multi-year window.** In this capacity, Hill signed Replimune Annual Reports, attesting to her knowledge of, as well as the accuracy of, the financial information reported there

in, including information on Replimune's cash flows and cash runway. She also spoke publicly on the subjects during calls with investors. For example, in May 2025, Hill reported that Replimune ended the 2024 fiscal year with "with cash and cash equivalents totaling $483.8 million," with 189.4 million spent on research and development expense over the past year. She then demonstrated her knowledge of, and oversight over, the Company's cash runway by affirming that "[b]ased on the current operating plan, the company believes that existing cash, cash equivalents, and short-term investments as of March 31, 2025, will enable the company to fund operations into the fourth quarter of 2026, which includes scale up for the potential commercialization of RP1 and skin cancers and for working capital and general corporate purposes."

### C.    Additional Facts in Support of Defendant Asltey-Sparke's Scienter

133.    ***Astley-Sparke was directly and extensively involved in developing and obtaining regulatory approval for RP1.*** Defendant Phillip Astley-Sparke is the Executive Chairman of Replimune's Board, one of the co-founders of Replimune, and has served as a member of the Company's Board since it was formed in 2015. Before joining Replimune, he was the President and/or CEO of several other biotech companies which had successfully developed and brought new drugs and/or treatments to market.  He also brought to Replimune significant experience in the areas of finance and investor fundraising—shown through his work in global venture capital and in the healthcare investment banking industries. His direct involvement in founding Replimune, his role as CEO, his experience in bringing pharmaceutical products to market, and his multiple public statements on RP1's regulatory approval prospects supports a strong inference that Astley-Sparke knew or was reckless in not knowing about whether RP1 had viable pathways for development and regulatory approval outside of the accelerated approval pathway.

134.    ***Astley-Sparke's repeated statements to the public about RP1's development and regulatory history demonstrate his knowledge or recklessness.*** During his tenure, Astley-Sparke's statements ensured investors that he and Coffin were hands-on managers who were actively involved in RP1's development and regulatory approval pathways. For example, on November 16, 2022, Astley-Sparke had the following back and forth with an analyst at Jeffries's London Healthcare Conference, in which he provided detailed information about RP1's prospects for regulatory approval under the accelerated approval pathway:

> Question: I believe this is single arm kind of trial and potentially for the accelerated approval. And we know FDA recently published some kind of a guideline for the accelerated approval and a lot of discussion. So, how confident you are this readout will still support the accelerated approval in a way?
>
> Answer: Well, I think, obviously, take comfort from the fact that our events has just followed in exactly the setting with a single arm study, with what would be a similar number of patients. So, I think it would be a bit odd if the agency treated us differently and has treated another company in very recent history.
>
> Question: Yeah. That makes sense. And when will that happen? I think you will have some full data mid next year and how long after that you will start to file the BLA for this one?
>
> Answer: Well, the full study is 125 patients. It should get the full approval around the year-end. And actually, the trigger for the primary analysis is the whole 12 months of the last patient, and that is the current, the way things are set up. But I am actually having discussions with the team about whether that's a little bit too conservative. Maybe it should be six months off, the last patient in. So, we'll either have the data set to support the filing late next year, or if we do something a bit different, maybe early around the middle of next year.

These detailed answers did not just demonstrate knowledge, they suggested personal oversight over RP1's development towards registration through internal meetings and/or access to regular reports of information on these subjects.

**D.    Additional Facts in Support of Defendant Coffin's Scienter**

135.    ***Coffin was directly and extensively involved in developing and obtaining regulatory approval for RP1.*** Defendant Robert Coffin, Ph.D., is also one of Replimune's co-

founders and its Chief Scientist. In these roles, he is the head of RP1's research and development. Before that, he worked alongside Defendant Astley-Sparke at another biotech company which successfully developed and brought a therapy treatment to market. His direct involvement in founding Replimune and his role as its chief scientist strongly suggest that Coffin was intimately tapped into RP1's development and regulatory prospects, including whether RP1 had viable pathways for development and regulatory approval outside of the accelerated approval pathway.

136.    ***Coffin's repeated statements to the public about RP1's development and regulatory history demonstrate his knowledge or recklessness.*** For part of the Class Period, Coffin was one of the primary executives at Replimune who spoke at length about RP1 clinical testing and regulatory pathways in press releases, SEC filings, and analyst conferences. For example, on July 14, 2021, Defendant Coffin gave the following answer when he and other panelists were asked for their thoughts on how the FDA would react "if [they] were trying to go for an accelerated approval" through a single arm trial (like RP1's IGNYTE trial): "… if one is really demonstrating a clinical benefit and a reasonable proportion of your population then the accelerated approval pathway is entirely appropriate and should continue even if you have to further prove the point post-approval through a complementary trial." Similarly, on January 9, 2023, at the 41st Annual JP Morgan Healthcare Conference, Defendant Coffin had the following back-and-forth with analysts about RP1's regulatory process following his presentation on RP1:

> Question: … On the regulatory side for RP1 in PD-1-failed melanoma, what gives you confidence that a single-arm approach in IGNYTE is going to be accepted by regulators? And how much duration of follow-up do you think you'll be needed there in a single-arm fashion?

> Answer: Sure. Yeah. I'm Robert Coffin, and I'm In charge of the R&D at Replimune. So, we have had discussions with the FDA, particularly a type B meeting with the FDA nearly a couple of years ago now, where we discussed whether a single-arm study would be acceptable for accelerated approval. And the feedback from the FDA is – was that as long as the data in its totality was

sufficiently compelling that it's certainly a setting where an accelerated approval filing could be accepted by the FDA. So, we have had no indication that anything has changed since and have had to have more recent communications with the FDA, where indeed we haven't heard anything different.

With regard to durability, various discussions with the FDA indicate that responses which last at least six months are deemed to be clinically meaningful as far as the FDA is concerned. And a key secondary endpoint of the study is, therefore, duration of response. And we do think from the data we've already shown both in this most recent data cap and before that our responses tend to be very durable, and therefore, we do expect the vast majority of our responses to last for at least six months, and therefore, easily meet that hurdle. I'd also think that the data we presented in December really does show a level of compelling this, which meets the criteria for overall compelling this which the FDA discussed with us at the Type B meeting.

Question: So, in fact, your confirmatory trials to be completely enrolled? I know regulations are changing... with the – from a regulatory perspective?

Answer: So all of our feedback from the FDA is that as long as we have the confirmatory trial started, when we file for accelerated approval in that indication, then that ticks the box as far as the FDA is concerned. So, we didn't (31:34) and we've got no suggestion from our interactions and have you is different to that.

## VII.    The Scienter of Replimune's Senior Officers is Imputed to the Company.

137.    Each of the Individual Defendants served as a high-ranking management-level employee of Replimune.  The scienter of each of the Individual Defendants and of all other management-level employees of Replimune, including each high-ranking officer or director, is imputable to Replimune. The knowledge of each of these individuals should therefore be imputed to Replimune for the purposes of assessing corporate scienter.

138.    Additionally, corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices and lead drug candidates—all important topics that would necessarily require approval

by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## VIII.    THE TRUTH BEGINS TO EMERGE

139.    On July 22, 2025, before the market opened, Replimune issued a press release entitled "Replimune Receives Complete Response Letter from FDA for RP1 Biologics License Application for the Treatment of Advanced Melanoma." It stated the following:

> [Replimune], a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced that the U.S. Food and Drug Administration (FDA) has issued a Complete Response Letter (CRL) regarding the Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of advanced melanoma.

> The CRL indicates that the FDA is unable to approve the application in its present form. The FDA has indicated that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness. Furthermore, the FDA said the trial cannot be adequately interpreted due to the heterogeneity of the patient population. The CRL also states that there are items related to the confirmatory trial study design which need to be addressed, including contribution of components. Importantly, no safety issues were raised.

> The Company will request a Type A meeting and expects it will be granted within 30 days. Replimune plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of RP1 without which the development of RP1 for advanced cancer patients with limited options will not be viable.

140.    On this news, the price of Replimune stock plummeted by $9.52 per share, or 77.24%, to close at $2.80 per share on July 22, 2025.

141.    Cantor Fitzgerald, reacting to the news, noted the revelation that without accelerated approval, Replimune could not develop RP1, and downgraded Replimune.

> We are downgrading REPL shares from Overweight to Neutral reflecting the probability that the FDA is going to require a randomized controlled trial in order to support approval of RP1. Our model is under review.

> Such a study will likely take years to conduct, and would forfeit RP1's lead time to market. REPL has suggested it does not have the resources to conduct such a Phase 3 trial. As a result, we are skeptical that RP1 will make it to market. The company

had cash of $484M as of March 31.

142.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## IX.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Replimune common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Replimune, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

144.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Replimune securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

145.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

146.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

147.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Replimune;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Replimune to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Replimune securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

X.    **PRESUMPTION OF RELIANCE**

149.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with over 800,000 shares per day on average during the Class Period;

(e)    the Company traded on the Nasdaq, has more than 30 market makers, and was covered by more than 10 analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)    unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

150.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

151.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

152.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

153.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

154.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Replimune securities during the Class Period.

156.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Replimune were materially false and misleading;

knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Replimune, their control over, and/or receipt and/or modification of Replimune's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Replimune, participated in the fraudulent scheme alleged herein.

157.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Replimune personnel to members of the investing public, including Plaintiffs and the Class.

158.    As a result of the foregoing, the market price of Replimune securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Replimune securities during the Class Period in purchasing Replimune securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

159.    Had Plaintiffs and the other members of the Class been aware that the market price of Replimune securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Replimune securities at the artificially inflated prices that they did, or at all.

160.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

161.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Replimune securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

162.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163.    During the Class Period, the Individual Defendants participated in the operation and management of Replimune, and conducted and participated, directly and indirectly, in the conduct of Replimune's business affairs. Because of their senior positions, they knew the adverse non-public information about Replimune's business practices.

164.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Replimune's financial condition and results of operations, and to correct promptly any public statements issued by Replimune which had become materially false or misleading.

165.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Replimune disseminated in the marketplace during the Class Period concerning Replimune's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Replimune to engage in the wrongful

acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Replimune within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Replimune securities.

166.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Replimune.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiffs' counsel as Class Counsel;

(b)    awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: January 13, 2026

THE ROSEN LAW FIRM, P.A.
/s/ Joshua Baker
Joshua Baker, Esq. (BBO # 695561)
101 Greenwood Ave., Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817

Fax: (212) 202-3827
Email: jbaker@rosenlegal.com

Phillip Kim, Esq. (*pro hac vice* to be submitted)
Laurence M. Rosen, Esq. (*pro hac vice* to be submitted)
Jonathan Stern, Esq. (*pro hac vice to be submitted*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
        lrosen@rosenlegal.com
        jstern@rosenlegal.com

*Lead Counsel for Plaintiffs*


**Hagens Berman Sobol Shapiro LLP**

 */s/ Raffi Melanson*
Raffi Melanson (BBO# 688650)
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
T: (617) 475-1978
raffim@hbsslaw.com

Lucas E. Gilmore (pro hac vice pending)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
T: (510) 725-3000
lucasg@hbsslaw.com

Additional Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2026, a true and correct copy of the foregoing **A**MENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Joshua Baker</u>
Joshua Baker, Esq.

47