**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

USAMA JBOOR, Individually and on behalf of all others similarly situated,

Plaintiff,

v.

REPLIMUNE GROUP, INC., SUSHIL PATEL, EMILY HILL,

Defendants.

Case No: 25-cv-12085-JEK

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ..... 4

II. JURISDICTION AND VENUE ..... 10

III. PARTIES ..... 10

A. Named Plaintiffs ..... 10

B. Corporate Defendant ..... 11

C. Individual Defendants ..... 12

IV. FACTUAL BACKGROUND ..... 14

A. The Drug Development Process ..... 14

B. FDA Accelerated Approval Pathway ..... 16

C. Company Background ..... 18

D. Development of RP1 ..... 19

E. Replimune Conceals its Disagreements with the FDA ..... 21

F. Replimune Receives a Complete Response Letter on July 21, 2025, but Continues to Deceive investors ..... 28

G. Required Reporting of Risk Factors under Item 105 ..... 31

V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ..... 32

A. May 5, 2021 Press Release ..... 32

B. 2021 Annual Report ..... 33

C. Q1 2022 Quarterly Report ..... 34

D. Q2 2022 Quarterly Report ..... 35

E. November 22, 2021 Piper Sandler Virtual Healthcare Conference ..... 37

F. Q3 2022 Quarterly Report ..... 38

G. February 18, 2022 REPL 11th Annual SVB Leerink Global Healthcare Conference ..... 39

H. 2022 Annual Report ..... 41

I. Q1 2023 Quarterly Report ..... 44

**J. Q2 2023 Quarterly Report ........ 46**

**K. November 16, 2022 Jefferies London Healthcare Conference ........ 49**

**L. December 7, 2022 8-K ........ 50**

**M. December 7, 2022 Special Call ........ 52**

**N. January 9, 2023 JP Morgan 41st Annual Healthcare Conference ........ 53**

**O. Q3 2023 Quarterly Report ........ 55**

**P. February 9, 2023 Press Release ........ 58**

**Q. 2023 Annual Report ........ 59**

**R. Q1 2024 Quarterly Report ........ 62**

**S. August 3, 2023 Press Release ........ 65**

**T. Q2 2024 Quarterly Report ........ 66**

**U. January 8, 2024 JP Morgan Healthcare Conference ........ 69**

**V. February 8, 2024 Press Release ........ 70**

**W. Q3 2024 Quarterly Report ........ 72**

**X. March 12, 2024 Leerink Partners Global Biopharma Conference – Fireside Chat ........ 76**

**Y. May 16, 2024 Press Release ........ 77**

**Z. 2024 Annual Report ........ 79**

**AA. June 6, 2024 Press Release ........ 82**

**BB. June 6, 2024 IGNYTE Clinical Trial Update Call ........ 84**

**CC. June 11, 2024 Goldman Sachs Global Healthcare Conference ........ 86**

**DD. August 8, 2024 Press Release ........ 88**

**EE. Q1 2025 Quarterly Report ........ 89**

**FF. September 9, 2024 Press Release ........ 92**

**GG. Q2 2025 Quarterly Report ........ 93**

**HH. January 21, 2025 Press Release ........ 96**

**II. Q3 2025 Quarterly Report ........ 97**

JJ. May 22, 2025 Q4 2025 Earnings Call ........ 100

KK. 2025 Annual Report ........ 103

LL. July 22, 2025 Press Release ........ 107

MM. October 20, 2025 Press Release ........ 108

NN. March 9, 2026 Leerink Global Healthcare Conference ........ 109

VI. ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER ........ 110

A. Additional Facts in Support of Defendant Patel's Scienter ........ 110

B. Additional Facts in Support of Defendant Hill's Scienter ........ 115

C. Additional Facts in Support of Defendant Astley-Sparke's Scienter ........ 117

D. Additional Facts in Support of Defendant Coffin's Scienter ........ 120

E. The FDA Commissioner's Public Statements Confirm Defendants' Scienter ... 122

VII. THE SCIENTER OF REPLIMUNE'S SENIOR OFFICERS IS IMPUTED TO THE COMPANY ........ 126

VIII. LOSS CAUSATION: THE TRUTH EMERGES ........ 127

A. Replimune Receives the First Complete Response Letter ........ 127

B. Replimune Receives the Second Complete Response Letter ........ 128

IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS ........ 129

X. PRESUMPTION OF RELIANCE ........ 131

COUNT I ........ 132

For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 132

COUNT II ........ 134

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants.... 134

PRAYER FOR RELIEF ........ 135

JURY TRIAL DEMANDED ........ 136

Lead Plaintiff Kevin Bond and Additional Plaintiffs Timothy Schirmer, Gaurav Jain and Osama Shoair ("Plaintiffs"), individually and on behalf of persons or entities who purchased or otherwise acquired publicly traded Replimune common stock between May 5, 2021 and July 21, 2025, inclusive (the "Class Period") and were damaged thereby, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Replimune Group, Inc. ("Replimune" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I. INTRODUCTION

1. This securities fraud class action arises from a series of false and misleading statements by Replimune and its key executives regarding the regulatory prospects for the Company's lead drug candidate, RP1. At a meeting in March of 2021, two months before the start of the Class Period, the FDA repeatedly warned Replume against attempting FDA approval based on their then-pending clinical trial, because it was not a randomized controlled trial. The FDA provided several other pieces of negative feedback to Defendants at that "Type B" meeting. Rather than disclose that information, Defendants painted a deceptively optimistic picture of their interactions with the FDA and RP1's prospects for approval. When the truth regarding the Company's concealed regulatory crisis emerged through two corrective disclosures, Replimune's stock price crashed, destroying hundreds of millions of dollars in shareholder value. This action

[1] Unless otherwise stated, all emphasis is added.

seeks to hold Defendants accountable for their years-long fraud and to recover the significant financial losses sustained by investors.

2. Replimune is a clinical-stage biotechnology company with a single operating purpose: bringing to market its RPx platform, a technology to modify herpes viruses to fight cancer.

3. Throughout the Class Period, Replimune's commercial viability was contingent upon obtaining regulatory approval from the FDA for its lead candidate, RP1. Because Replimune had no other revenue-generating drugs on the market, the Company's valuation was largely derived from the successful development and eventual commercialization of this experimental melanoma treatment.

4. Replimune's path to market for RP1 required the submission of a Biologics License Application (BLA), the formal FDA gateway for biological products. A BLA's success depends entirely on one or more properly designed clinical trials that generate clear evidence of a drug's efficacy.

5. Since at least 2021, the Company focused its BLA strategy on the FDA's Accelerated Approval pathway, a regulatory mechanism that permits earlier approval based on a Phase 2 trial, rather than the full three phase clinical trial process. This Accelerated Approval pathway would benefit Replimune because it allows companies to begin marketing drugs while final confirmatory trials are still ongoing, significantly shortening development timelines and enabling earlier revenue generation.

6. Because Replimune had no other potential revenue-generating drug candidates on the immediate horizon, the FDA's feedback regarding the clinical trial for RP1's BLA constituted the definitive factor in the Company's core business prospects. Any indication that the FDA

disagreed with Replimune's approach represented the most critical information available regarding the Company's future.

7. To support its BLA for RP1, Replimune intended to submit data from its IGNYTE trial: a single-arm Phase 2 study of 140 adult patients with advanced skin cancer that could not be surgically removed and had already failed standard immunotherapy. The study sought to test RP1 in combination with nivolumab, a well-known immunotherapy drug brand named Opdivo, to see if adding RP1 would make nivolumab work better. Instead of being given through an IV, the drug was injected directly into the tumor itself. The study aimed for an Objective Response Rate (ORR) of 30%-40% (i.e., the percentage of patients whose cancer significantly shrinks or disappears after treatment).

8. Critically, throughout the Class Period, Defendants hid the fact that since at least March 2021, the FDA had been repeatedly sounding the alarm about Replimune's plans for RP1. During a key Type B meeting on March 25, 2021, the FDA gave Replimune several explicit warnings about the IGNYTE trial:

- **The FDA Repeatedly Warned Against Reliance on a Single-Arm Study**: The FDA warned Replimune that its study design was incapable of proving whether its drug, RP1, actually worked. Because Replimune used a "single-arm" study, one where every patient received a combination of RP1 and nivolumab (an existing, already-approved drug), the agency noted that it would be impossible to tell which of the two drugs was primarily responsible for shrinking tumors. To fix this, the FDA recommended a randomized controlled trial that would have directly compared patients getting the combination against those getting the existing drug alone. Without this comparison, the FDA cautioned that

Replimune could not isolate the "contribution" of RP1, effectively leaving the company unable to prove that its own product provided any added benefit to patients.

- **The FDA Warned Against Replimune's Proposed Endpoint**: the IGNYTE trial's endpoint was a 30%-40% ORR, meaning that the treatment would shrink or eliminate the tumors in 30% to 40% of patients in the trial. However, the FDA explicitly cautioned that this range would not be satisfactory to them, indicating that it might not translate into an "unequivocal clinical benefit".
- **The FDA Considered the Patient Population too Heterogeneous**: The FDA expressed serious concerns that the results of the IGNYTE trial would be impossible to interpret because the patients in the study were too different from one another. In clinical trials, "baseline heterogeneities" refers to a situation where the test subjects have widely varying medical backgrounds—such as different stages of cancer or prior treatments—which can muddy the data. The FDA warned that if the patient group was too inconsistent, it would be impossible to tell if a positive result was actually caused by the drug or if it was simply due to the specific characteristics of certain patients. Because Replimune did not account for these inconsistencies in its trial design, the agency cautioned that the final data might not provide the clear, uniform evidence needed for approval.
- **"Problematic" Results from Injected Tumors**: The FDA warned Replimune that it would be difficult to trust the results seen in tumors that had been directly injected with the drug. Because RP1 is administered via an "intra-tumoral" route, meaning it is put straight into a specific lesion, the agency noted that any shrinkage in those specific spots could be misleading. The FDA cautioned that this method makes the data "problematic" because

intratumoral drug administration requires expertise that clinicians not associated with the clinical trial might not be able to replicate in a real world setting.

9. At a pre-BLA meeting on September 3, 2024, the FDA reiterated that Replimune must "provide evidence to demonstrate that there is a compelling reason that *both* RP1 and nivolumab *are necessary* to achieve the observed treatment effect." This was a direct rebuke of Replimune's "single-arm" study design, which the FDA had already warned could not isolate whether RP1 was providing any added benefit over the existing immunotherapy, nivolumab.

10. Rather than disclose the serious obstacles that RP1 faced, Defendants concealed the FDA's concerns from investors, instead misleadingly characterizing the FDA's feedback as positive. In quarterly and annual reports signed by the Individual Defendants, Replimune repeatedly mischaracterized the FDA's feedback from the March 2021 Type B meeting, stating that "the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose" the agency indicated "if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway", while omitting the agency's explicit warnings against a single-arm approach and other design defects. At investor conferences, Defendants Coffin and Astley-Sparke personally assured analysts that the FDA had given no indication that "anything has changed" and that the IGNYTE data met the "criteria for overall compellingness." Even as late as May 2025, Defendant Hill characterized Replimune's FDA interactions as yielding "no impediments" to approval.

11. What's more, Defendants actively concealed from investors that that Accelerated Approval was not merely an advantageous pathway for RP1 but was in fact the only pathway through which RP1's development would be viable. Without Accelerated Approval, Replimune would have to wait for the completion of a full Phase 3 randomized controlled trial (IGNYTE-3)

to seek conventional approval, an expensive process that would take years. With the Company's limited cash runway and no revenue, the time required to complete a traditional Phase 3 trial would exhaust Replimune's financial resources before it could bring RP1 to market. At no point prior to the FDA's rejection, however, did Replimune disclose this existential dependency. Instead, Defendants gave investors the false and misleading impression that while Accelerated Approval would be beneficial, the conventional approval pathway remained available if Accelerated Approval were denied.

12. By misrepresenting and suppressing the FDA's feedback, Defendants successfully misled the market. Analyst after analyst repeated Defendants' lies and reported Replimune's FDA interactions as "positive and validating for the RP1 registrational pathway" and characterized them as "confirming an accelerated approval path." None of these analysts, consisting of some of the most sophisticated investment banks on Wall Street, including firms like JP Morgan, Leerink Partners, and BMO Capital Markets, were aware that the FDA had, in fact, repeatedly warned Replimune against the very approach the Company was touting.

13. Like all unsustainable deceptions, Defendants' fraud was destined to unravel. The truth began to emerge on July 22, 2025, when Replimune announced that the FDA had issued a Complete Response Letter ("CRL") rejecting its BLA for RP1. The FDA found that the IGNYTE trial "is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness" and that the trial "cannot be adequately interpreted due to the heterogeneity of the patient population" — the very concerns the agency had communicated to Replimune years earlier. In the same press release, Replimune disclosed for the first time that without "the timely accelerated approval of RP1 … the development of RP1 for advanced cancer patients with limited options will not be viable."

14. On this news, the price of Replimune stock plummeted by $9.52 per share, or 77.24%, to close at $2.80 per share on July 22, 2025. Cantor Fitzgerald immediately downgraded the stock, observing that "REPL has suggested it does not have the resources to conduct such a Phase 3 trial" and concluding that "we are skeptical that RP1 will make it to market."

15. But the July 22, 2025 disclosure did not fully reveal the scope of Defendants' fraud. While investors now knew that the FDA had rejected Replimune's BLA and that RP1 was not viable without Accelerated Approval, they did not yet know that the FDA had been repeatedly warning Replimune against its chosen regulatory approach since at least March 25, 2021, or that Defendants had systematically concealed and misrepresented those warnings. Rather than come clean, Defendants continued their campaign of deception.

16. On July 22, 2025, CEO Patel issued a press release claiming to be "surprised by this FDA decision" and asserting that "[t]he issues highlighted in the CRL were not raised by the agency during the mid- and late-cycle reviews" — statements that concealed Defendants' longstanding knowledge of the FDA's opposition. On September 2, 2025, Replimune told investors it had submitted a briefing book to the FDA "addressing the points from the CRL" and "highlighting prior agreements related to the patient population." And on October 20, 2025, Replimune announced the FDA had accepted its BLA resubmission, with Patel stating the Company had been "working to address agency feedback" and had included "[a]dditional information, data and analyses" — giving investors false comfort that the resubmission had resolved the FDA's concerns. As late as March 9, 2026, Defendant Hill continued to frame the July 2025 rejection as a "very surprising, complete response" attributable to "changes in leadership at the FDA," while concealing that the agency's concerns had been consistent since 2021. These post-July 22, 2025 CRL misstatements maintained artificial inflation in Replimune's stock price

and caused additional harm to investors who purchased shares in reliance on Defendants' false assurances.

17. Following the initial rejection, Replimune held a Type A meeting with the FDA on September 16, 2025. Unbeknownst to investors, at that meeting, as the April 10, 2026 CRL would later reveal, the FDA communicated that the response criteria used in the IGNYTE trial "were not consistent with RECIST v1.1 [the standardized measurements used to assess cancer treatment efficacy in clinical trials] and may not be comparable to response rates reported in the historical literature" — calling into question the very foundation of the efficacy data on which the BLA was based. The FDA also provided specific recommendations regarding the use of data from the ongoing Phase 3 trial (IGNYTE-3) to potentially support Accelerated Approval. Instead of following the FDA's guidance, Replimune submitted data from an early, unplanned analysis from the Phase 3 trial representing only 10% of the planned enrollment, along with additional exploratory analyses of the IGNYTE data, to support its BLA resubmission -- data patently "insufficient to support an efficacy claim," as the FDA would later find. The agency further noted that the "contribution of effect" deficiency remained unresolved, finding it "unclear whether the observed responses… are due to nivolumab alone" and identifying that over half of responding patients lacked non-injected target lesions to assess systemic activity. Defendants' decision to resubmit an application they knew was built on data the FDA had repeatedly deemed inadequate — while simultaneously telling investors and analysts that the resubmission "addressed agency feedback" — demonstrates that Defendants knowingly perpetuated their fraud well after the initial corrective disclosure.

18. The full scope of Defendants' fraud was revealed on April 10, 2026, when the FDA publicly released a second Complete Response Letter that detailed the agency's longstanding and

consistent warnings dating back to the 2021 Type B meeting — warnings Defendants had systematically concealed from investors. The April 2026 CRL confirmed that the FDA's concerns about RP1's single-arm trial design, patient heterogeneity, and inability to isolate the contribution of RP1 versus nivolumab had been "consistent" since March 2021. The letter also revealed that Replimune's October 2025 BLA resubmission had failed to address the agency's core concerns, relying on an unplanned analysis of only 10% of the planned Phase 3 enrollment — data the FDA found "insufficient to support an efficacy claim."

19. On this news, Replimune's stock fell from $5.91 to $1.70, a decline of 71.2%. Piper Sandler downgraded the stock, noting that the CRL "makes it clear that FDA's concern on the contribution of components in the single-arm IGNYTE trial were not addressed" and that the agency's concerns were "longstanding" — "quoting feedback from a March 2021 Type B meeting" that included the explicit warning that the FDA "would not recommend that the Sponsor submit a BLA based on the results of a single-arm study."

20. Indeed, on May 5, 2026, FDA Commissioner Marty Makary publicly confirmed the fraud alleged herein. In a nationally televised interview, Commissioner Makary characterized Defendants' public statements as "corporate spin," confirmed that the FDA had "clearly recommended" a randomized controlled trial that Replimune "clearly did not do," and stated that "independent teams arrived to the same recommendation" to reject Replimune's application. Commissioner Makary further stated that investors were "not getting the full story" from Defendants and that "[t]he full story is in our complete response letter."

21. As a result of Defendants' material misrepresentations and omissions, which caused the Company's artificially inflated stock price to collapse upon the revelation of the truth, Plaintiffs and the Class have suffered damages for which this action seeks redress.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

25. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

### A. Named Plaintiffs

26. Lead Plaintiff Kevin Bond, as set forth in the previously filed certification, incorporated by reference herein, purchased Replimune common stock during the Class Period and was economically damaged thereby.

27. Plaintiff Timothy Schirmer, as set forth in the previously filed certification, incorporated by reference herein, purchased Replimune common stock during the Class Period and was economically damaged thereby.

28. Plaintiff Gaurav Jain, as set forth in the previously filed certification, purchased Replimune common stock during the Class Period and was damaged thereby.

29. Plaintiff Osama Shoair, as set forth in the certification attached hereto as Exhibit A, purchased Replimune common stock during the Class Period and was damaged thereby.

## B. Corporate Defendant

30. Defendant Replimune describes itself as follows:

> [Replimune] was founded in 2015 with the mission to transform cancer treatment by pioneering the development of novel oncolytic immunotherapies. Replimune's proprietary RPx platform is based on a potent HSV-1 backbone intended to maximize immunogenic cell death and the induction of a systemic anti-tumor immune response. The RPx platform is designed to have a unique dual local and systemic activity consisting of direct selective virus-mediated killing of the tumor resulting in the release of tumor derived antigens and altering of the tumor microenvironment to ignite a strong and durable systemic response. The RPx product candidates are expected to be synergistic with most established and experimental cancer treatment modalities, leading to the versatility to be developed alone or combined with a variety of other treatment options.

31. Pertinent to this action is the Company's IGNYTE trial, the purpose of which is to treat skin cancer.

32. RP1, as mentioned below, is described by the Company as follows:

> RP1 (vusolimogene oderparepvec) is Replimune's lead product candidate and is based on a proprietary strain of herpes simplex virus engineered and genetically armed with a fusogenic protein (GALV-GP R-) and GM-CSF, intended to maximize tumor killing potency, the immunogenicity of tumor cell death, and the activation of a systemic anti-tumor immune response.

33. Defendant Replimune is incorporated in Delaware and its head office is located at 500 Unicorn Park Drive, Woburn, Massachusetts 01801.

34. Replimune's common stock trades on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "REPL".

35. Since Replimune's inception, the development and commercialization of its RPx platform, including RP1, has been of the utmost importance to the company. As Replimune's SEC filings confirm, to date, the company has brought no products to market. Instead, "[a]ll of [its] product candidates are in research or development." Moreover, to date, the Company has "never generated any revenue from product sales and may never be profitable." This is because

Replimune's "ability to generate any revenues from the sale of [its] product candidates will depend heavily on the successful development, regulatory approval and commercialization of one or more of these product candidates using our RPx platform."

36. Additionally, Replimune has stated multiple times that, even though the Company expects to be funded through at least the middle of 2026, it "will require additional financing to achieve [its] commercialization" goals. To that end, throughout the Class Period, Replimune has multiple registration statements for the purpose of raising money through the sale of Replimune securities. In June 2022, for example, the Company filed a Form S-3 to notify its intent to sell up to $400 million worth of securities. In November 2025, the Company reported having nearly $323.6 million in cash-on-hand, enabling the Company to fund its "operating expenses and capital expenditure requirements through at least 12 months." Additionally, the Company filed an amended registration statement, allowing the Company to offer and sell up to $250 million worth of securities instruments, for further funding.

**C. Individual Defendants**

37. Defendant Sushil Patel ("Patel") has served as the Company's CEO since April 1, 2024. Prior to that time, he served as the Company's Chief Strategy Officer from January 2023 to April 2024 and Chief Commercial Officer from May 2021 to January 2023. Prior to joining Replimune, Patel served as VP, Franchise Head for Lung, Skin, Tumor Agnostic, and Rare Cancers at Genentech, Inc. since April 2018.

38. Defendant Emily Hill ("Hill") has served as the Company's Chief Financial Officer ("CFO") since September 2023. Before that time, she served as the Chief Financial Officer of PTC Therapeutics, Inc. since June 2019, and previously held various positions of increasing responsibility at PTC Therapeutics, Inc. since 2013.

39. Defendant Philip Astley-Sparke is one of Replimune's co-founders and also serves as the Executive Chairman of its Board—a position he transitioned to in April 2024 after serving as Replimune's CEO from January 2020 to April 2024. From 2016 until June 2021, Mr. Astley-Sparke served as Chairman of uniQure N.V., a Nasdaq-listed gene therapy company. From 2013 to 2015, Astley-Sparke served as uniQure N.V.'s President of U.S. operations, where he established its U.S. infrastructure. Mr. Astley-Sparke served as Vice President and General Manager at Amgen, Inc. until December 2011, following Amgen Inc.'s acquisition of BioVex Group, Inc. in March 2011. Astley-Sparke was previously President and Chief Executive Officer of BioVex Group, Inc. Prior to BioVex Group, Inc., Mr. Astley-Sparke was a healthcare investment banker at Chase H&Q and qualified as a Chartered Accountant with Arthur Andersen LLP.

40. Defendant Robert Coffin is one of Replimune's co-founders and served as its Chief Research and Development Officer from 2020 to April 1, 2024. Previously, Coffin was Founder & CTO of BioVex Group Inc., a spin-out from his research group at University College London in 1999. BioVex was acquired by Amgen in 2011, where Coffin served as the Vice President of Global Development until 2013, before co-founding Replimune in 2015.

41. Defendants Patel, Hill, Astley-Sparke, and Coffin are collectively referred to herein as the "Individual Defendants."

42. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

43. Replimune is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

44. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Replimune under *respondeat superior* and agency principles.

45. Defendant Replimune and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. FACTUAL BACKGROUND

### A. The Drug Development Process

46. As described by the FDA, the development of a successful drug is a multistep process.

47. **Step 1: Discovery and Development.** The first step in drug development is the discovery of the new drug. Researchers can discover new drugs through several mechanisms, including through new research insight, testing new molecular compounds, or observing unanticipated effects of pre-existing drug treatments. At the discovery stage, a drug company could be experimenting with thousands of compounds as potential candidates for development as medical treatments. After early testing, the drug company will typically narrow its focus to a small number for detailed experimentation.

48. **Step 2: Preclinical Research.** Before testing a new drug in humans, researchers must first assess its potential to cause harm in preclinical testing. The two primary types of preclinical research are in vitro and in vivo research. In vitro preclinical research tests potential drugs or treatments on cells, tissues, or microorganisms in a controlled lab setting. In vivo preclinical research involves testing new drugs, therapies, or devices in whole, living organisms (like animal models.)

49. **Step 3: Clinical Research.** When preclinical research supports that a new drug may be safe for humans, a drug developer may then begin testing how the drug interacts with actual human bodies. Clinical research refers to the broad collection of studies done on actual people. Researchers will design clinical trials to answer specific research questions related to the new medical drug. As part of this design process, they will decide, among other things: (i) who can participate in the studies; how long the study will last; whether there will be a control group or other ways to limit bias; and how data will be collected.

50. As shown in the chart below, the clinical research step involves multiple phases:




51. **Step 4: FDA Review.** If a drug developer has evidence from its early tests and preclinical and clinical research that a drug is safe and effective for its intended use, the company can file an application to market the drug. As discussed in the next **section**, a drug developer can seek approval of their new drug along several regulated pathways.

52. **Step 5: FDA Post-Market Safety Monitoring.** Despite the rigorous steps in the process of drug development, limitations exist. Therefore, FDA reviews reports of problems with prescription and over-the-counter drugs and can decide to add cautions to the dosage or usage information, as well as other measures for more serious issues.

## B. FDA Accelerated Approval Pathway

53. The U.S. Food and Drug Administration ("FDA") administers an Accelerated Approval pathway that permits earlier approval of certain drugs and biologics intended to treat serious or life-threatening conditions for which there is an unmet medical need.

54. Under a normal approval process, a product can only be approved based on evidence of actual clinical benefit, established by a Phase 3 trial. Under Accelerated Approval, the

FDA may approve a product based on evidence from early- or mid-stage clinical trials demonstrating an effect on a "surrogate endpoint"[2] or an intermediate clinical endpoint that is "reasonably likely to predict clinical benefit," rather than on direct evidence of improvement in survival or other definitive clinical outcomes.

55. In practice, accelerated approvals are frequently based on data from Phase 2 clinical trials, including single-arm or non-randomized studies, or from early Phase 3 trials that have not yet demonstrated statistically significant results on traditional clinical endpoints. The Accelerated Approval pathway was initially adopted in 1992, in part to expedite access to treatments for HIV/AIDS and has since been codified by Congress and incorporated into the FDA's broader framework of expedited review programs.

56. For drug manufacturers, Accelerated Approval provides a regulatory mechanism to obtain FDA approval and begin commercial marketing prior to completion of traditional Phase 3 confirmatory trials. Under the FDA's standard drug development framework, Phase 1 trials primarily assess safety and dosing, Phase 2 trials evaluate preliminary efficacy and continued safety in a limited patient population, and Phase 3 trials are designed to confirm clinical benefit in larger, typically randomized and controlled studies. Accelerated Approval allows sponsors to rely on Phase 2 data or interim Phase 3 data to secure approval, significantly shortening development timelines and permitting earlier revenue generation while more definitive trials remain ongoing.

57. While Accelerated Approval allows a drug to be marketed before completion of Phase 3 trials, it does not eliminate the need for them. Rather, it allows companies to market drugs while mandatory post-marketing confirmatory trials are ongoing. These are typically conducted as

---

[2] A "surrogate endpoint" refers to an objective measure that is not directly a measure of a medical benefit but is reasonably likely to predict a meaningful medical endpoint. For instance, lowered cholesterol could be considered a surrogate endpoint for reduced heart attack risk.

Phase 3 or Phase 4 studies. These trials are intended to verify and describe the anticipated clinical benefit suggested by the surrogate or intermediate endpoint relied upon at approval. If the required confirmatory trials fail to demonstrate clinical benefit, are not completed with due diligence, or yield negative results, the FDA retains authority to withdraw approval or modify the drug's labeling. Accordingly, Accelerated Approval represents a conditional regulatory determination, dependent on the successful completion of later-stage clinical trials demonstrating actual patient benefit.

58. At the same time, failure to obtain Accelerated Approval does not preclude a drug from proceeding through the FDA's conventional approval pathway. A sponsor that is unable to secure Accelerated Approval may continue clinical development, including completion of traditional Phase 3 trials designed to demonstrate direct clinical benefit, and may ultimately seek approval under the FDA's standard review process. As a result, absent specific disclosures to the contrary, a reasonable investor would not necessarily understand Accelerated Approval to be existential to a company or its product candidate, but rather as a potential means of expediting market entry and advancing commercialization timelines. In the absence of clear warning, investors would reasonably assume that the conventional approval pathway remained available if Accelerated Approval were delayed or denied and would therefore view representations concerning Accelerated Approval in the context of timing, risk, and interim valuation rather than as determinative of a product's ultimate approvability.

**C. Company Background**

59. Replimune Group, Inc. is a clinical-stage biotechnology company focused on the research, development, and commercialization of oncolytic immunotherapies--that is, human altered viruses designed to selectively target and destroy tumor cells while stimulating anti-tumor

immune responses. The Company is organized with a single operating purpose—bringing its proprietary technology platform, referred to as the RPx platform, to market. This platform is based on a genetically engineered herpes simplex type 1 virus (HSV-1).

60. To date, the company has brought no products to market. Instead, "[a]ll of [its] product candidates are in research or development." Moreover, to date, the Company has "never generated any revenue from product sales and may never be profitable." This is because Replimune's "ability to generate any revenues from the sale of [its] product candidates will depend heavily on the successful development, regulatory approval and commercialization of one or more of these product candidates using our RPx platform."

**D. Development of RP1**

61. Replimune's lead product candidate has been RP1, also known as vusolimogene oderparepvec, which has been evaluated in melanoma and other solid tumors.

62. Replimune advanced RP1 through a series of clinical studies collectively referred to as the IGNYTE program, which evaluated RP1 as a standalone therapy and in combination with nivolumab, an existing cancer treatment. From a regulatory perspective, the IGNYTE studies constituted late Phase 1 and Phase 2 clinical development, meaning they were primarily designed to evaluate safety, dosing, and preliminary evidence of anti-tumor activity, rather than to definitively establish clinical benefit. In practical terms, these studies addressed whether RP1 could be administered safely and whether it caused tumors to shrink, not whether it improved survival compared to alternative treatments.

63. Before November 21, 2024, the most important clinical data Replimune had reported for RP1 came from a specific group of patients treated in a so-called "registrational cohort" within the broader IGNYTE clinical trial program. This cohort was treated and analyzed

over several years leading up to mid-2024 and was identified by Replimune as the principal evidentiary basis for its regulatory strategy.

64. The registrational cohort functioned as a Phase 2, single-arm clinical study, meaning that all enrolled patients received RP1 (in combination with nivolumab) and that no control or comparison group was included. The study was therefore designed to assess preliminary anti-tumor activity—such as whether tumors shrank and how long any responses lasted—rather than to definitively determine whether RP1 improved survival or outperformed other available treatments.

65. The patients enrolled in this cohort had advanced melanoma and had already experienced disease progression after treatment with prior anti-PD-1 therapies. In other words, these patients had exhausted other treatment options.

66. A single-arm study means that all enrolled patients received RP1 in combination with nivolumab and that no control or comparator group was included. The primary endpoint of this cohort was objective response rate (ORR), assessed using modified RECIST 1.1 criteria, which measures the percentage of patients whose tumors shrink by a predefined amount. See ClinicalTrials.gov, NCT03767348; Replimune Press Release, June 6, 2024, available at https://ir.replimune.com/news-releases/news-release-details/replimune-announces-positive-topline-primary-analysis-data.

67. Because the registrational cohort was a single-arm study without a comparator, it was not designed to compare RP1 to another therapy or to standard of care. As a result, the study could not generate measures of statistical significance demonstrating superiority or inferiority relative to another treatment. Instead, the reported outcomes consisted of descriptive statistics,

such as observed response rates and duration of response, rather than statistically significant comparative results.

68. By mid-2024, Replimune reported that approximately one-third of patients in the registrational cohort experienced an objective tumor response and that those responses were often durable, lasting several months or longer. While these findings were presented as evidence of anti-tumor activity in a heavily pretreated population, the study did not demonstrate improved overall survival or other definitive clinical outcomes, nor did it establish comparative efficacy versus other therapies through randomized or statistically controlled approaches.

69. Based on these Phase 2-level, single-arm results, Replimune pursued a regulatory strategy focused on Accelerated Approval. At the same time, Replimune initiated IGNYTE-3, a Phase 3, randomized, controlled clinical trial intended to evaluate whether RP1 plus nivolumab improves meaningful clinical outcomes, including overall survival, compared to other treatment options.

70. Since at least 2021, Replimune told investors that it was seeking to obtain approval of RP1 through an accelerated approval pathway. Crucially, however, at no point prior to the failure of accelerated approval did Replimune reveal to investors that, without accelerated approval, RP1 would become economically unviable for Replimune. This gave investors the false and misleading impression that while accelerated approval would be advantageous to Replimune, it was not life-or-death for the development of RP1, and that in the absence of accelerated approval, Replimune could still ultimately obtain approval of RP1 upon completion of its Phase 3 trial.

**E. Replimune Conceals its Disagreements with the FDA**

71. Throughout the class period, Replimune falsely reassured investors that, despite the obvious issue with single-arm trials, the FDA was willing to accept such a trial in order to approve

RP1. Replimune also concealed several other pieces of negative feedback regarding the IGNYTE trial that it received from the FDA.

72. On May 5, 2021, Replimune filed a Form 8-K with the SEC that disclosed the results of a March 25, 2021 Type B meeting with the FDA, highlighting the potential for accelerated approval:

> Replimune recently held a Type B meeting with the FDA to discuss the design of the 125-patient, single-arm cohort in the IGNYTE clinical trial which is currently enrolling patients with anti-PD1 failed cutaneous melanoma, with registrational intent. **The FDA expressed that while a randomized controlled trial would always be preferred to support licensure, that in this population if the data generated were sufficiently compelling, then the data could be considered for submission by the FDA under the accelerated approval pathway.** The FDA also confirmed that a confirmatory trial would be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a Biologics License Application (BLA) submission.
>
> (emphasis added).

73. This mischaracterized what actually happened at the March 25, 2021 Type B meeting. As the FDA would later reveal, in a Complete Response Letter dated April 10, 2026, (the "April 10, 2026 Complete Response Letter"), at the 2021 Type B meeting, the FDA provided several pieces of materially adverse feedback to Replimune that Defendants omitted to disclose.

74. First, the FDA repeatedly warned Replimune against a single-arm study, telling the company that "your proposed single-arm study will not enable identification of the contribution of each component of the combination to the overall response rate". In other words, the IGNYTE study was measuring the effect of RP1 in combination with nivolumab, but because Replimune did not include a control group, the study could not measure the effect of RP1 alone and could not separate the effect of RP1 from the effect of nivolumab. The FDA reiterated this concern multiple times at the March 25, 2021 Type B meeting, recommending that Replimune "conduct a randomized controlled trial (RCT) to demonstrate efficacy and safety of the combination and

isolate the contribution from each component to the overall treatment effect" and reiterating that the FDA "would not recommend that the Sponsor [Replimune] submit a BLA based on the results of a single-arm study".

75. Second, the FDA informed Replimune its proposed target surrogate endpoint was inadequate, stating that "your proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication". This is significant because ORR is a surrogate endpoint, referring to the percentage of patients whose tumors shrink or disappear, and the FDA's criticism called into question whether ORR is a suitable surrogate for what RP1 is ultimately supposed to do – extend life, and whether 30% to 40% would actually be a sufficiently large percentage to show a real benefit to patients.

76. Third, the FDA informed Replimune that there were "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects". In other words, there were too many differences among the people in the IGNYTE trial to be able to reliably interpret results.

77. Finally, the FDA noted that "we consider the interpretation of responses in the setting of the intra-tumoral route of administration to be problematic in the lesions which have been injected." In other words, in the IGNYTE study, RP1, rather than being injected into the blood stream, was injected directly into the tumor. This presented a serious challenge for interpreting results in terms of real world effects because it is far more technically difficult to inject a drug directly into a tumor than into a vein, and therefore the FDA could not assume that, if the drug was rolled out to patients in general, clinicians would be able to replicate the efficacy of RP1 when used by the clinicians in the IGNYTE trial, who would have received much more hands on training than a typical physician administering RP1.

78. The FDA also provided detail about a pre-BLA meeting that was held on September 3, 2024. At that meeting the FDA told Replimune that it must "provide evidence to demonstrate that there is a compelling reason that *both* RP1 and nivolumab *are necessary* to achieve the observed treatment effect."

79. The Company's concealment of the FDA's warnings was immediately successful, leading sophisticated analysts to believe the regulatory feedback as "positives." For example, on May 5, 2021, Barclays issued a glowing report—based directly on private conversations with management—that fundamentally misunderstood the FDA's stance:

> We spoke with management following Replimune's regulatory updates this morning around the registration directed trials for RP1 in CSCC and anti-PD1 refractory melanoma — we view the changes as positives. Our key takes include: 1) For CSCC, the trial now has two shots on goal, and only needs to meet one of the primary endpoints to support approval a) CR and/or b) ORR, and encouragingly target enrollment to be reduced from 240 patients to only 180 — we believe RP1 + PD1 is already de-risked with a 73% ORR (including 5 CRs and 3 PRs) that compares favorably to single agent and other therapies (see Figure 1), 2) For r/r melanoma (aka PD1 failed patients), the single arm 125 patient will support a potential accelerated approval – of note, from speaking to management, we like the stringent inclusion criteria for anti-PD1 refractory melanoma patients vs several competitors.[3]

80. BTIG was similarly misled into believing the FDA had validated the Company's strategy, reporting to investors that the agency had "confirmed" a path to approval that was actually under significant fire behind closed doors:

> Replimune also provided a regulatory update on its pivotal ongoing (IGNYTE) study for anti-PD1 failed melanoma that is evaluating RP1 in combination with nivolumab. The FDA has confirmed that the data (if positive) from this trial would be considered for BLA submission and accelerated approval of RP1 + nivo in this setting. As expected, Replimune would further need to run a confirmatory trial to converted accelerated approval into regular approval. Initial data from the IGNYTE trial also remain on track for 2022. Additionally, Replimune plans to present updated data from the

[3] [Cite]

> previous P2 study on June 3 that has shown an ORR of 31% (5/16) and a CR rate of 6% to date.

81. Because Defendants suppressed the FDA's specific warnings about the 30%–40% ORR threshold, Wedbush was led to believe that an even lower ORR would suffice, reporting that the Company's strategy "makes sense".:

> **For IGNYTE, following a Type B meeting REPL confirmed that the FDA would be willing to consider data from the ongoing single-arm 125 patient study under an accelerated approval pathway.** We believe this makes sense since there is no standard of care for patients who have failed PD-1 in melanoma – recent data from Idera Pharmaceuticals' (IDRA, NEUTRAL) randomized Ph 3 study of its TLR9 agonist tilsotolimod plus ipilumumab vs. ipilumumab alone in this population demonstrated an ORR of ~9% in both arms; PD-1 re-treatment in this population is associated with a similar ORR (Ahmed et al., 2020). We believe an ORR of >20% would therefore be meaningful in this population, with a median duration of response of >6 months. As of October 2020, the current ORR in the Ph 2 expansion cohort of RP1 plus nivo. was 31% (1 CR, 4 PR), with four responses (80%) ongoing at out to over 12 months – we also note the highly refractory nature of the patients in this study – 87.5% were stage IVM1b/M1c. REPL also reiterated initial data from the study (all 125 patients with follow up) is expected in 2022.[4]

82. Leerink Partners' report confirms that Defendants led analysts to believe the FDA's feedback was a "reaffirmation" of the Company's path rather than the warning it actually was:

> **REPL announced today that they recently held a Type B meeting with the FDA regarding the IGNYTE trial.** While the FDA expressed that a randomized controlled trial is preferred to support licensure, the agency said that if the data generated in this population were sufficiently compelling it could be considered for submission under the accelerated approval pathway, with a confirmatory trial required as a post-marketing commitment. The company maintains their guidance of providing an initial data update in 2022.
>
> …
>
> **We spoke with REPL management following the announcement and view this update as positive and validating for the RP1 registrational pathway.** Specifically, management provided additional commentary on the reasoning and implications of the CERPASS changes, confirmed that the IGNYTE update is primarily a reaffirmation of previous assumptions, and previewed the agenda

[4] Cite.

> for their 6/3 clinical update event (LINK) concurrent with the American Society of Clinical Oncology (ASCO) meeting.
>
> …
>
> **Management stated that FDA feedback during their Type B meeting on IGNYTE is in-line with their expectations and provided additional confirmation and clarity.** FDA feedback confirmed management's expectation that single arm data from the melanoma cohort is sufficient to pursue an accelerated approval pathway. Management noted that while they do not have detail on what a confirmatory trial would look like, they plan to discuss that with the FDA in the coming quarters, well ahead of filing a Biologics License Applications (BLA) for RP1.[5]

83. Relying on the Company's sanitized account of the Type B meeting, Jefferies assured investors that the meeting was "positive" and the Company's path to accelerated approval was "confirmed," completely unaware that the FDA had actually challenged the foundation of the trial:

> W/ a positive FDA meeting, Co is confirming an accelerated approval path for RP1/nivo combo in aPD1-refractory melanoma. Co recently held a Type B meeting w/ the FDA, during which the FDA noted a single arm pivotal study w/ "sufficiently compelling" data could support an accelerated approval (AA) provided a confirmatory study design to be discussed w/ the FDA prior to the BLA submission. The current stat assumptions include: 1) 22% ORR to discount true ORR of <15%, 2) 28% ORR to discount true ORR of <20%. Recall, aPD1 and aCTLA4 achieved ~6-7% and ~13-15% ORR, in this population, respectively. The initial data are on track during '22. We see this confirmation is positive, allowing for RP1 fast path into the competitive market.

84. On December 7, 2022, Replimune touted preliminary results from the IGNYTE trial with CEO Astley-Sparke characterizing a 36% response rate—a benchmark that the FDA had already signaled was insufficient—as "highly encouraging" and "compelling" data that provided "high confidence" in a "fast to market" approval, while continuing to conceal the highly relevant negative feedback it received from the FDA, stating in a press release that:

> We are pleased to be providing an initial data snapshot from the first 75 patients from the IGNYTE clinical trial being conducted with

[5] Cite.

> registrational intent for the treatment of anti-PD1 failed cutaneous melanoma," said Philip Astley-Sparke CEO of Replimune. "The data confirms the prior signal seen in anti-PD1 failed melanoma in a smaller earlier cohort of patients, with the data from the first 75 patients in the new cohort showing an overall 36% ORR, a 20% CR rate, and clinically meaningful activity across all sub-groups analyzed, including the most advanced Stage IVM1b/c patients. This highly encouraging data, taken together with the compelling and durable data with RP1 we have previously shared from our prior IGNYTE cohorts gives us high confidence we will be able to realize our ambition of establishing a broad skin cancer franchise with RP1. We plan to also further leverage our planned US commercial infrastructure with potential fast to market opportunities with RP2/3, and today announced a cost sharing collaboration with Roche in 3L CRC and 2L HCC.[6]

85. Because Replimune had, to this point, successfully concealed from the public the FDA's skepticism of a 30%-40% ORR, market observers were understandably enthusiastic about these results. BTIG was led to believe the reported "results surpass the approvability bar":

> An ORR of 36% (27/75, Exhibit 1) is certainly higher than Replimune's internal bar of 28% (provided based on FDA's guidance) and suggests that the trial requires 8 additional responses from the full data set (n = 125) to meet this ≥28% approvability bar An ORR of 36% (27/75, Exhibit 1) is certainly higher than Replimune's internal bar of 28% (provided based on FDA's guidance) and suggests that the trial requires 8 additional responses from the full data set (n = 125) to meet this ≥28% approvability bar…. We believe that these results surpass the approvability bar and provide an opportunity for RP1 to move to earlier lines of treatment ((neo)adjuvant settings) given its benign safety profile.

86. Similarly, SVB Leerink stated that "REPL hosted an investor event and provided multiple pipeline updates, most notably positive initial data from the IGNYTE registration-directed cohort of RP1 in antiPD-1-failed cutaneous melanoma" and that led Leerink to conclude that the program was performing "favorably," despite the data falling short of the benchmarks the FDA was actually demanding:

> Today REPL disclosed an initial data snapshot from the IGNYTE cohort featuring the first 75 patients enrolled (of 125 planned), all with follow-up of at least 6 months. The data were highlighted by an overall response rate (ORR) of 36%, which is consistent with the smaller dataset shown in Phase I/II showing 38% ORR in a similar

[6] Cite.

> patient population (n=16). We believe this compares very favorably to standard-of-care benchmarks (see details within) and is supportive of approval if replicated in the full dataset.
>
> …
>
> REPL management has stated previously ORR >20% represents an approvable threshold in anti-PD-1-failed cutaneous melanoma. The study's statistical design is powered such that an observed ORR of 22% is needed to discount <15% and an observed ORR of 28% is needed to discount <20%. Our analysis of the standard of care benchmarks (see Figure 4) suggests ORR is 4-16% for anti-CTLA-4 monotherapy in these patients.[7]

**F. Replimune Receives a Complete Response Letter on July 21, 2025, but Continues to Deceive investors**

87. On July 21, 2025, the FDA issued a complete response letter ("July 21, 2025 Complete Response Letter") rejecting Replimune's BLA. The FDA told Replimune that while "[t]he prespecified response rate in the RPL-001-16 trial appears numerically higher compared to the proposed historical control rate from literature reports … the numerically higher response rate cannot be adequately interpreted due to heterogeneity of the RPL-001-16 trial patient population…." In addition, "[t]he RPL-001-16 trial was also not designed to isolate the contribution of vusolimogene oderparepvec to the observed ORR when administered in combination with nivolumab." As a result, "the RPL-001-16 trial is not considered to be an adequate and well controlled clinical investigation that provides substantial evidence of effectiveness".

88. The July 21, 2025 Complete Response Letter also identified defects in the Phase 3 trial and recommended that Replimune "submit a revised study protocol that assesses the individual contribution of vusolimogene oderparepvec to the observed ORR and provide a detailed justification for the statistical assumptions that support your primary efficacy endpoints."

[7] Cite

89. While this was a serious blow to RP1's prospects, it was not yet apparent to investors, at the time of the July 21, 2025 Complete Response Letter, that Replimune and the other Defendants had known about the FDA's concerns since 2021.

90. The next day, Replimune issued a press release quoting Defendant Patel, stating that "[w]e are surprised by this FDA decision and disappointed for advanced melanoma patients who have limited treatment options as highlighted by the granting of breakthrough status at the time we provided the IGNYTE primary data," and that "[t]he issues highlighted in the CRL were not raised by the agency during the mid- and late-cycle reviews. Additionally, we had also aligned on the design of the confirmatory study. We strongly believe that RP1 in combination with nivolumab can bring substantial benefit to advanced melanoma patients." Patel's expression of surprise further concealed from investors that the Defendants had long known of the FDA's disapproval of Replimune's approach.

91. On September 2, 2025, Replimune told investors that it had "submitted a briefing book to the FDA addressing the points from the CRL, highlighting prior agreements related to the patient population, criteria for PD-1 resistance, and use of literature to support contribution of components. The briefing book also includes an additional analysis of data from the BLA and addresses comments about the phase 3 confirmatory trial design." On September 16, Replimune held a Type A meeting with the FDA. Replimune resubmitted a BLA and announced on October 20, 2025 that the FDA accepted for review Replimune's revised BLA.

92. Because Replimune had successfully concealed the extent of the FDA's skepticism and spin the FDA's procedural acceptance of the resubmission as a substantive victory, this news gave investors false comfort for RP1's prospects of success. On October 20, 2025, Cantor reported

that the "major overhang" had been removed, incorrectly interpreting the FDA's review as a sign that the agency was softening its stance:

> **RP1 Resubmission Acceptance Removes A Major Overhang Towards Approval**
>
> **Takeaways**
>
> **Great news this morning—the FDA has accepted Replimune's BLA resubmission for RP1 in response to the July CRL.** The new PDUFA date is set for April 10, 2026, under a Class II review timeline. We view the quick turnaround since the Type A meeting roughly one month ago as an encouraging sign that the FDA may be shifting from its previously critical stance and could be more open to RP1's Accelerated Approval (AA). While RP1 is not completely out of the woods, and details around the resubmission package or any additional regulatory requirements remain limited, we see this as a major step toward eventual approval. In pre-market trading, REPL shares are up roughly 75%, while the XBI is flat. This resu**bmission falls under the longer Class II category (six-month review) versus the expedited Class I (two-month review).** This may reflect substantial changes to the application or simply a more conservative timeline amid current FDA capacity constraints (government shutdown). **Notably, Replimune's press release stated, "We look forward to working closely with the agency to expedite this review as much as possible for patients' benefit," leaving open the possibility of a more compressed review period**.[8]

93. Wedbush was similarly deceived, in a report titled Dust Off the Launch Plans; Second BLA Review; Upgrading to OUTPERFORM, misinterpreting the FDA's routine acceptance of the BLA as a "turnaround" and a "highly promising" signal of approval:

> REPL announced FDA acceptance of BLA submission for RP1 (Tudriqev) + nivolumab in advanced melanoma, with a PDUFA date for April 10, 2026, based on an FDA Class II resubmission timeline. The submission is considered to be a complete response to the CRL that REPL received in July this year, which indicated that the FDA did not consider the IGNYTE trial to be an adequate and wellcontrolled study that provides substantial evidence of effectiveness, further noting the heterogeneity of the patient population. The CRL also indicated that the design of the ongoing confirmatory Ph 3 study (IGNYTE-3), which is evaluating RP1 plus nivolumab vs. physicians' choice in PD-1/CTLA-4 refractory melanoma patients, has issues that need to be addressed including contribution of components, as well as noting CMC deficiencies. We view the FDA turnaround, following a Type A meeting with

---

8

> REPL, as highly promising; we have to assume that the FDA has given somewhat of a green light for the re-submission, which includes additional information. As a reminder, the combination of RP1 and nivolumab previously demonstrated a compelling 33% ORR, which compares favorably to multiple datasets that indicated re-treatment with ICI gives.[9]

94. Replimune also managed to convince Leerink Partners that this was good news, in a report titled "RP1 BLA Resubmission Accepted with PDUFA of 4/10/2026; Upgrading to OP; PT $13," where the firm explicitly cited its conversations with management as the basis for believing the July 2025 CRL deficiencies were being resolved:

> **Bottom Line: This morning, REPL announced that the FDA accepted the BLA resubmission of RP1 + nivolumab in anti-PD-1 failed melanoma with a PDUFA date of 4/10/2026. We are upgrading the stock to OP with a PT of $13 with renewed confidence in the program following the news and management conversation.** Recall, the original Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec; GALV, GM-CSF oncolytic virus) + nivolumab received a Complete Response Letter (CRL) in July citing the heterogeneity of patient population in the single-arm Phase II IGNYTE study as well as inadequate evidence for the contribution of components in both the Phase II data and the ongoing Phase III IGNYTE-3 study design. This morning, REPL announced that the FDA has accepted the BLA resubmission and considered this resubmission as a complete response to the CRL received in July. The PDUFA date for the resubmission was set as 4/10/2026 based on a Class II resubmission timeline. We caught up with management after the news, during which they expressed confidence in the path forward for RP1 in this indication. See within for more details. We are upgrading REPL to OP following the news and management conversation with renewed confidence in RP1, while acknowledging some remaining uncertainties with the review process. We model a 60% probability of success (POS) for RP1 in anti-PD-1 failed melanoma. PT to $13 mainly reflecting increased POS for RP1 in anti-PD-1 failed melanoma.[10]

## G. Required Reporting of Risk Factors under Item 105

95. 17 CFR § 229.105 requires issuers of securities to provide "under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering

[9]

[10] Cite

speculative or risky." 17 CFR § 229.105. In addition, issuers are required to "[c]oncisely explain how each risk affects the registrant or the securities being offered." *Id*.

96. While Defendants disclosed that there was a risk that RP1 might not receive Accelerated Approval, they wholly misrepresented how that risk would affect Replimune. Rather than acknowledge that, without accelerated approval, development of RP1 would not be viable, Replimune falsely stated that failure to obtain Accelerated Approval would merely require them to conduct additional clinical trials. This materially misled investors as to the severity of the risk inherent in their pursuit of the Accelerated Approval pathway.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. May 5, 2021 Press Release

97. On May 5, 2021, Replimune issued a press release entitled, "Replimune Provides a Regulatory Update for its Registration- Directed Clinical Trials Evaluating RP1 in Combination with Libtayo® (cemiplimab) for the Treatment of CSCC & Evaluating RP1 in Combination with Opdivo® (nivolumab) in anti-PD1 Failed Melanoma," that was filed with the SEC on a Form 8-K signed by Replimune's then Chief Financial Officer Jean Franchi.

98. The May 5, 2021 press release touted the FDA's procedural openness to an accelerated approval pathway, with Defendant Coffin claiming the March 25, 201 FDA Type B meeting provided "clarity" on a path toward approval:

> **IGNYTE**
>
> Replimune recently held a Type B meeting with the FDA to discuss the design of the 125-patient, single-arm cohort in the IGNYTE clinical trial which is currently enrolling patients with anti-PD1 failed cutaneous melanoma, with registrational intent. ***The FDA expressed that while a randomized controlled trial would always be preferred to support licensure, that in this population if the data generated were sufficiently compelling, then the data could be considered for submission by the FDA***

> ***under the accelerated approval pathway***. The FDA also confirmed that a confirmatory trial would be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a Biologics License Application (BLA) submission.
>
> Dr. Coffin commented: "***The discussion with the FDA at the Type B meeting provides clarity on the appropriate regulatory pathway to potential approval for RP1 in combination with Opdivo in anti-PD1 failed melanoma based on the data intended to be generated from our onging clinical trial***. We look forward to releasing initial data from this study during 2022."

99. The foregoing statement was false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading

**B. 2021 Annual Report**

100. On May 20, 2021, Replimune filed its annual report for the fiscal year ended March 31, 2021 with the SEC on form 10-K ("2021 10-K"). The 2021 10-K was signed by Defendants Astley-Sparke and Coffin.

101. In its overview, the 2022 Annual Report stated, in pertinent part, that:

> In March 2021 we held a Type B meeting with the FDA to discuss the design of this cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this

> patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission.

102. The foregoing statement was false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

**C. Q1 2022 Quarterly Report**

103. On August 6, 2021, Replimune filed its quarterly report for the quarter ended June 30, 2022 with the SEC on Form 10-Q ("Q1 2022 Quarterly Report"). The Q1 2022 Quarterly Report was signed by Defendant Astley-Sparke.

104. In its overview, the Q1 2022 Quarterly Report stated, in pertinent part, that:

> In March 2021 we held a Type B meeting with the FDA to discuss the design of this cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. We expect to

> complete enrollment in mid-year 2022 and release data from this cohort in late 2022. In order to document sufficient durability of response, an important secondary endpoint of the study, the timing of the primary analysis upon which a filing is intended to be made is expected to be extended by approximately 6 months from year end 2022. In connection with a presentation at SITC in October 2020 we announced updated clinical data from the IGNYTE Phase 1/2 clinical trial evaluating RP1 in combination with nivolumab from the cohorts of patients with melanoma and non-melanoma skin cancers. As reported, RP1 in combination with nivolumab has continued to be well tolerated, and we believe demonstrates continued promising anti-tumor activity in patients with skin cancers, including in patients with anti-PD-1 failed melanoma, and in patients with CSCC. In June 2021 we presented a data update from these cohorts of RP1 in combination with nivolumab that showed compelling depth and durability of response and strongly supports these ongoing studies in CSCC and anti-PD-1 failed melanoma.

105. The foregoing statement was false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

**D. Q2 2022 Quarterly Report**

106. On November 4, 2021, Replimune filed its quarterly report for the quarter ended September 30, 2021 with the SEC on Form 10-Q ("Q2 2022 Quarterly Report"). The Q2 2022 Quarterly Report was signed by Defendant Astley-Sparke.

107. In its overview, the Q2 2023 Quarterly Report stated, in pertinent part, that:

> In March 2021 we held a Type B meeting with the United States Federal Drug Administration (the "FDA") to discuss the design of this cohort in the IGNYTE trial. In this meeting, the FDA expressed its view that while a randomized controlled clinical trial would always be preferred for registration purposes, in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that as is required under the FDA's accelerated approval pathway, we would need to conduct a randomized confirmatory trial. We intend to discuss the design of the confirmatory trial with the FDA prior to a BLA submission. We expect to complete enrollment in mid-year 2022 and release initial interim data from this cohort in late 2022. In order to document sufficient durability of response, an important secondary endpoint of the study, the timing of the primary analysis upon which a filing is intended to be made is expected to be triggered in mid-year 2023. In connection with a presentation at SITC in October 2020 we announced updated clinical data from the IGNYTE Phase 1/2 clinical trial evaluating RP1 in combination with nivolumab from the cohorts of patients with melanoma and non-melanoma skin cancers. As reported, RP1 in combination with nivolumab has continued to be well tolerated, and we believe demonstrates continued promising anti-tumor activity in patients with skin cancers, including in patients with anti-PD-1 failed melanoma, and in patients with CSCC. In June 2021 we presented a data update from these cohorts of RP1 in combination with nivolumab that showed compelling depth and durability of response and which we believe strongly supports these ongoing studies in CSCC and anti-PD-1 failed melanoma.

108. The foregoing statement was false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

## E. November 22, 2021 Piper Sandler Virtual Healthcare Conference

109. On November 22, 2021, acting on Replimune's behalf, Defendant Astley-Sparke participated in an investor conference hosted by Piper Sandler. In response to Piper Sandler analyst Do Kim's question about what the FDA required for approval, Defendant Astley-Sparke claimed, "We don't exactly know what the hurdle is," despite having already received clear feedback from the FDA that the IGNYTE trial's single-arm design was disfavored and required "compelling" efficacy results that exceeded the Company's performance. Furthermore, he falsely suggested that data from the unrelated CERPASS study could satisfy the FDA's "contribution of components" concerns for the IGNYTE trial:

> Q - Do Kim
>
> Right. Right. And the CSC (sic) [CSCC] CERPASS study will be fairly definitive since it is a randomized, blinded study. But as you look at PD-1 failed melanoma, you will have data in a single arm. How or what will be the hurdles to make that approvable? What are you looking for there, FDA looking for in terms of responses?
>
> A - Philip Astley-Sparke
>
> ***Yeah, we have had a Type B meeting, we don't exactly know what the hurdle is***. Obviously, the FDA will look at totality of the data and they'll want to look at the exact study population, is it weighted more toward Stage 3 disease? Is it weighted more towards late Stage 4 disease or a combination of both? What we do know, we know two things about the FDA stance in these kind of situations. One is, they do want evidence that the component parts that contribute to the whole i.e. in this case RP1 is additive. So, they will be looking, I think, for some form of evidence, even if it's not related to the PD-1 melanoma study itself. ***But obviously, we will be able to provide in the same timeframe the CERPASS data, which is a randomized study showing the contribution of the parts, that's number one***.
>
> And number two, yes, I think they'll be focused on durability and they would expect, I'm sure, the majority, if not getting up towards two-thirds of the responses to be durable in nature. Given the fact that you're not going to be able to compare two arms in terms of durability that I think it's very important we have to show very strong durability data in a single arm study. And to that point, and that's why we're actually although we're going to announce initial interim data on the IGNYTE melanoma 125 patient cohort with registration intent late next year, we're actually going to delay the

> primary analysis by six months into mid-2023 to ensure that we've got really mature durability data before we go to the FDA. I mean, it is a whole mark it seems of our products now through RP1 through RP2, if patients go into response that tend to be very, very meaningful

110. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**F. Q3 2022 Quarterly Report**

111. On February 3, 2022, Replimune filed its quarterly report for the quarter ended December 31, 2021 with the SEC on Form 10-Q ("Q3 2022 Quarterly Report"). The Q3 2022 Quarterly Report was signed by Defendant Astley-Sparke.

112. In its overview, the Q3 2023 Quarterly Report stated, in pertinent part, that:

> In March 2021 we held a Type B meeting with the United States Federal Drug Administration, or FDA, to discuss the design of this cohort in the IGNYTE trial. In this meeting, the FDA expressed its view that while a randomized controlled clinical trial would always be preferred for registration purposes, in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that as is required under the FDA's accelerated approval pathway, we would need to conduct a randomized confirmatory trial. We intend to discuss the design of the confirmatory trial with the FDA prior to a BLA submission. We expect to release initial directional data from this cohort in late 2022. In order to document

> sufficient durability of response, an important secondary endpoint of the study, the primary analysis upon which a filing is intended to be made, is expected to be triggered 12 months following the last patient being enrolled. In connection with a presentation at SITC in October 2020 we announced updated clinical data from the IGNYTE Phase 1/2 clinical trial evaluating RP1 in combination with nivolumab from the cohorts of patients with melanoma and non-melanoma skin cancers. As reported, RP1 in combination with nivolumab has continued to be well tolerated, and we believe demonstrates continued promising anti-tumor activity in patients with skin cancers, including in patients with anti-PD-1 failed melanoma, and in patients with CSCC. In June 2021 we presented a data update from these cohorts of RP1 in combination with nivolumab that showed compelling depth and durability of response and which we believe strongly supports these ongoing studies in CSCC and anti-PD-1 failed melanoma.

113. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

### G. February 18, 2022 REPL 11th Annual SVB Leerink Global Healthcare Conference

114. On February 18, 2022, on behalf of Replimune, Defendant Astley-Sparke participated in an investor conference hosted by SVB Leerink. In response to analyst Jonathan Chang's question, Defendant Astley-Sparke falsely bolstered investor confidence by benchmarking the Company's prospects against a 31% response rate from a prior study, which he presented as a "reason to believe" in the success of the ongoing IGNYTE trial:

> Q - Jonathan Chang

> Understood. So maybe switching over to RP1, and you guys have ongoing registrational studies in the CSCC and PD-1 refractory melanoma. First, can you describe the development plans in those areas? And then discuss your reasons for confidence as to why those studies could be positive?
>
> A - Philip Astley-Sparke
>
> Yes, so we have two studies being run with registrational intent. First, in cutaneous squamous cell carcinoma, that's PD-1 naive cutaneous squamous cell carcinoma as a randomized study comparing RP1 plus Regeneron's anti-PD-1 cemiplimab against cemiplimab alone. We drew primary independent endpoints of complete response and partial response.
>
> Our study is recruiting well and expect to have last patient in by the middle of the year. The trigger for the primary analysis is six months thereafter, which will be late in the year and then hopefully a small number of months thereafter to actually disclosing the result into the -- into the marketplace.
>
> In terms of what gives us confidence to that trial will be successful goes to the prior sister study we ran single arm study, in combination with BMS's Opdivo, where we saw in particular, a one in two -- almost a one in two complete response rate. In fact, nearly all of our responses end up, with the exception of one or two, converting to complete response.
>
> Whereas, PD-1 alone historically has shown relatively no complete response rate, single digits on label although they have ticked up into the mid-teens on subsequent analysis. So we do think there's some margin for error on there. And we'd also expect to actually win on overall response rate as well, although the Delta difference from what we've seen is somewhat smaller than what we've seen between the CR rate. So that's CSCC.
>
> ***In melanoma, we are running a single arm study in the PD-1 failed setting. The -- that's 125 patient study with registrational intent, although it would be an accelerated pathway, we would have to do a confirmatory study. What gives us the reason to believe in that study is again, a prior study done with -- with Opdivo and patients that had failed checkpoint blockade drugs.***
>
> And this was actually a fairly late stage population, 87.5% stage four M1b, M1c with visceral disease. ***And what we saw there is a currently 31% response rate, it still has a couple of patients on studies that may go up further, and we will update that cohort at our event in -- in March***.

115. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it

recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**H. 2022 Annual Report**

116. On May 19, 2022, Replimune filed its annual report for the fiscal year ended March 31, 2021 with the SEC on form 10-K (2022 10-K). The 2022 10-K was signed by Defendants Astley-Sparke and Coffin.

117. In its overview, the 2022 Annual Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. In March 2022, we released updated data showing that RP1 combined with nivolumab continues to demonstrate deep and durable responses in patients with melanoma, including a 37.5% overall response rate in anti-PD-1 failed disease. We expect to release initial directional data from the first 75 patients with six month follow up in late 2022. In order to document sufficient durability of response, an important secondary endpoint of the study, the primary analysis upon which a filing is intended to be made is expected to be triggered 12 months following the last patient being enrolled.

118. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it

recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

119. In its risk disclosures, the 2022 Annual Report stated, in pertinent part, that:

> ***the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.*** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

120. The foregoing statement was materially false and misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv)

the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

121. In addition, the 2022 10-K stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

122. The foregoing statement was materially false and misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**I. Q1 2023 Quarterly Report**

123. On August 4, 2022, Replimune filed its quarterly report for the quarter ended June 30, 2022 with the SEC on Form 10-Q ("Q1 2023 Quarterly Report"). The Q1 2023 Quarterly Report was signed by Defendant Astley-Sparke.

124. In its overview, the Q1 2023 Quarterly Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. In March 2022, we released updated data showing that RP1 combined with nivolumab continues to demonstrate deep and durable responses in patients with melanoma, including a 37.5% overall response rate in anti-PD-1 failed disease. We have completed enrollment of the first 75 patients in this cohort of the IGNYTE trial and expect to release a data snapshot from these patients with six months follow-up in late 2022. The data snapshot from these first 75 patients will be investigator assessed as compared to the primary endpoint of ORR for all patients in this cohort which is to be assessed by central review. In order to document sufficient durability of response, an important secondary endpoint of the study, the primary analysis upon which a filing is intended to be made, is expected to be triggered 12 months following the last patient being enrolled.

125. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting

efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

126. In its risk disclosures, the Q1 2023 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

127. The foregoing statement was materially false and misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely

requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

128. In addition, the Q1 2023 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

129. The foregoing statement was materially false and misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

### J. Q2 2023 Quarterly Report

130. On November 3, 2022, Replimune filed its quarterly report for the quarter ended September 30, 2022 with the SEC on Form 10-Q ("Q2 2023 Quarterly Report"). The Q2 2023 Quarterly Report was signed by Defendant Astley-Sparke.

131. In its overview, the 2022 Annual Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. In March 2022, we released updated data showing that RP1 combined with nivolumab continues to demonstrate deep and durable responses in patients with melanoma, including a 37.5% overall response rate in anti-PD-1 failed disease. We recently reported that we have completed enrollment of the first 75 patients in this cohort of the IGNYTE trial and we continue to expect to release a data snapshot from these patients with six months follow-up in late 2022. The data snapshot from these first 75 patients will be investigator assessed as compared to the primary endpoint of ORR for all patients in this cohort which is to be assessed by central review. In order to document sufficient durability of response, an important secondary endpoint of the study, the primary analysis upon which a filing is intended to be made, is expected to be triggered 12 months following the last patient being enrolled.

132. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

133. In its risk disclosures, the Q2 2023 Quarterly Report also stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies**. By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

134. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

135. In addition, the Q1 2023 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical

> trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

136. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**K. November 16, 2022 Jefferies London Healthcare Conference**

137. On November 16, 2022, on behalf of Replimune, Defendant Astley-Sparke participated in an investor conference hosted by Jeffries. In response to analyst Roger Song's question, Defendant Astley-Sparke suggested that the FDA was effectively "required" to approve the IGNYTE trial because of how it had treated other companies:

> A - Roger Song
>
> Got it. Okay. I believe this is a single-arm kind of a trial and potentially for the accelerated approval, and we know FDA recently published some kind of a guideline for the accelerated approval and a lot of the discussions. So, how confident you are these results will still support accelerated approval and why?

A - Philip Astley-Sparke

> ***Well, I think, obviously, take comfort from the fact that our events has just followed in exactly the setting with a single arm study, with what would be a similar number of patients. So, I think it would be a bit odd if the agency treated us differently and has treated another company in very recent history.***

138. The foregoing statement was materially false and misleading in that it failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**L. December 7, 2022 8-K**

139. On December 7, 2022, Replimune filed with the SEC a press release attached to Form 8-K titled "Replimune Announces Positive Initial Data from the Anti-PD1 Failed Melanoma Cohort of the IGNYTE Clinical Trial & an RP2/3 Program Update".

140. The press release contained a sub heading stating "*RP1 combined with nivolumab continues to demonstrate deep and durable responses in patients with anti-PD1 failed melanoma*" and "*Overall response rate (ORR) of 36% and complete response (CR) rate of 20%, with clinically meaningful activity across a broad range of anti-PD1 failed cutaneous melanoma settings observed, including in patients with high tumor burden and visceral disease*".

141. The press release went on to state that

> "We are pleased to be providing an initial data snapshot from the first 75 patients from the IGNYTE clinical trial being conducted with registrational intent for the treatment of anti-PD1 failed

> cutaneous melanoma," said Philip Astley-Sparke CEO of Replimune. "The data confirms the prior signal seen in anti-PD1 failed melanoma in a smaller earlier cohort of patients, with the data from the first 75 patients in the new cohort showing an overall 36% ORR, a 20% CR rate, and clinically meaningful activity across all sub-groups analyzed, including the most advanced Stage IVM1b/c patients. This highly encouraging data, taken together with the compelling and durable data with RP1 we have previously shared from our prior IGNYTE cohorts gives us high confidence we will be able to realize our ambition of establishing a broad skin cancer franchise with RP1. We plan to also further leverage our planned US commercial infrastructure with potential fast to market opportunities with RP2/3, and today announced a cost sharing collaboration with Roche in 3L CRC and 2L HCC."

142. In a section titled "**Data Snapshot from the IGNYTE Clinical Trial Evaluating RP1 Combined with Nivolumab in anti-PD1 Failed Melanoma**" the press release stated

> IGNYTE is Replimune's multi-cohort clinical trial evaluating RP1 combined with nivolumab in multiple tumor type specific cohorts. The Company is today presenting new data from the first 75 patients from the 125 patient anti-PD1 failed melanoma cohort, which has registrational intent. The IGNYTE clinical trial is being conducted under a collaboration and supply agreement with Bristol-Myers Squibb, with the anti-PD1 failed melanoma cohort expected to complete enrollment by around the end of this year.
>
> The ORR in the first 75 patients from the anti-PD1 failed melanoma cohort was 36%, consistent with that observed in the prior Phase 2 cohort (N=16) presented in June 2022 where an ORR of 37.5% was seen. The complete response (CR) rate was 20.0%, compared to 12.5% shown in the prior 16 patients presented in June 2022. Further patients remain on study from the first 75 patients who have the opportunity for response, and current responses continue to deepen. The data demonstrates that RP1 combined with nivolumab shows clinically meaningful durable activity across the range of anti-PD1 failed cutaneous melanoma presentations, including in patients with moderate to high tumor burden, with 85% of responses ongoing.
>
> The data clearly demonstrate systemic activity, with both injected and in un-injected lesions responding, including in un-injected visceral disease. Most responses seen were in patients who did not respond to prior anti-PD1 therapy (i.e. did not previously achieve a PR or CR).
>
> Safety data with RP1 in combination with nivolumab assessed across all skin cancer patients treated with RP1 combined with nivolumab (N=187), including the new 75 patients, continues to demonstrate an attractive safety profile, with predominantly 'on target' Grade 1-2 side effects indicative of systemic immune activation.

> Overall, Replimune believes that RP1 in combination with nivolumab has the potential to become a go-to treatment option for melanoma patients after progressing on or after anti-PD1 therapy, including on adjuvant therapy or on or after a first- or second-line anti-PD1-containing regimen, including in combination with anti-CTLA-4.
>
> The data snapshot from the first 75 patients was investigator assessed as compared to the primary endpoint of ORR for all patients in the cohort which is to be assessed by central review.
>
> "The rate, depth and durability of responses seen across a range of anti-PD1 failed melanoma settings with RP1 combined with nivolumab suggests broad utility of RP1 in this difficult to treat patient population," said Dr. Mark Middleton, Professor of Experimental Cancer Medicine, consultant Medical Oncologist at the Oxford Cancer Centre and Head of the Department of Oncology at the University of Oxford, and Principal Investigator on the IGNYTE study. "Based on the growing body of clinical data with RP1, I believe it has the potential to become a new treatment paradigm across multiple skin cancers, including in melanoma patients who have failed anti-PD1 therapy. I look forward to seeing the primary analysis data from the full 125 patients in the anti-PD1 failed cohort from the IGNYTE clinical trial, and of the registration-directed CERPASS clinical trial in CSCC in 2023."

143. The foregoing statements were misleading for failing to disclose that the FDA had specifically warned against using an ORR of 30% to 40%, stating in March of 2021 that the "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication".

## M. December 7, 2022 Special Call

144. Also on December 7, 2022, Replimune had a "special call" in part to discuss the results set forth in the foregoing section.

145. On the Special Call, Astley-Sparke stated, in prepared remarks, that

> Slide 4 shows the agenda for the call, which will start with a brief further introduction from me, followed by 3 content sections. **The first section covers the data from the first 75 patients of our 125-patient study in anti-PD-1-failed melanoma being run with registrational intent. The data speaks to the emergence of a potential new treatment option in this unmet need setting with a 36% overall response rate, a 20% complete response rate, strong durability to date and strong data in all stages of disease, including late stage 4.**

(emphasis added)

146. Patel stated, in his prepared remarks, that "firstly, the data demonstrates, we are able to help a range of anti-PD-1 failed patients that occur in routine clinical practice."

147. The foregoing statements were misleading for failing to disclose that the FDA had specifically warned against using an ORR of 30% to 40%, stating in March of 2021 that the "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication".

**N. January 9, 2023 JP Morgan 41st Annual Healthcare Conference**

148. On January 9, 2023, on behalf of Replimune, Defendants Astley-Sparke and Coffin participated in an investor conference. In response to analyst Anupam Rama's inquiry, Defendant Coffin explained that nothing had changed regarding the FDA's regulatory stance since 2021 and assured investors that the Company's recently released interim IGNYTE results met the FDA's criteria for being "sufficiently compelling":

> Anupam Rama
>
> . . .
>
> But Phillip, thank you so much for the presentation. On the regulatory side for RP1 and PD1 failed melanoma, what gives you confidence that a single-arm approach in IGNYTE is going to be accepted by regulators? And how much duration of follow-up do you think it will be needed there in a single-arm fashion?
>
> Philip Astley-Sparke
>
> You want to take that Rob?
>
> Robert Coffin
>
> Sure, yeah. I'm Robert Coffin and I'm in charge of the R&D at Replimune. ***So, we have had discussions with the FDA, particularly Type B meeting with the FDA nearly a couple of years ago now, where we discussed whether a single-arm study would be acceptable for accelerated approval. And the feedback from the FDA is -- was that as long as the data in its totality were sufficiently compelling, there is certainly a setting were an accelerated approval filing could be accepted by the FDA.***

> ***So, we have had no indications that anything has changed since. And we have had more recent communications with the FDA where indeed, we haven't heard anything different***.
>
> With regards to durability, various discussions with FDA indicate that responses which last at last six months are deemed to be clinically meaningful as far as the FDA is concerned. And a key secondary endpoint of the study is therefore duration of response.
>
> And we do think, from the data we've already shown, both in this most recent data and before that, our responses tend to be very durable. And therefore, we do expect the vast majority of our responses to last for at least six months and therefore easily meet that hurdle.
>
> ***I'd also think that the data we presented in December really does show a level of compelling this, which meets the criteria for overall compelling this which the FDA discussed with us at the Type B meeting.***

149. The foregoing statement failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

150. Coffin and Astley Sparke answered another question, assuring investors that simply starting a confirmatory trial "ticks the box" for the FDA:

> Analyst
>
> We expect your confirmatory trials to be completely enrolled? I know regulations are changing, but the -- from a regulatory perspective?
>
> Robert Coffin

> ***So all of our feedback from the FDA is that, as long as we have the confirmatory trial started, when we filed for accelerated approval in that indication, then that ticks the box as far as the FDA is concerned***. So, we did it with CEBR [ph], not CEDR and we've got no suggestion from our interactions that have you, is different to that.
>
> Philip Astley-Sparke
>
> It's also a fact that Iovance's BLA has just been accepted for filing and I don't think they started their confirmatory study and there's a very similar setting.

151. The foregoing statement failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**O. Q3 2023 Quarterly Report**

152. On February 9, 2023, Replimune filed its quarterly report for the quarter ended December 31, 2022 with the SEC on Form 10-Q ("Q3 2023 Quarterly Report"). The Q3 2023 Quarterly Repor was signed by Defendant Astley-Sparke.

153. In its overview, the Q3 2023 Quarterly Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized

> confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. In December 2022, we reported data from the first 75 patients with at least six months follow-up. The data snapshot based on investigator response showed a 20% CR rate and a 36% ORR with activity across all disease stages and strong durability. In January, we competed target enrollment of 125 patients with patients in screening at that time continuing to be enrolled. Enrollment is expected to complete this month with a final total study size of approximately 140 patients. The primary analysis is expected in Q1 2024, 12 months after enrollment of the last patient.

154. The foregoing statement failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

155. In its risk disclosures, the Q3 2023 Quarterly Report stated that:

> the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies. By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

156. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

157. In addition, the Q3 2023 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

158. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized

controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**P. February 9, 2023 Press Release**

159. On February 9, 2023, Replimune issued a press release attached to a form 8-K filed by the SEC and signed by Jean Franchi.

160. That press release, in the section titled "Program Highlights & Milestones", stated

> RP1 combined with Opdivo in anti-PD1 failed melanoma
>
> o Presented data evaluating the first 75 patients with at least six-months follow up in the anti-PD1 failed melanoma cohort of the IGNYTE clinical trial in December.
>
> o The data demonstrated an overall response rate (ORR) of 36% and complete response (CR) rate of 20%, with clinically meaningful activity across a broad range of anti-PD1 failed cutaneous melanoma settings observed, including in patients with high tumor burden and visceral disease.
>
> o Systemic activity was seen in both injected and in un-injected lesions responding, including in un-injected visceral disease, with most responses seen in patients who did not respond to prior anti-PD1 therapy.
>
> o Safety data with RP1 in combination with nivolumab assessed across all skin cancer patients treated with RP1 combined with nivolumab (all studies, N=187), including the 75 patients reported on in December, continues to demonstrate an attractive safety profile, with predominantly 'on target' Grade 1-2 side effects indicative of systemic immune activation.

> o Target enrollment of 125 patients was reached in January with patients in screening at that time continuing to be enrolled. Enrollment is expected to complete this month with a final total study size of approximately 140 patients. The primary analysis is expected in Q1 2024, 12 months after the enrollment of the last patient.

161. The foregoing statement was misleading for failing to disclose that the FDA warned Replimune that a "30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication."

**Q. 2023 Annual Report**

162. On May 18, 2023, Replimune filed its annual report for the fiscal year ended March 31, 2023 with the SEC on form 10-K ("2023 10-K"). The 2023 10-K was signed by Defendants Astley-Sparke and Coffin.

163. In its overview, the 2022 Annual Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. In December 2022, we reported data from the first 75 patients with at least six months follow-up. The data snapshot based on investigator response showed a 20% CR rate and a 36% ORR with activity across all disease stages and strong durability. In January 2023, we completed target enrollment of 125 patients with patients in screening at that time continuing to be enrolled. We completed enrollment in this cohort in March 2023, ultimately enrolling 141 patients. Further updated data from the initial 75 patients is expected to be presented at the American Society of Clinical Oncology, or ASCO, in June 2023, and a data snapshot for all 141 patients, who will all have a minimum of 6 months follow-up, is expected in Q4 2023. The data snapshot for all 141 patients with a minimum of 6 months follow-up will be evaluated for the potential to align a dual launch with CERPASS, assuming both indications for RP1 are timely approved, however, the per protocol primary analysis continues to be expected 12 months after enrollment of the last patient, March 2024, with topline data expected in Q2 2024.

164. The foregoing statement failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

165. In its risk disclosures, the 2023 10-K stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

166. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA

noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

167. In addition, the 2023 10-K stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

168. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis

of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**R. Q1 2024 Quarterly Report**

169. On August 3, 2023, Replimune filed with the SEC its quarterly report for the quarter ended June 30, 2023 with the SEC on Form 10-Q ("Q1 2024 Quarterly Report"). The Q1 2024 Quarterly Report was signed by Defendant Astley-Sparke.

170. In its overview, the 2022 Annual Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. The design of the confirmatory trial is intended to be discussed with the FDA prior to a BLA submission. In December 2022, we reported data from the first 75 patients with at least six months follow-up. The data snapshot based on investigator response showed a 20% CR rate and a 36% ORR with activity across all disease stages and strong durability. In January 2023, we completed target enrollment of 125 patients with patients in screening at that time continuing to be enrolled. We completed enrollment in this cohort in March 2023, ultimately enrolling 141 patients. In June 2023, further updated data from the initial 75 patients was presented at the American Society of Clinical Oncology, or ASCO, showing RP1 combined with nivolumab continued to demonstrate deep and durable responses with a well-tolerated safety profile and no progression in responding patients since the prior data snapshot. The updated data also showed overall response rate (ORR) of 37.4%, with clinically meaningful activity across the range of anti-PD1 failed cutaneous melanoma settings enrolled, including in patients with moderate-high tumor burden and visceral disease. We remain on track to announce snapshot data for all patients (N=141) in Q4 2023 by which point all patients will have had at least 6 months follow up. The data snapshot for all 141 patients with a minimum of 6 months follow-up will be evaluated for the potential to align a dual launch with CERPASS, assuming both indications for RP1 are timely approved, however, the per protocol primary analysis continues to be expected 12 months after enrollment of the last patient, March 2024.

171. The foregoing statement failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

172. In its risk disclosures, the Q1 2024 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

173. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA

noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

174. In addition, the Q1 2024 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

175. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities

among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**S. August 3, 2023 Press Release**

176. On August 3, 2023, Replimune issued a press release attached to a form 8-K filed by the SEC and signed by Defendant Astley-Sparke.

> **RP1 combined with Opdivo in anti-PD1 failed melanoma**
>
> o Presented updated data from the ongoing IGNYTE clinical trial at the 2023 American Society of Clinical Oncology (ASCO) Annual Meeting in June. These data included the first 75 patients from the anti-PD1 failed melanoma cohort combined with the 16 anti-PD1 failed melanoma patients from the prior all comers 30 patient melanoma cohort (N=91 in total).
>
> o The data demonstrated an overall response rate (ORR) of 37.4%, with clinically meaningful activity across the range of anti-PD1 failed cutaneous melanoma settings enrolled, including in patients with moderate-high tumor burden and with visceral disease.
>
> o Systemic activity was seen in both injected and un-injected lesions, with both responding with similar durability and kinetics, including in un-injected visceral disease.
>
> o RP1 continues to be generally well tolerated with safety data showing predominantly 'on target' flu-like Grade 1-2 side effects indicative of systemic immune activation. Grade 3 treatment related events were rarely seen in the 91-patient group, with a range of Grade 3 events in one patient each, and two Grade 3 events of fatigue. There were two Grade 4 treatment related events (elevated lipase, and cytokine release syndrome) and no treatment related Grade 5 events.
>
> o The Company remains on track to announce snapshot data for all patients (N=141) in Q4 2023 by which point all patients will have had at least 6 months follow up, prior to the per protocol primary analysis at 12 months post the last patient enrolled.

177. The foregoing statement was misleading for failing to disclose that the FDA warned Replimune that a "30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication."

**T. Q2 2024 Quarterly Report**

178. On November 7, 2023, Replimune filed its quarterly report for the quarter ended September 30, 2023 with the SEC on Form 10-Q ("Q2 2024 Quarterly Report"). The Q2 2024 Quarterly Report was signed by Defendants Astley-Sparke and Hill.

179. In its overview, the Q2 2024 Quarterly Report stated, in pertinent part, that:

> In March 2021, we held a Type B meeting with the FDA to discuss the design of the 125 patient expansion cohort in the IGNYTE trial. In this meeting, the FDA expressed that while a randomized controlled clinical trial would always be preferred for registration purpose, that in this patient population with no clear standard of care, if the clinical data is sufficiently compelling then the data could be considered for submission by the FDA under the accelerated approval pathway. The FDA also indicated that a randomized confirmatory trial would also be needed as is required under the accelerated approval pathway. In December 2022, we reported data from the first 75 patients with at least six months follow-up. The data snapshot based on investigator response showed a 20% CR rate and a 36% ORR with activity across all disease stages and strong durability. In January 2023, we completed target enrollment of 125 patients with patients in screening at that time continuing to be enrolled. We completed enrollment in this cohort in March 2023, ultimately enrolling 140 patients. In June 2023, further updated data from the initial 75 patients was presented at the American Society of Clinical Oncology, or ASCO, showing RP1 combined with nivolumab continued to demonstrate deep and durable responses with a well-tolerated safety profile and no progression in responding patients since the prior data snapshot. The updated data also showed overall response rate (ORR) of 37.4%, with clinically meaningful activity across the range of anti-PD1 failed cutaneous melanoma settings enrolled, including in patients with moderate-high tumor burden and visceral disease. We remain on track to announce snapshot data for all patients (N=140) in early December 2023 by which point all patients will have had at least 6 months follow up and at which time we also expect to present the design of a confirmatory study agreed with the FDA to support the potential approval of RP1 in anti-PD1 failed melanoma via the accelerated approval pathway. Planning for the confirmatory study is underway to ensure it has commenced ahead of any BLA submission. The per protocol primary analysis will take place 12 months post the last

> patient enrolled and, accordingly, we plan to submit a BLA in Q3 2024.

180. The foregoing statement failed to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Describing the FDA's feedback as positive while omitting these adverse facts was misleading.

181. In its risk disclosures, the Q2 2024 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

182. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for

an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

183. In addition, the Q2 2024 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

184. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities

among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. The foregoing statement was also misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**U. January 8, 2024 JP Morgan Healthcare Conference**

185. On January 8, 2024, Replimune participated in the JP Morgan Healthcare Conference and published a Company presentation entitled "Igniting a Systemic Immune Response to Cancer," which was subsequently filed with the SEC on Form 8-K signed by Defendant Astley-Sparke. On slide 14, the Company summarized a Type C meeting with the FDA regarding the IGNYTE trial for anti-PD1 failed melanoma. The presentation highlighted that the FDA acknowledged the unmet medical need in this patient population and agreed to a two-arm randomized trial design utilizing physician's choice as a comparator. The Company outlined its plan to submit the BLA in the second half of 2024, contingent upon centrally reviewed data and specific follow-up requirements: all patients must be followed for at least 12 months, and all responding patients must be followed for at least six months from the initiation of their response.




186. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**V. February 8, 2024 Press Release**

187. On February 8, 2024, Replimune issued a press release entitled, "Replimune Reports Fiscal Third Quarter 2024 Financial Results and Provides Corporate Update," which was

filed with the SEC on a Form 8-K signed by Defendant Astley-Sparke. In the press release, Defendants highlighted "positive data" from the full 156-patient IGNYTE cohort, reporting an overall response rate (ORR) of 31.4%. Regarding regulatory progress, the Defendants stated that following a Type C meeting, the FDA had agreed to a confirmatory Phase 3 study design—a two-arm randomized trial using physician's choice as a comparator. The press release further noted that the FDA required this trial to be underway at the time of a BLA submission under the accelerated approval pathway. Consequently, Replimune reaffirmed its plan to submit a BLA in the second half of 2024, contingent upon 12 months of patient follow-up and central data review by RECIST v1.1:

> - Positive data update in December 2023 for all 140 patients in the IGNYTE clinical trial cohort of RP1 in anti-PD1 failed melanoma demonstrating durability of response
> - Centrally reviewed 12-month primary analysis data from IGNYTE trial of RP1 in anti-PD1 failed melanoma and biologics license application (BLA) submission expected in 2H 2024
>
> . . .
>
> Program Highlights & Milestones
>
> RP1
>
> - RP1 combined with Opdivo® (nivolumab) in anti-PD1 failed melanoma
>   - o The Company presented initial data from the full population enrolled into the registration directed anti-PD1 failed melanoma cohort from the IGNYTE clinical trial in December 2023. In the full data set of 156 patients (140 patients from the registration-directed expansion cohort and 16 anti-PD1 failed cutaneous melanoma patients from the prior phase 2 cohort), had an overall response rate (ORR) of 31.4% with a complete response rate (CR) of 12% showing activity consistent with the prior snapshot of 91 patients. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed.

> o Following a Type C meeting with the U.S. Food and Drug Administration (FDA), a confirmatory study design concept consisting of a 2-arm randomized trial with physician's choice of treatment as a comparator arm in anti-PD1 failed melanoma patients was agreed. The FDA requested that the Phase 3 confirmatory trial be underway at the time of a BLA submission under the accelerated approval pathway. The FDA also indicated that all patients should be followed for at least 12 months and have undergone central review by RECIST v1.1. A BLA submission for RP1 in combination with nivolumab in anti-PD1 failed melanoma is planned for 2H 2024.

188. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**W. Q3 2024 Quarterly Report**

189. On February 8, 2024, Replimune filed its quarterly report for the quarter ended December 31, 2023 with the SEC on Form 10-Q ("Q3 2024 Quarterly Report"). The Q3 2024 Quarterly Report was signed by Defendants Astley-Sparke and Hill. In its overview, the Q3 2024 Quarterly Report stated, in pertinent part, that:

> Our leading clinical trial of RP1 is our IGNYTE trial, a multi-cohort Phase 1/2 clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us

> a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort enrolling patients with anti-PD-1 failed cutaneous melanoma who are being treated with RP1 in combination with nivolumab. In December 2023, we reported the full data set of 156 patients (140 patients from the registration-directed expansion cohort and 16 anti-PD1 failed cutaneous melanoma patients from the prior phase 2 cohort) with an overall response rate (ORR) of 31.4% and a complete response rate (CR) of 12%. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. Following a Type C meeting with the U.S. Food and Drug Administration (FDA), a confirmatory study design concept consisting of a 2-arm randomized trial with physician's choice of treatment as a comparator arm in anti-PD1 failed melanoma patients was agreed. The FDA requested that the Phase 3 confirmatory trial be underway at the time of a BLA submission under the accelerated approval pathway. The FDA also indicated that all patients should be followed for at least 12 months and have undergone central review by RECIST v1.1. A BLA submission for RP1 in combination with nivolumab in anti-PD1 failed melanoma is planned for 2H 2024.
>
> In our non-melanoma skin cancer, or NMSC, cohort of the IGNYTE clinical trial, we provided a data update in December 2023 from the first 30 patients with at least 6 months of follow up including patients with CSCC, Merkel cell carcinoma (MCC), basal cell carcinoma, and angiosarcoma in this cohort. The data showed that treatment with RP1 in combination with nivolumab led to an ORR of 30% which is consistent with data from the anti-PD1 failed melanoma cohort with approximately one-third of patients responding and 60% demonstrating clinical benefit. The combination of RP1 and nivolumab was well tolerated in this patient population with a safety profile consistent with the overall experience seen with this treatment regimen to date.

190. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not

translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

191. In its risk disclosures, the Q3 2024 Quarterly Report stated that:

> . . .the development of our product candidates for use in combination with another product or product candidate may present challenges that are not faced for single agent product candidates. While we have opened a clinical trial for use of RP1 as a monotherapy, we are generally developing RP1 and our other product candidates for use in combination with anti-PD-1 or potentially anti-PD(L)-1 therapies, and may develop RP1 or our other product candidates for use with other therapies. ***Although we intend our IGNYTE anti-PD-1 failed melanoma cohort and our CERPASS trial to be registration directed, the FDA may require us to use more complex clinical trial designs in order to evaluate the contribution of each product and product candidate to any observed effects***. It is possible that the results of these trials could show that any positive previous trial results are attributable to the therapy with which our products were combined and not our product candidates. Moreover, following product approval, the FDA may require that products used in conjunction with each other be cross-labeled for combined use. To the extent that we do not have rights to the other product, this may require us to work with a third party to satisfy such a requirement. Moreover, developments related to the other product may impact our clinical trials for the combination as well as our commercial prospects should we receive marketing approval. Such developments may include changes to the other product's safety or efficacy profile, changes to the availability of the approved product, and changes to the standard of care.

192. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not

translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

193. In its risk disclosures, the Q3 2024 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

194. The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

195. In addition, the Q3 2024 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

196. The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

## X. March 12, 2024 Leerink Partners Global Biopharma Conference – Fireside Chat

197. On March 12, 2024, Replimune management, including CEO Philip Astley-Sparke, CFO Emily Hill, and Chief Strategy Officer Sushil Patel, participated in a Fireside Chat at the Leerink Partners Global Biopharma Conference. During the discussion, management provided an update on the IGNYTE registrational study. Regarding the regulatory path, management confirmed the intent to seek accelerated approval and detailed a September 2023 meeting with the FDA. They stated that the FDA acknowledged the unmet need in the anti-PD1 failed melanoma population and agreed upon the concept for a confirmatory study design. This confirmatory study—a randomized trial against a physician's choice control arm—was expected to be in "start-up activities" and underway by the time the BLA is filed.

> Question – Jonathan Chang: Understood. So let's discuss the IGNYTE study since RP1s being evaluated in anti-PD1 failed melanoma. Can you discuss the latest data that you've disclosed on that? And what the timelines are associated with that study?
>
> Answer – Philip Astley-Sparke: So, last December, we disclosed interim update on that registrational study, which was six months after the last patient in showing a 31% response rate in the 140 patient cohort being run with registrational intent. The official analysis is 12 months after the last patient in which showed trigger point was early March, which has passed. So, it's that trigger point that we will base the data cut for the actual] filing that that actually being collected. It will have to go through independent central review. The data we have disclosed to-date has been investigated, 00:10:50 response, and then we plan to file it by the end of the year in the second half with the FDA also completing all the other BLA modules.
>
> Question – Jonathan Chang: Got it. What does the regulatory path look like for this and what could future development plans?
>
> Answer – Philip Astley-Sparke: Well, it's – it will be through the accelerated approval pathway if it gets approved. We had a meeting with the FDA last September. The FDA acknowledged that the population is one of unmet need. They also acknowledged the fact that, really, a second course of anti-PD-1 we expected to have benefit in as much as they commented that the contribution of component can be proven by the literature.
>
> They're delineating what they want to see in a pre-BLA package from which they would determine whether a filing should take

> place. And they agreed upon the concept of confirmatory study design, which is required for any product that goes through the accelerated approval pathway. And, essentially, the confirmatory study is in the same population that we run in my study. So, with a control arm and the control arm will be physician's choice, we will have that study underway by the time that we file the BLA. We're currently planning start-up activities.
>
> Question – Jonathan Chang: Got it. And when could investors see the IGNYTE data that would support this BLA submission?
>
> Answer – Philip Astley-Sparke: Yeah. The data, based on the actual official data backdrop, was off the to put it through Central Review, and then we will disclose it ahead of the BLA filing in the second half.

198. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**Y. May 16, 2024 Press Release**

199. On May 16, 2024, Replimune issued a press release entitled "Replimune Reports Fiscal Fourth Quarter and Year Ended 2024 Financial Results and Provides Corporate Update," which was filed with the SEC on Form 8-K and signed by CEO Sushil Patel. In the release, the company announced that it was on track to present the 12-month primary analysis results from the IGNYTE trial—evaluated by independent central review—in the second quarter of 2024. The

Company also disclosed the completion of a successful Type C meeting with the FDA specifically regarding Chemistry, Manufacturing, and Controls (CMC). This meeting was described as a "critical step" to align on manufacturing plans ahead of the intended BLA submission. Dr. Patel emphasized that these milestones, including the anticipated BLA filing in the second half of 2024, were essential to Replimune's transition into a commercial-stage company and its goal of bringing its first oncolytic immunotherapy to patients with advanced skin cancer.

> • Twelve-month primary analysis results by independent central review from the IGNYTE clinical trial of RP1 (vusolimogene oderparepvec) in anti-PD1 failed melanoma expected Q2 2024
>
> • Recent Type C CMC meeting with the U.S. Food and Drug Administration (FDA) supports IGNYTE Biologics License Application (BLA) submission expected in 2H 2024
>
> . . .
>
> "We have exciting milestones in the coming months, including sharing the investigator-assessed 12-month IGNYTE data at ASCO and then the official primary analysis by independent central review later in the second quarter," said Sushil Patel, Ph.D., CEO of Replimune. "Importantly, the design of our Phase 3 confirmatory IGNYTE-3 clinical trial has been agreed with the FDA, with patient enrollment planned to initiate in the second half of the year prior to the submission of our BLA for RP1. We also completed a successful Type C meeting with the FDA to align on our CMC plans ahead of the intended BLA. These are all critical steps as we plan for our next phase as a commercial stage company and, pending FDA approval, prepare to bring our first oncolytic immunotherapy to patients with advanced skin cancer."

200. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not

translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**Z. 2024 Annual Report**

201. On May 16, 2024, Replimune filed its annual report for the fiscal year ended March 31, 2024 with the SEC on Form 10-K ("2024 10-K"). The 2024 10-K was signed by Defendants Patel, Hill, Coffin, and Astley-Sparke.

202. In its Annual Report on Form 10-K, Replimune detailed the progress of its lead IGNYTE trial and noted that following a Type C meeting with the FDA, the FDA agreed to the design of the IGNYTE-3 confirmatory trial. The 2024 10-K highlighted that the FDA requires this trial to be underway at the time of a BLA submission expected to occur during the second half of 2024.

> Our leading clinical trial of RP1 is our IGNYTE trial, a multi-cohort Phase 1/2 clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort enrolling patients with anti-PD-1 failed cutaneous melanoma who are being treated with RP1 in combination with nivolumab. In December 2023, we reported the full data set of 156 patients (140 patients from the registration-directed expansion cohort and 16 anti-PD1 failed cutaneous melanoma patients from the prior phase 2 cohort), by investigator assessment, with an overall response rate, or ORR, of 31.4% and a complete response rate, or CR, of 12%. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. Following a Type C meeting with the U.S. Food and Drug Administration, or FDA, a Phase 3 study design was agreed. This confirmatory study, our IGNYTE-3 trial, is a randomized, controlled, multicenter, open-label Phase 3 clinical study comparing RP1 in combination with nivolumab versus physician's choice treatment for patients with unresectable Stage IIIb-IV cutaneous melanoma whose disease progressed on an anti PD-1 and an anti-CTLA-4 containing regimen (administered either as a combination regimen or in sequence) or who are not candidates

> for treatment with an anti-CTLA-4 therapy. The FDA requested that the IGNYTE-3 trial be underway at the time of a BLA submission under the accelerated approval pathway and we plan to enroll patients into this trial in the second half of 2024. The FDA also indicated that all responding patients in the IGNYTE anti-PD-1 failed cohort of melanoma patients should be followed for at least 6 months with assessments completed through independent central review using RECIST v1.1, in addition to modified RECIST used in the study. Topline primary data from RP1 in combination with nivolumab in anti-PD-1 failed melanoma patients is expected in the second quarter of 2024 and we plan to submit a BLA for this cohort in the second half of 2024.
>
> In our non-melanoma skin cancer, or NMSC, cohort of the IGNYTE clinical trial, we provided a data update in December 2023 from the first 30 patients with at least 6 months of follow up including patients with cutaneous squamous cell carcinoma, or CSCC, Merkel cell carcinoma, or MCC, basal cell carcinoma, and angiosarcoma in this cohort. The data showed that treatment with RP1 in combination with nivolumab led to an ORR of 30% which is consistent with data from the anti-PD-1 failed melanoma cohort with approximately one-third of patients responding and 60% demonstrating clinical benefit. The combination of RP1 and nivolumab was well tolerated in this patient population with a safety profile consistent with the overall experience seen with this treatment regimen to date. Enrollment remains open in this cohort.

203. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

204. In its risk disclosures, the 2024 10-K stated that:

> . . . the development of our product candidates for use in combination with another product or product candidate may present challenges that are not faced for single agent product candidates. While we have opened a clinical trial for use of RP1 as a monotherapy, we are generally developing RP1 and our other product candidates for use in combination with anti-PD-1 or potentially anti-PD(L)-1 therapies and may develop RP1 or our other product candidates for use with other therapies. ***Although*** we ***intend our IGNYTE anti-PD-1 failed melanoma trial cohort to be registration directed, the FDA may require us to use more complex clinical trial designs in order to evaluate the contribution of each product and product candidate to any observed effects***. It is possible that the results of these trials could show that any positive previous trial results are attributable to the therapy with which our products were combined and not our product candidates.

205. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

206. In its risk disclosures, the 2024 10-K stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental

> payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

207. The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

208. In addition, the 2024 10-K stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

209. The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**AA. June 6, 2024 Press Release**

210. In a June 6, 2024, press release filed with the SEC on Form 8-K, Replimune announced positive topline primary analysis data from its IGNYTE trial, reporting an overall response rate of 33.6% by independent central review. CEO Sushil Patel stated that based on these "compelling results" and "recent FDA interactions," the company was "increasingly confident" in its regulatory path. The release noted that Replimune had already shared the results with the agency and planned to request a pre-BLA meeting in anticipation of a BLA submission and a 2025 commercial launch. Additionally, the company highlighted that the data met an **"additional analysis requested by the FDA"** regarding RECIST 1.1 criteria and confirmed that all patient responses lasted more than six months.

> Replimune Group, Inc. (Nasdaq: REPL), a clinical stage biotechnology company pioneering the development of a novel class of oncolytic immunotherapies, today announced the topline results from the primary analysis of the IGNYTE clinical trial of RP1 plus nivolumab in anti-PD1 failed melanoma. The results by independent central review show one-third of patients receiving RP1 plus nivolumab responded to treatment, improving upon the investigator-assessed data presented at ASCO 2024, with all responses lasting greater than 6 months from baseline.
>
> "The overall strength of the IGNYTE data and safety profile further highlights the potential of RP1 in a difficult treatment setting with limited options for patients," said Sushil Patel, Ph.D., CEO of Replimune. "***Based on these compelling results and recent FDA interactions, we are increasingly confident in our path forward. We have shared the results with the agency and plan to request a pre-BLA meeting, in advance of our intended BLA submission. With these data in hand, we are preparing for a commercial launch next year***."
>
> The anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140 patients who received RP1 plus nivolumab after confirmed progression while being treated with at least 8 weeks of prior anti-PD1 therapy (+/- anti-CTLA-4). The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months.
>
> The topline results show the overall response rate was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the FDA. Responses from baseline were highly durable, with all responses lasting more than 6 months and median duration of response exceeding 35 months. The Company plans to submit the full primary analysis data from the anti-PD1 failed melanoma cohort including key secondary endpoint data and subgroups for presentation at an upcoming medical congress.

211. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not

translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**BB. June 6, 2024 IGNYTE Clinical Trial Update Call**

212. On June 6, 2024, Replimune hosted its IGNYTE Clinical Trial Update Call, featuring a management team that included Sushil Patel (Chief Executive Officer), Robert Coffin (Founder, President, and Chief R&D Officer), and Konstantinos Xynos (Chief Medical Officer). During the call, management presented an investor deck that on Slide 22 purportedly detailed the interactions with the FDA.




213. Commenting on Slide 22, Defendant Patel characterized the information as a "topline summary of two key FDA interactions," emphasizing that the feedback received from the agency had been directly "incorporated into the RP1 program." He further noted that the clinical

results presented during the call were specifically designed to "address" the regulatory requirements and milestones established through those prior discussions with the FDA.

214. During the IGNYTE Clinical Trial Update Call, an analyst requested that management elaborate on the "reasons for confidence in the accelerated approval path ahead." In response, Defendant Coffin referred to Slide 22 and referred to the cumulative history of "quite a number of different interactions with the FDA." Mr. Coffin explained that during these discussions, the parties identified the specific requirements necessary for a BLA filing and asserted that the Company had "indeed done" each of the items requested by the FDA, placing Replimune in a "good position" to have the BLA accepted later in the year.

> **Robert Coffin**: So, you did also ask about confidence with regard to the accelerated approval pathway. Clearly, there's never 100% guarantee in any regulatory process. However, over the last years we have had quite a number of different interactions with the FDA as summarized by Sush in the relevant slide. The most recent in September last year, where we did take the FDA through the data which we had at that time, and we discussed with the FDA what would be needed to include in the BLA filing using data as provided to the FDA by central review.
>
> So if you look at the slide, you'll see the things which we particularly discussed. But in higher-level summary, we do believe each of the things we discussed with the FDA, we have indeed done and therefore we should be in a good position to file the BLA later in the year to have the BLA accepted and hopefully accelerated approval to results in the fullness of time. But of course there are no guarantees. But we think we're in a good place.

215. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not

translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**CC. June 11, 2024 Goldman Sachs Global Healthcare Conference**

216. On June 11, 2024, Replimune CEO Sushil Patel participated in the Goldman Sachs Global Healthcare Conference, where the company published an investor presentation entitled "Igniting a Systemic Immune Response to Cancer." On Slide 22, which was identical to the slide previously presented during the June 6 update call, the company reiterated the specific regulatory milestones and feedback established through its Type B and Type C meetings with the FDA.




217. During the Goldman Sachs Global Healthcare Conference, CEO Sushil Patel highlighted that the topline results had already been shared with the FDA in preparation for a pre-BLA meeting. He stated that the company was specifically orienting its submission to "previous

conversations" with the agency to demonstrate how the program was "meeting the criteria" established in those discussions.

> Now, I'm going to move on to the next steps in terms of regulatory review data. The top line data has already been shared with the FDA will be requesting a pre-BLA meeting just to sort of orient to previous conversations we've had and why we feel that we're meeting the criteria that we had based on those discussions with the agency. We had a type B meeting and a type C meeting well recently the FDA gave us a lot of direction of what they wanted to see. And as I mentioned, one of the key things is to make sure that we had a real world population, that we saw clinically meaningful activity across subgroups, which I shared with you. We believe we've met that bar. As I also mentioned, the FDA wanted to see RESIST 1.1 data from Central Review again that date has held up relative to the investigator assessed data. And then one of the important things that the FDA did say is we're a combination treatment. So, how are we going to look at the individual contribution? This is a tough setting to actually identify that given the heterogeneity of the population. They did say that we can use individual contribution of components by literature. And as I mentioned, if you use the criteria we used, we would not really expect to see any more than 10% response rate for single agent anti-PD-1. So again, we believe we've met that criteria as well.

218. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

## DD. August 8, 2024 Press Release

219. On August 8, 2024, Replimune issued a press release filed on Form 8-K in which CEO Sushil Patel highlighted a "highly productive quarter" and emphasized the **"positive"** clinical results that underpinned the company's regulatory strategy. Dr. Patel specifically stated that his **"confidence in the RP1 program is reinforced"** by the IGNYTE primary analysis data, which revealed a strong **overall response rate (ORR) of 33.6%** by modified RECIST 1.1 criteria.

> "We have had a highly productive quarter as we gear up for the upcoming pre-BLA meeting with the FDA and prepare to enroll the first patient in our confirmatory trial of RP1 in anti-PD1 failed melanoma," said Sushil Patel, Ph.D., CEO of Replimune. "Our confidence in the RP1 program is reinforced by the IGNYTE primary analysis data that we presented in June, which demonstrates the potential of RP1 to address unmet needs in anti-PD1 failed melanoma patients who have not responded to prior existing therapies.
>
> **Program Highlights & Milestones**
>
> **RP1**
>
> **• RP1 combined with Opdivo® (nivolumab) in anti-PD1 failed melanoma**
>
> o In June, the Company announced positive topline primary analysis data by independent central review from the IGNYTE clinical trial of RP1 plus nivolumab in anti-PD1 failed melanoma. Topline results showed the 12-month overall response rate was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the FDA. Responses from baseline were highly durable, with all responses lasting more than 6 months and median duration of response exceeding 35 months.

220. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA

noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**EE. Q1 2025 Quarterly Report**

221. On August 8, 2024, Replimune filed its quarterly report for the quarter ended June 30, 2024 with the SEC on Form 10-Q ("Q1 2025 Quarterly Report"). The Q1 2025 Quarterly Report was signed by Defendants Patel and Hill. The Q1 2025 Quarterly report stated:

> Our leading clinical trial of RP1 is our IGNYTE trial, a multi-cohort Phase 1/2 clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort enrolling patients with anti-PD-1 failed cutaneous melanoma who are being treated with RP1 in combination with nivolumab. The anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140 patients who received RP1 plus nivolumab after confirmed progression while being treated with at least 8 weeks of prior anti-PD1 therapy (+/- anti-CTLA-4). The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the U.S. Food and Drug Administration, or FDA. Responses from baseline were highly durable, with all responses lasting more than 6 months and median duration of response exceeding 35 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. The Company plans to submit the full primary analysis data from the anti-PD1 failed melanoma cohort including key secondary endpoint data and subgroups for presentation at an upcoming medical congress. Following a Type C meeting with the FDA, a confirmatory study design concept consisting of a 2-arm randomized trial with physician's choice of treatment as a comparator arm in anti-PD1 failed melanoma patients was agreed. The FDA requested that the Phase 3 confirmatory trial be underway at the time of a BLA submission under the accelerated approval pathway. In May 2024, we reported completing a

> successful Type C meeting with the FDA that confirmed alignment on our Chemistry, Manufacturing and Controls, or CMC, plans to support an IGNYTE anti-PD1 failed melanoma BLA submission. A pre-BLA meeting with the FDA is planned for September 2024 and a BLA submission for RP1 in combination with nivolumab in anti-PD1 failed melanoma is planned for the second half of 2024.

222. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

223. In its risk disclosures, the Q1 2025 Quarter Reported stated:

> Moreover, the development of our product candidates for use in combination with another product or product candidate may present challenges that are not faced for single agent product candidates. While we have opened a clinical trial for use of RP1 as a monotherapy, we are generally developing RP1 and our other product candidates for use in combination with anti-PD-1 or potentially anti-PD(L)-1 therapies, and may develop RP1 or our other product candidates for use with other therapies. Although we intend our IGNYTE anti-PD-1 failed melanoma cohort and our CERPASS trial to be registration directed, the FDA may require us to use more complex clinical trial designs in order to evaluate the contribution of each product and product candidate to any observed effects. It is possible that the results of these trials could show that any positive previous trial results are attributable to the therapy with which our products were combined and not our product candidates.

224. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

225. In its risk disclosures, the Q1 2025 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

226. The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

227. In addition, the Q1 2025 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

228. The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**FF. September 9, 2024 Press Release**

229. On September 9, 2024, Replimune issued a press release entitled "Replimune Announces Positive Pre-BLA Meeting with FDA and Confirms BLA Submission On Track for 2H 2024," announcing a **"successful"** pre-BLA meeting with the FDA, which the company claimed **"confirmed that the accelerated approval path is available"** for RP1 in anti-PD1 failed melanoma. CEO Sushil Patel stated that the company remained "on track" to submit the BLA in the second half of 2024, supported by the previously reported **33% overall response rate** from the IGNYTE trial:

> Replimune Group, Inc. (NASDAQ: REPL), a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced it has completed a successful pre-Biologics License Application (pre-BLA) meeting with the U.S. Food and Drug Administration (FDA) that supports the Company's plans to submit a BLA for RP1 (vusolimogene oderparepvec) for the treatment of anti-PD1 failed melanoma via the accelerated approval pathway in 2H 2024.
>
> "This successful pre-BLA meeting confirmed that the accelerated approval path is available for RP1 in anti-PD1 failed melanoma," said Sushil Patel, Ph.D., Chief Executive Officer at Replimune. "With the confirmatory IGNYTE-3 trial underway, we remain on track to submit the BLA in 2H 2024 and continue our preparations to bring RP1 to patients with advanced melanoma."
>
> Topline results from the primary analysis of the IGNYTE clinical trial of RP1 plus nivolumab shared earlier this year showed an overall response rate of 33%. Independently reviewed data from the IGNYTE clinical trial, including key secondary endpoints and subgroup analyses will be presented as a late-breaking abstract during an oral session at the European Society for Medical

> Oncology (ESMO) Annual Congress 2024 in Barcelona on Sunday, September 15, 2024, at 3:45pm CEST.

230. The September 9, 2024, press release was materially misleading because it characterized the pre-BLA meeting as "successful" and "confirmed" the availability of the accelerated approval path while omitting a critical regulatory hurdle. Specifically, the company failed to disclose that during the September 3, 2024, meeting, the FDA mandated that Replimune "provide evidence to demonstrate that there is a compelling reason that both RP1 and nivolumab are necessary to achieve the observed treatment effect." By framing the meeting as a definitive green light for the BLA submission, Defendants downplayed the ongoing risk that the agency remained unsatisfied with the company's proof of contribution of components. This omission was particularly significant given that the FDA had previously expressed concerns at the March 2021 FDA Type B meeting, including that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial.

**GG. Q2 2025 Quarterly Report**

231. On November 12, 2024, Replimune filed its quarterly report for the quarter ended September 30, 2024 ("Q2 2025 Quarterly Report"). The Q2 2025 Quarterly Report was signed by Defendants Patel and Hill.

232. The Q2 2025 Quarterly Report stated:

> Our leading clinical trial of RP1 is our IGNYTE trial, a multi-cohort Phase 1/2 clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort enrolling patients with anti-PD-1 failed cutaneous melanoma who are being treated with RP1 in combination with nivolumab. The anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140 patients who received RP1 plus nivolumab after confirmed progression while being treated with at least 8 weeks of prior anti-PD1 therapy (+/- anti-CTLA-4). The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the U.S. Food and Drug Administration, or FDA.
>
> . . .
>
> In August 2024, we announced the dosing of the first patient in our IGNYTE-3 trial and in September 2024, we announced completion of a successful pre-BLA meeting with the FDA that supports our plans to submit a BLA for RP1 for the treatment of anti-PD1 failed melanoma under the accelerated approval pathway before the end of the year.

233. In its risk disclosures, the Q2 2025 Quarterly Report stated that:

> Moreover, the development of our product candidates for use in combination with another product or product candidate may present challenges that are not faced for single agent product candidates. While we have opened a clinical trial for use of RP1 as a monotherapy, we are generally developing RP1 and our other product candidates for use in combination with anti-PD-1 or potentially anti-PD(L)-1 therapies, and may develop RP1 or our other product candidates for use with other therapies. Although we intend our IGNYTE anti-PD-1 failed melanoma cohort and our CERPASS trial to be registration directed, the FDA may require us to use more complex clinical trial designs in order to evaluate the contribution of each product and product candidate to any observed effects. It is possible that the results of these trials could show that any positive previous trial results are attributable to the therapy with which our products were combined and not our product candidates.

234. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B

meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Moreover, the statements failed to disclose that during the September 3, 2024, meeting, the FDA mandated that Replimune "provide evidence to demonstrate that there is a compelling reason that both RP1 and nivolumab are necessary to achieve the observed treatment effect." By framing the meeting as a definitive green light for the BLA submission, the Defendants downplayed the ongoing risk that the agency remained unsatisfied with the company's proof of contribution of components.

235. In its risk disclosures, the Q2 2025 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]

236. The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

237. In addition, the Q2 2025 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

238. The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

### HH. January 21, 2025 Press Release

239. On January 21, 2025, Replimune issued a press release entitled "Replimune Announces Biologics License Application Acceptance and Priority Review for RP1 for the Treatment of Advanced Melanoma," which was subsequently filed with the SEC on a Form 8-K signed by Defendant Patel. In the press release, the Company announced that the FDA had accepted its BLA for RP1 and granted it Priority Review. The press release stated that the BLA was "supported by the primary analysis data of the IGNYTE trial," and that the FDA had "not identified any potential review issues" at this time:

> Replimune Group, Inc. (NASDAQ: REPL), a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced that the U.S. Food and Drug Administration (FDA) has accepted the Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec) in combination with nivolumab for patients with advanced melanoma. The FDA granted the BLA Priority Review with a Prescription Drug User Fee Act (PDUFA) action date of July 22, 2025. The FDA also informed the Company that they are not currently planning to hold an advisory committee meeting in relation to this application, ***and at this time have not identified*** any ***potential review issues***. ***The BLA is supported by the primary analysis data of the IGNYTE trial, evaluating RP1 combined with nivolumab in patients with anti-PD-1 failed melanoma.*** A confirmatory Phase 3 trial, IGNYTE-3, is currently underway with over 100 sites planned globally.
>
> "There are limited treatment options and a significant unmet need for patients with advanced melanoma who previously received an

> anti-PD-1 containing regimen," said Sushil Patel, Ph.D., Chief Executive Officer, Replimune. "The BLA acceptance is an important milestone for Replimune, and we look forward to working closely with the FDA on the review of our application."

240. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Moreover, the statements failed to disclose that during the September 3, 2024, pre-BLA meeting, the FDA mandated that Replimune "provide evidence to demonstrate that there is a compelling reason that both RP1 and nivolumab are necessary to achieve the observed treatment effect." By omitting these facts, Defendants downplayed the ongoing risk that the agency remained unsatisfied with the company's proof of contribution of components.

## II. Q3 2025 Quarterly Report

241. On February 12, 2025, Replimune filed its quarterly report for the quarter ended December 31, 2024 with the SEC on Form 10-Q ("Q3 2025 Quarterly Report"). The Q3 2025 Quarterly Report was signed by Defendants Patel and Hill.

242. The Q3 2025 Quarterly Report stated that:

> Our leading clinical trial of RP1 is our IGNYTE trial, a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1. The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma. The anti-PD1 failed melanoma cohort from the IGNYTE clinical trial includes 140 patients who received RP1 plus nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the U.S. Food and Drug Administration, or FDA. Responses from baseline were highly durable with 85% of responses lasting more than 12 months. The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed.
>
> . . .
>
> In November 2024, we announced submission of a biologics license application (BLA) to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the Accelerated Approval pathway. We recently announced the FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act goal date of July 22, 2025.
>
> Following a Type C meeting with the FDA, a confirmatory study design concept consisting of a 2-arm randomized trial with physician's choice of treatment as a comparator arm in anti-PD1 failed melanoma patients, or the IGNYTE-3 trial, was agreed. The FDA requested that the Phase 3 confirmatory IGNYTE-3 trial be underway at the time of a BLA submission under the accelerated approval pathway.

243. In its risk disclosures, the Q3 2025 Quarterly Report stated that:

> Moreover, the development of our product candidates for use in combination with another product or product candidate may present challenges that are not faced for single agent product candidates. While we have opened a clinical trial for use of RP1 as a monotherapy, we are generally developing RP1 and our other product candidates for use in combination with anti-PD-1 or potentially anti-PD(L)-1 therapies, and may develop RP1 or our other product candidates for use with other therapies. Although we

> intend our IGNYTE anti-PD-1 failed melanoma cohort to be registration directed, the FDA may require us to use more complex clinical trial designs in order to evaluate the contribution of each product and product candidate to any observed effects. It is possible that the results of these trials could show that any positive previous trial results are attributable to the therapy with which our products were combined and not our product candidates.

244. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Moreover, the statements failed to disclose that during the September 3, 2024, pre-BLA meeting, the FDA mandated that Replimune "provide evidence to demonstrate that there is a compelling reason that both RP1 and nivolumab are necessary to achieve the observed treatment effect." By omitting these facts, Defendants downplayed the ongoing risk that the agency remained unsatisfied with the company's proof of contribution of components.

245. In its risk disclosures, the Q3 2025 Quarterly Report stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in

> granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

246. The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

247. In addition, the Q1 2025 Quarterly Report stated, in pertinent part, that

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve a marketing application[.]

248. The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

### JJ. May 22, 2025 Q4 2025 Earnings Call

249. On May 22, 2025, Replimune hosted an earnings call to discuss its fourth quarter fiscal year 2025 financial results. During the call, Defendant Patel reaffirmed the company's trajectory toward commercialization, stating that Replimune was **"poised to realize"** its mission based on the "substantial body of evidence" generated to date. Specifically, Patel touted the IGNYTE study's results—showing a durable response in roughly one-third of patients—as a primary driver for regulatory confidence. He further signaled that the approval process was in its final stages, disclosing that the company had **"recently completed the late cycle meeting"** with

the FDA. Patel positioned RP1 as the "first choice" for advanced melanoma patients following anti-PD-1 failure given its **"compelling safety and efficacy data."**

> Replimune was founded to pioneer the next generation of oncolytic immunotherapy and is now poised to realize that promise with ***a substantial body of evidence supporting our mission***. ***In particular, data from the IGNYTE study shows that roughly one-third of patients are able to achieve durable response in a high unmet need setting with few options***.
>
> . . .
>
> Over the past year, we have made significant regulatory progress, resulting in a recognition of RP1 as a breakthrough therapy with priority review and a PDUFA date, July 22, 2025. We remain actively engaged with the FDA and recently completed the late cycle meeting and manufacturing inspections.
>
> The IGNYTE-3 confirmatory study is underway and has a primary endpoint overall survival. Enrollment in the US is on track with over 100 sites planned globally. While we have seen important advances in the melanoma treatment landscape, the unmet need remains significant. We believe upon FDA approval, RP1 will be well positioned to be the first choice for advanced melanoma patients, who have previously received an anti-PD-1 containing regimen.
>
> ***This is based on a combination of compelling safety and efficacy data, a comprehensive understanding of the patient population and prescriber base, and a launch model optimized to unlock the potential of intra-tumoral injections.***

250. Later, in response to analyst inquiry CFO Emily Hill and CEO Sushil Patel characterized Replimune's interactions with the FDA as "successful," asserting that there were "no impediments" to approval and that the IGNYTE trial's results significantly outperformed historical benchmarks:

> Question – Jonathan Chang: Hi, guys. Good morning. Thanks for taking the questions. Congrats on the progress and for hosting what I believe is your first earnings call. First question, can you discuss the impact you're seeing from the recent regulatory changes? And can you provide any color on recent FDA interactions? And then, on second question on IGNYTE, can you discuss the translation of response rate into metrics like PFS and OS and what benchmarks are you pointing to for PFS and OS in the anti-PD-1 failed melanoma setting? Thank you.
>
> Answer – Emily Hill: Thanks, Jonathan. This is Emily. I'll take the first segment of your question. So, just as a reminder for those on

the call, we received breakthrough designation late last year and then submitted our BLA for RP1 and PD-1 failed melanoma. Our BLA was accepted in January with a priority review. And since that in January, we've been responding to information requests from the FDA in a timely and thorough manner.

We're very grateful to have seen committed and consists engagement from our review team and we haven't seen any changes to the cadence of that commitment. Having recently completed both our late cycle meeting with the FDA and our manufacturing inspections, ***we're very pleased with the outcome of those interactions and we believe there are no impediments***. We're on track for our July 22 PDUFA.

Answer – Sushil Patel: And Jonathan, just to address your second question and yes, you're right, this is our first call, which we are excited about. ***So, in terms of the data that we've seen for IGNYTE, just as a reminder, we've seen around a third patient or a third of patients achieve durable responses, which you look at median duration of response of more than 20 months. This is a single arm study as you're aware and so obviously, there are some limitations of PFS and OS in this study***.

However, we've seen a PFS around four months and then overall survival, which I think is actually very impressive, where we've seen more than – about 55% of patients still alive at three years. And so, we think that's going to be very meaningful relative to other options in this space. ***You asked about the benchmarks we should be using and I think it is important to remember that the IGNYTE did use a very strict criteria for anti-PD-1 failure and there isn't exact apples-to-apples comparisons. But, if you think about some of the other studies and assets or molecules used in this space, such as ipi-nivo or Opdualag having failed there, either ipi-nivo, Opdualag in the frontline setting***.

You see about a 12% response rate and typically physicians and KOLs would tell you would not expect to see median overall survival of more than 12 months. So, I think, that's a reasonable benchmark than most people use. Further checkpoint inhibition after failure of prior checkpoint inhibition really only results in a response rate of 6% or 7% with very modest overall survival benefits.

251. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for

an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Moreover, the statements failed to disclose that during the September 3, 2024, pre-BLA meeting, the FDA mandated that Replimune "provide evidence to demonstrate that there is a compelling reason that both RP1 and nivolumab are necessary to achieve the observed treatment effect." By omitting these facts, Defendants downplayed the ongoing risk that the agency remained unsatisfied with the company's proof of contribution of components.

**KK. 2025 Annual Report**

252. On May 22, 2025, Replimune published its annual report for the fiscal year ended March 31, 2025 with the SEC on Form 10-K ("2025 10-K"). The 2025 10-K was signed by Defendants Patel, Hill and Astley-Sparke.. Therein, Replimune repeated the same false or misleading statements it made in its May 2024 Annual Report.

253. Specifically, the 2025 10-K stated that:

> Our leading clinical trial of RP1 is referred to as the IGNYTE trial, which is a multi-cohort clinical trial being conducted in collaboration with Bristol Myers Squibb Company, or BMS, under which BMS has granted us a non-exclusive, royalty-free license to, and is supplying at no cost, its anti-PD-1 therapy, nivolumab, for use in combination with RP1.
>
> The leading tumor specific cohort in the IGNYTE trial is our registration directed Phase 2 expansion cohort in anti-PD-1 failed cutaneous melanoma. The anti-PD-1 failed melanoma cohort from the IGNYTE trial includes 140 patients who received RP1 in combination with nivolumab. The primary analysis by independent central review was triggered once all patients had been followed for at least 12 months. The topline results showed the overall response

rate, or ORR, was 33.6% by modified RECIST 1.1 criteria, the primary endpoint as defined in the protocol, and 32.9% by RECIST 1.1 criteria, an additional analysis requested by the FDA. Responses from baseline were highly durable with 85% of responses lasting more than 12 months. The median duration of response from baseline was 27.6 months and the median duration of response from treatment initiation was 21.6 months. RP1 combined with nivolumab continues to be well-tolerated, with mainly Grade 1-2 "on target" side effects, observed. In September 2024, we presented the independently reviewed data from the IGNYTE trial, including key secondary endpoints and subgroup analysis as a late-breaking abstract during an oral session at the European Society for Medical Oncology, or ESMO. Data presented at ESMO showed activity across all subgroups, including patients who had prior anti-PD-1 and anti-CTLA-4 treatment had an ORR of 27.7% and patients who had primary resistance to anti-PD-1 had an ORR of 35.9% by modified RECIST v1.1. In November 2024, we presented a late-breaking abstract featuring the IGNYTE trial primary analysis that had been selected for oral presentation at the 39th Annual Meeting of the Society for Immunotherapy of Cancer (SITC 2024). The data presented at SITC 2024 included further clinical subgroup and initial biomarker data from the IGNYTE trial.

In November 2024, we announced submission of a biologics license application, or BLA, to the FDA for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of adult patients with advanced melanoma who have previously received an anti-PD-1 containing regimen and that the FDA has granted Breakthrough Therapy designation to RP1 in combination with nivolumab in the same setting. The submission was made under the accelerated approval pathway. The FDA accepted our BLA and granted priority review with a Prescription Drug User Fee Act, or PDUFA, goal date of July 22, 2025. The FDA recently completed their late-cycle review meeting and all manufacturing inspections for the BLA and we believe we remain on track for the July 22, 2025 PDUFA date.

In August 2024, we announced the dosing of the first patient in the IGNYTE-3 trial, or the I-3 trial, a confirmatory study design concept consisting of a 2-arm randomized Phase 3 clinical trial with physician's choice of treatment as a comparator arm in anti-PD-1 failed melanoma patients. With over 100 sites planned globally and an expectation to enroll 400 patients, the I-3 trial will assess RP1 in combination with nivolumab in patients with advanced melanoma who have progressed on anti-PD-1 and anti-CTLA-4 therapies or are ineligible for anti-CTLA-4 treatment. We continue to enroll patients in the I-3 trial.

In our non-melanoma skin cancer, or NMSC, cohort of the IGNYTE trial, we provided a data update in December 2023 from the first 30 patients with at least 6 months of follow up including patients with cutaneous squamous cell carcinoma, or CSCC, Merkel cell carcinoma, or MCC, basal cell carcinoma, and angiosarcoma in this cohort. The data showed that treatment with RP1 in combination

> with nivolumab led to an ORR of 30% which is consistent with data from the anti-PD-1 failed melanoma cohort with approximately one-third of patients responding and 60% demonstrating clinical benefit. The combination of RP1 and nivolumab was well tolerated in this patient population with a safety profile consistent with the overall experience seen with this treatment regimen to date. Enrollment remains open in this cohort.

254. In its risk disclosures, the 2025 10-K stated that:

> Moreover, the development of our product candidates for use in combination with another product or product candidate may present challenges that are not faced for single agent product candidates. While we have opened a clinical trial for use of RP1 as a monotherapy, we are generally developing RP1 and our other product candidates for use in combination with anti-PD-1 or potentially anti-PD(L)-1 therapies and may develop RP1 or our other product candidates for use with other therapies. Although we intend for some of our trials to support registrational filings, the FDA may require us to use more complex clinical trial designs in order to evaluate the contribution of each product and product candidate to any observed effects. It is possible that the results of these trials could show that any positive previous trial results are attributable to the therapy with which our products were combined and not our product candidates.

255. The foregoing statement was misleading because it materially downplayed the risk that the FDA would decide that Replimune's intended pathway for RP1, accelerated approval, would not be accepted by the FDA by failing to disclose that at the March 2021 FDA Type B meeting, the FDA communicated that (i) it recommended that Replimune conduct a randomized controlled trial rather than rely on a single-arm study; (ii) a single-arm study "would not allow for an adequate assessment of the contribution of RP1 to the overall clinical activity"; (iii) the FDA noted that Replimune's "proposed target of 30% to 40% objective response rate (ORR) may not translate into unequivocally improved clinical benefit in this indication"; (iv) the FDA expressed concern about "potential issues of interpreting efficacy result due to baseline heterogeneities among study subjects"; and (v) the FDA "would not recommend submitting a BLA" on the basis of the single-arm IGNYTE trial. Moreover, the statements failed to disclose that during the September 3, 2024, pre-BLA meeting, the FDA mandated that Replimune "provide evidence to

demonstrate that there is a compelling reason that both RP1 and nivolumab are necessary to achieve the observed treatment effect." By omitting these facts, Defendants downplayed the ongoing risk that the agency remained unsatisfied with the company's proof of contribution of components.

256. In its risk disclosures, the 2025 10-K stated that:

> **the FDA may decide that our intended pathways, including accelerated approval, are not appropriate for our product candidates, requiring that we conduct additional studies.** By example, in recent years the accelerated approval pathway has come under significant FDA and public scrutiny. Accordingly, depending on the results of our studies, the FDA may be more conservative in granting accelerated approval or, if granted, may be more apt to withdrawal approval if clinical benefit is not confirmed. Even if accelerated approval is granted, payors, including governmental payors, may be less welling to provide sufficient reimbursement for products approved via accelerated approval[.]
>
> (emphasis added)

257. The foregoing statement was misleading because they materially misrepresented the significance of the risk posed by Replimune's failure to obtain Accelerated Approval for RP1, characterizing the consequence of that risk merely requiring more trials, when in reality, a failure of Accelerated Approval would render development of RP1 unviable.

258. In addition, the 2025 10-K stated, in pertinent part, that:

> we may decide, or regulators may require us, to conduct or gather, as applicable, additional clinical trials, analyses, reports, data, or preclinical trials, or we may abandon product development programs. By example, the FDA may determine that larger trials, Phase 3 trials, randomized and controlled clinical trials, or clinical trials designed to replicate results found in our registrational or pivotal trials are required before we may file a BLA or before the FDA will approve or maintain a marketing application;

259. The foregoing statement was misleading because it failed to disclose the risk that if the FDA did in fact require Phase 3 trials prior to the approval of RP1, RP1 would not be viable.

**LL. July 22, 2025 Press Release**

260. On July 22, 2025, Replimune issued a press release entitled, "Replimune Receives Complete Response Letter from FDA for RP1 Biologics License Application for the Treatment of Advanced Melanoma," which was filed with the SEC on Form 8-K and signed by CEO Sushil Patel. In the release, Defendant Patel characterized the FDA's decision as unexpected and represented that the "issues highlighted in the CRL were not raised by the agency during the mid- and late-cycle reviews."

> The CRL indicates that the FDA is unable to approve the application in its present form. The FDA has indicated that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness. Furthermore, the FDA said the trial cannot be adequately interpreted due to the heterogeneity of the patient population. The CRL also states that there are items related to the confirmatory trial study design which need to be addressed, including contribution of components.
>
> . . .
>
> "***We are surprised by this FDA decision*** and disappointed for advanced melanoma patients who have limited treatment options as highlighted by the granting of breakthrough status at the time we provided the IGNYTE primary data," said Sushil Patel, Ph.D., Chief Executive Officer, Replimune. "***The issues highlighted in the CRL were not raised by the agency during the mid- and late-cycle reviews. Additionally, we had also aligned on the design of the confirmatory study*** "

261. The representation that the FDA's decision was a "surprise" was materially false and misleading because it suppressed the fact that the agency had consistently warned Replimune against its regulatory path for years. Specifically, the April 2026 CRL reveals that during the September 3, 2024, pre-BLA meeting, the FDA explicitly mandated that the company provide "compelling" evidence that both RP1 and nivolumab were necessary to achieve the observed effect—a requirement that remained unresolved throughout the review cycle. Furthermore, the FDA had previously communicated at the March 2021 FDA Type B meeting that it "would not

recommend submitting a BLA" based on the single-arm IGNYTE trial, as such a study could not isolate RP1's contribution to the observed clinical activity. By claiming the issues were "not raised," Patel obscured the reality that the July 2025 CRL was the direct result of the company's failure to address longstanding regulatory deficiencies regarding the isolation of components.

**MM. October 20, 2025 Press Release**

262. On October 20, 2025, Replimune issued a press release entitled, "Replimune Announces FDA Acceptance of BLA Resubmission of RP1 for the Treatment of Advanced Melanoma," which was filed on a Form 8-K with the SEC and signed by CEO Sushil Patel. In the release, Defendant Patel expressed satisfaction with the agency's acceptance of the resubmission, asserting that Replimune had spent the preceding months **"working to address agency feedback"** and had included "[a]dditional information, data and analyses" in the resubmission that the FDA deemed a complete response to the July 2025 CRL:

> "We are pleased the agency has accepted the resubmission of our BLA for RP1," said Sushil Patel, Ph.D., CEO of Replimune. "RP1 plus nivolumab offers a strong risk benefit profile where there are few options for patients with advanced melanoma, who have progressed on PD-1 based therapy. We look forward to working closely with the agency to expedite this review as much as possible for patients' benefit."
>
> During the past few months, Replimune has been working to address agency feedback. Additional information, data and analyses were included in the resubmission which will be part of the BLA review. The FDA indicated this resubmission is considered to be a complete response to the complete response letter received in July 2025.

263. The October 20, 2025, press release was materially false and misleading because it represented that Replimune had "addressed agency feedback" when, in reality, the company had ignored explicit FDA guidance and submitted data the agency found "insufficient to support an efficacy claim". While CEO Patel touted the inclusion of "[a]dditional information" in the BLA resubmission, the April 2026 CRL reveals that during a Type A meeting on September 16, 2025,

the FDA had specifically warned that the response criteria used in the IGNYTE trial (RPL-001-16) were inconsistent with standard RECIST v1.1 methodology and potentially incomparable to historical benchmarks. Despite the FDA providing specific recommendations on how to utilize Phase 3 data (RP1-104) to support Accelerated Approval, the company instead submitted an early, unplanned analysis representing only 10% of the planned enrollment—data patently inadequate to prove effectiveness. Furthermore, the resubmission failed to resolve the "contribution of effect" deficiency; the agency noted it remained "unclear whether the observed responses... are due to nivolumab alone" and identified that over half of responding patients lacked non-injected target lesions to assess systemic activity. The release further suppressed the fact that the agency's advice had remained "consistent" since 2021 and that the exploratory analyses provided were patently unreliable.

**NN. March 9, 2026 Leerink Global Healthcare Conference**

264. On March 9, 2026, Defendants Patel and Hill participated in the Leerink Global Healthcare Conference, discussing its lead oncolytic immunotherapy candidate RP1 for advanced melanoma and regulatory progress toward an April 10, 2026 FDA PDUFA date. During the Conference, Defendant Hill continued to frame the July 2025 rejection as an unexpected development while discussing the Company's resubmission:

> Question – Unidentified speaker: Great. Maybe just start on the regulatory front with RP1. What has happened in the past? Where do things stand today and what is ahead of us?
>
> Answer – Hill: Good question. Thank you, Jonathan. So RP1 for advanced melanoma back in mid-2024, we shared the centrally reviewed data from the IGNYTE-2 trial. And after that, data was disclosed, we received breakthrough designation from the FDA. Subsequently, we submitted a BLA application and got a priority review for that application. We went through mid-cycle, late-cycle reviews and very robust inspections, got to labeling discussions, had had a very productive review. But around that time there were changes in leadership at the FDA, and we ended up with a very surprising, complete response during our July 22 PDUFA.

> After the PDUFA, we were able to schedule a Type A Meeting with the FDA, where we discussed the data and the application. And subsequent to that, we came to the conclusion to resubmit the BLA. That resubmission was accepted. And as Sush mentioned, we were given an April 10th PDUFA. During the review process, we've received additional information requests and responded to those information requests and we are working towards our April 10th PDUFA now.

265. The representation that the FDA's findings were a "surprise" was materially false and misleading because it suppressed the fact that the agency's advice had remained "consistent" since March 2021. While management suggested the regulatory hurdles were due changes in leadership and unexpected, the FDA had explicitly warned Replimune years earlier that a single-arm study "would not allow for an adequate assessment" of RP1's contribution and that the agency "would not recommend" a BLA submission based on such data. Furthermore, Defendant Hill's suggestion that the October resubmission addressed agency feedback was false and misleading; Defendant Hill omitted to disclose that the resubmission was essentially futile as it relied on an unplanned analysis of only 10% of the planned enrollment from a Phase 3 trial, which was patently "insufficient to support an efficacy claim". Further, Defendant Hill omitted to disclose the resubmission failed to resolve the "contribution of effect" deficiency.

## VI. ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

266. Numerous additional facts give rise to a strong inference that Replimune and the Individual Defendants knew, or were deliberately reckless in not knowing, that their statements about RP1's regulatory pathways were false and misleading or omitted material facts necessary to make them not misleading when made.

### A. Additional Facts in Support of Defendant Patel's Scienter

267. ***Defendant Patel's Personal Knowledge of the FDA's Persistent Warning***s. Defendant Patel had access to the minutes of Replimune's meetings with the FDA, including the March 2021 Type B meeting, the September 2023 Type C meeting, and the September 2024 pre-

BLA meeting, and was therefore aware of what the FDA communicated to the Company during those interactions. Indeed, Patel's own public statements confirm his knowledge of those meetings and their substance. For example, on June 11, 2024, at the Goldman Sachs Global Healthcare Conference, Patel stated that the "topline results had already been shared with the FDA" and that the Company was orienting its BLA submission to "previous conversations" with the agency to demonstrate how the program was "meeting the criteria" established in those prior discussions. Similarly, on June 6, 2024, during the IGNYTE Clinical Trial Update Call, Patel characterized the Company's FDA interactions as a "topline summary of two key FDA interactions" and affirmed that the feedback received from the agency had been directly "incorporated into the RP1 program." And on July 22, 2025, after receipt of the first CRL, Patel personally claimed to be "surprised by this FDA decision" and asserted that "[t]he issues highlighted in the CRL were not raised by the agency during the mid- and late-cycle reviews" — statements that would be impossible to make without direct knowledge of what the FDA had communicated during those meetings. These statements demonstrate that Patel had actual knowledge of, or access to, the substance of the FDA's communications to Replimune, including the agency's repeated warnings against the Company's chosen regulatory approach.

268. ***Patel was directly and extensively involved in developing and obtaining regulatory approval for RP1.*** Throughout the Class Period, Defendant Patel was one of the primary executives of Replimune and was one of the ultimate decision makers on matters vital to RP1's development, regulatory approval, and commercialization. Since April 1, 2024, he has served as Replimune's CEO. He also sits on Replimune's Board of Directors. Before becoming CEO, Patel served as Replimune's Chief Commercial and Chief Strategy Officers. Over the course of his career, he has aggregated more than 20 years of experience in the biotech industry, including

the specific areas of pre- and post-launch commercialization strategy and execution in both the U.S. and global markets. As chief commercial officer, Patel lead Replimune's commercial team including launch readiness initiatives and played a key role in the development and execution of the Company's "go to market" strategy. In announcing this appointment, the Company celebrated Patel's "wealth of experience in immuno-oncology and an incredible track record of success in defining and implementing launch strategies." And Patel himself noted RP1's registration-directed clinical trials as the groundwork for his plans to "build an innovative and comprehensive commercial strategy." Similarly, in the press announcing his appointment as CEO, Patel specifically noted he would be focusing on data collection for RP1 and Replimune's subsequent license application submission for RP1. Since becoming CEO, he has demonstrated his commitment to and knowledge of the development goal in his multiple public statements, including multiple, detailed interviews he has given with science media outlets like Biotech TV about RP1 and its clinical data. These highly knowledgeable statements, presumably from personal knowledge or reports, assured investors that Patel (and his subordinates) were hands-on managers who were actively involved in RP1's development and regulatory approval pathways.

269. ***Patel acknowledged that regulatory approval of RP1 was core to Replimune' s ongoing operations.*** As discussed above, in the April 1, 2024 press release announcing his appointment as CEO, Patel specifically noted he would be focusing on data collection for RP1 and Replimune's subsequent license application submission for RP1. Likewise, on November 21, 2024, in a press release announcing that Replimune had filed its BLA for RP1 under the accelerated approval pathway, Patel remarked that the effort was "an important milestone for Replimune." Further, in a January 21, 2025 press release announcing the FDA's acceptance of the BLA, Patel

stated, “"The BLA acceptance is an important milestone for Replimune, and we look forward to working closely with the FDA on the review of our application.”

270. ***Patel's repeated statements to the public about RP1's development and regulatory history demonstrate his knowledge or recklessness.*** In addition to false statements identified above, Patel has frequently fielded questions about RP1's timeline and history, and given detailed answers in response. He also provided such information in interviews with media outlets. As just one example, on July 23, 2025, shortly after Replimune received a CRL from the FDA, Patel provided a 20-minute interview to Biotech TV, during which he walked through the decisions behind the design of RP1's clinical studies and its interactions with the FDA. He also demonstrated his extensive knowledge of RP1's science by commenting, for example, on minor changes that Replimune could implement to its IGNYTE studies to remedy issues identified by the FDA. His public statements on these matters further reinforce the inference that they were intimately involved in directing and/or overseeing Replimune's strategy for regulatory approval and were involved in and/or had knowledge of Replimune's interactions with the FDA.

271. ***Patel was informed at internal meetings and had access to internal contemporaneous reports and data that contradicted his statements to investors***. By signing and authorizing SEC filings and press releases that directed investors to the Company's website for more information about Replimune and its platform, Patel represented that he had reviewed, approved of, and authorized the statements made on the website. Because of this position of control and authority, his ability to exercise power and influence over Replimune' s conduct and his access to material inside information about RP1 during the Class Period, Patel, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act. Due to Patel's participation in interacting with the Board of Directors and keeping it informed, he

had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and products. Through his position, Patel also attended meetings, as well as received, reviewed and had access to reports and data relevant to the material and omitted fact that Replimune could not develop RP1 without access to the accelerated approval pathway.

272. ***As CEO and Replimune's Chief Operating Decision Maker ("CODM"), Defendant Patel was acutely aware of, and the chief decisionmaker on decisions relating to, the long-term financial viability of RP1.*** As CEO and CODM, Patel served as the most senior person at Replimune charged with managing the Company's operating cash flows to develop and market its RPx platform over a multi-year window. In those roles, Patel steered the Company through cash-raising events, including a public offering in November 2024—the same month Replimune filed its BLA for RP1. Patel spoke publicly about the Company's finances, including in a January 2025 call with investors. And he signed quarterly SEC reports disclosing the Company's present and near-term financial circumstance. According to Replimune's Annual Reports, before these SEC filings were submitted, Patel "reviews consolidated operating results, and uses the Company's consolidated net income (loss), in order to monitor actual results as compared to the budget, and to determine how best to allocate the Company's operating and capital resources, specifically as it relates to the Company's development programs."

273. Indeed, Replimune and Patel confirmed Patel's acute awareness of RP1's viability after the fact. Specifically, after the truth emerged that the development of RP1 may not be viable without the accelerated approval pathway, Replimune began disclosing in multiple places in its SEC filings (signed by Patel) that the financial estimates in the SEC filings (which Patel had reviewed prior to signing) "were based on assumptions that may prove to be wrong, including the assumption that the development of RP1 will remain viable, and the Company could utilize its

available capital resources sooner than expected." Additionally, Patel personally affirmed that RP1's viability was contingent on Accelerated Approval in a September 2025 press release, in which he said "We remain steadfastly committed to patient access while we work with the FDA to secure regulatory approval for RP1, however, without accelerated approval based on the current application, continuation of the RP1 program in advanced melanoma, including the phase 3 confirmatory trial, will not be viable."

**B. Additional Facts in Support of Defendant Hill's Scienter**

274. ***Hill's Personal Knowledge of the FDA's Persistent Warnings***. Defendant Hill also had access to the minutes of Replimune's meetings with the FDA, including the March 2021 Type B meeting, the September 2023 Type C meeting, and the September 2024 pre-BLA meeting, and was therefore aware of what the FDA communicated to the Company during those interactions. Hill's own public statements confirm her knowledge of the substance of those FDA communications. Most notably, on May 22, 2025, during the Q4 2025 Earnings Call, Hill personally characterized Replimune's interactions with the FDA as "successful," asserting that "we haven't seen any changes to the cadence of that commitment" from the FDA review team and that "having recently completed both our late cycle meeting with the FDA and our manufacturing inspections, we're very pleased with the outcome of those interactions and we believe there are no impediments." Hill further noted that since receiving BLA acceptance in January, the Company had been "responding to information requests from the FDA in a timely and thorough manner." Additionally, on March 9, 2026, at the Leerink Global Healthcare Conference, Hill characterized the July 2025 CRL as a "very surprising, complete response" and attributed it to "changes in leadership at the FDA," while describing the Company's post-CRL Type A meeting and subsequent BLA resubmission in detail — further demonstrating her intimate familiarity with the

substance of the Company's FDA interactions and the content of those meetings. These statements demonstrate that Hill had actual knowledge of, or access to, the substance of the FDA's communications to Replimune.

275. ***Hill understood that regulatory approval of RP1 was core to Replimune's ongoing operations.*** Defendant Emily Hill has served as Replimune's chief financial officer since 2023. Before, she worked as the CFO of PTC Therapeutics, where she supported the company's growth from clinical to commercial stage. Before PTC, she worked in several investor relations roles and as an equity researcher. In the press release announcing her joining Replimune, Defendant Hill noted that the Company was "on the cusp of major value inflection points with data from two [anticipated] potentially registrational trials" and noted her focus would be in "applying [her] expertise and experience to help Replimune continue its growth and make the transition from a clinical to commercial stage company."

276. ***Hill was informed at finance meetings and had access to internal contemporaneous reports and data regarding RP1's development prospects with and without accelerated approval.*** Replimune has no revenue, has no marketed products, and is singularly focused on the development and potential commercialization of its single segment—the RPx platform. As CFO, Defendant Hill was acutely aware of these facts. Each year at Replimune, she was one of three executive signatories for Replimune's regular SEC filings, representing that she had reviewed, approved of, and authorized the statements made in those filings. Those filings confirmed what Hill also knew as the Company's CEO—Replimune generated no revenues. Additionally, they confirmed that the Company's "ability to generate any revenues from the sale of our product candidates will depend heavily on the successful development, regulatory approval and commercialization of one or more of these product candidates using our RPx platform." And

as chief financial officer—that is, the executive managing Replimune's financial health, forecasting, and financial planning—she would have also been acutely aware of the material information that Defendants omitted—i.e., that the Company could not viably develop RP1 without access to the accelerated approval pathway—through the Company's financial planning and analysis process—in public companies, a process generally under the purview of the CFO.

277. ***As CFO, Defendant Hill's paramount responsibility involved tracking the cash flows necessary for the viable development and commercialization of Replimune's RPx platform over a multi-year window.*** In this capacity, Hill signed Replimune Annual Reports, attesting to her knowledge of, as well as the accuracy of, the financial information reported there in, including information on Replimune's cash flows and cash runway. She also spoke publicly on the subjects during calls with investors. For example, in May 2025, Hill reported that Replimune ended the 2024 fiscal year "with cash and cash equivalents totaling $483.8 million," with 189.4 million spent on research and development expense over the past year. She then demonstrated her knowledge of, and oversight over, the Company's cash runway by affirming that "[b]ased on the current operating plan, the company believes that existing cash, cash equivalents, and short-term investments as of March 31, 2025, will enable the company to fund operations into the fourth quarter of 2026, which includes scale up for the potential commercialization of RP1 and skin cancers and for working capital and general corporate purposes."

**C. Additional Facts in Support of Defendant Astley-Sparke's Scienter**

278. ***Astley-Spake's Personal Knowledge of the FDA's Persistent Warnings***. Defendant Astley-Sparke also had access to the minutes of Replimune's meetings with the FDA, including the March 2021 Type B meeting and the September 2023 Type C meeting, and was therefore aware of what the FDA communicated to the Company during those interactions. Astley-

Sparke's own public statements confirm his knowledge of those meetings and their substance. For example, on November 16, 2022, at the Jefferies London Healthcare Conference, Astley-Sparke answered a question about FDA regulatory requirements for accelerated approval by providing detailed information about RP1's design relative to FDA expectations, stating that he took "comfort from the fact that [Iovance] has just filed in exactly this setting with a single-arm study" and opining that "it would be a bit odd if the agency treated us differently." Similarly, on January 9, 2023, at the JP Morgan Healthcare Conference, when Coffin stated that the data "meets the criteria for overall compellingness which the FDA discussed with us at the Type B meeting," Astley-Sparke interjected to note that "Iovance's BLA has just been accepted for filing and I don't think they started their confirmatory study and there's a very similar setting" — demonstrating his granular familiarity with the FDA's feedback at the March 2021 Type B meeting and its implications for Replimune's regulatory pathway. On March 12, 2024, at the Leerink Partners Global Biopharma Conference, Astley-Sparke further discussed the FDA's regulatory milestones in detail, including feedback from both the March 2021 Type B and September 2023 Type C meetings. These statements demonstrate that Astley-Sparke had actual knowledge of, or access to, the substance of the FDA's communications to Replimune, including the agency's repeated warnings against the Company's chosen regulatory approach.

279. ***Astley-Sparke was directly and extensively involved in developing and obtaining regulatory approval for RP1.*** Defendant Philip Astley-Sparke is the Executive Chairman of Replimune's Board, one of the co-founders of Replimune, and has served as a member of the Company's Board since it was formed in 2015. Before joining Replimune, he was the President and/or CEO of several other biotech companies which had successfully developed and brought new drugs and/or treatments to market. He also brought to Replimune significant experience in

the areas of finance and investor fundraising—shown through his work in global venture capital and in the healthcare investment banking industries. His direct involvement in founding Replimune, his role as CEO, his experience in bringing pharmaceutical products to market, and his multiple public statements on RP1's regulatory approval prospects supports a strong inference that Astley-Sparke knew or was reckless in not knowing about whether RP1 had viable pathways for development and regulatory approval outside of the accelerated approval pathway.

280. ***Astley-Sparke's repeated statements to the public about RP1's development and regulatory history demonstrate his knowledge or recklessness.*** During his tenure, Astley-Sparke's statements ensured investors that he and Coffin were hands-on managers who were actively involved in RP1's development and regulatory approval pathways. For example, on November 16, 2022, Astley-Sparke had the following back and forth with an analyst at Jeffries's London Healthcare Conference, in which he provided detailed information about RP1's prospects for regulatory approval under the accelerated approval pathway:

> Question: I believe this is single arm kind of trial and potentially for the accelerated approval. And we know FDA recently published some kind of a guideline for the accelerated approval and a lot of discussion. So, how confident you are this readout will still support the accelerated approval in a way?
>
> Answer: Well, I think, obviously, take comfort from the fact that our events has just followed in exactly the setting with a single arm study, with what would be a similar number of patients. So, I think it would be a bit odd if the agency treated us differently and has treated another company in very recent history.
>
> Question: Yeah. That makes sense. And when will that happen? I think you will have some full data mid next year and how long after that you will start to file the BLA for this one?
>
> Answer: Well, the full study is 125 patients. It should get the full approval around the year-end. And actually, the trigger for the primary analysis is the whole 12 months of the last patient, and that is the current, the way things are set up. But I am actually having discussions with the team about whether that's a little bit too conservative. Maybe it should be six months off, the last patient in. So, we'll either have the data set to support the filing late next year,

> or if we do something a bit different, maybe early around the middle of next year.

281. These detailed answers did not just demonstrate knowledge, they suggested personal oversight over RP1's development towards registration through internal meetings and/or access to regular reports of information on these subjects.

**D. Additional Facts in Support of Defendant Coffin's Scienter**

282. ***Coffin's Personal Knowledge of the FDA's Persistent Warnings***. Defendant Coffin also had access to the minutes of Replimune's meetings with the FDA, including the March 2021 Type B meeting, the September 2023 Type C meeting, and the September 2024 pre-BLA meeting, and was therefore aware of what the FDA communicated to the Company during those interactions. As the head of RP1's research and development, Coffin would have been a direct participant in or recipient of the minutes from these regulatory meetings. Coffin's own public statements confirm his personal knowledge of those meetings and their substance. For example, on January 9, 2023, at the JP Morgan Healthcare Conference, Coffin stated: "we have had discussions with the FDA, particularly a type B meeting with the FDA nearly a couple of years ago now, where we discussed whether a single-arm study would be acceptable for accelerated approval. And the feedback from the FDA is — was that as long as the data in its totality was sufficiently compelling that it's certainly a setting where an accelerated approval filing could be accepted by the FDA." Coffin further stated that "we have had no indication that anything has changed since and have had to have more recent communications with the FDA, where indeed we haven't heard anything different." Similarly, on June 6, 2024, during the IGNYTE Clinical Trial Update Call, Coffin referred to the cumulative history of "quite a number of different interactions with the FDA" and asserted that the Company had addressed each of the items the FDA requested, stating "we do believe each of the things we discussed with the FDA, we have indeed done and

therefore we should be in a good position to file the BLA." These statements demonstrate that Coffin had actual knowledge of, or access to, the substance of the FDA's communications to Replimune, including the agency's repeated warnings against the Company's chosen regulatory approach.

283. ***Coffin was directly and extensively involved in developing and obtaining regulatory approval for RP1.*** Defendant Robert Coffin, Ph.D., is also one of Replimune's co-founders and its Chief Scientist. In these roles, he is the head of RP1's research and development. Before that, he worked alongside Defendant Astley-Sparke at another biotech company which successfully developed and brought a therapy treatment to market. His direct involvement in founding Replimune and his role as its chief scientist strongly suggest that Coffin was intimately tapped into RP1's development and regulatory prospects, including whether RP1 had viable pathways for development and regulatory approval outside of the accelerated approval pathway.

284. ***Coffin's repeated statements to the public about RP1's development and regulatory history demonstrate his knowledge or recklessness***. For part of the Class Period, Coffin was one of the primary executives at Replimune who spoke at length about RP1 clinical testing and regulatory pathways in press releases, SEC filings, and analyst conferences. For example, on July 14, 2021, Defendant Coffin gave the following answer when he and other panelists were asked for their thoughts on how the FDA would react "if [they] were trying to go for an accelerated approval" through a single-arm trial (like RP1's IGNYTE trial): "… if one is really demonstrating a clinical benefit and a reasonable proportion of your population then the accelerated approval pathway is entirely appropriate and should continue even if you have to further prove the point post-approval through a complementary trial." Similarly, on January 9,

2023, at the 41st Annual JP Morgan Healthcare Conference, Defendant Coffin had the following back-and-forth with analysts about RP1's regulatory process following his presentation on RP1:

> Question: … On the regulatory side for RP1 in PD-1-failed melanoma, what gives you confidence that a single-arm approach in IGNYTE is going to be accepted by regulators? And how much duration of follow-up do you think you'll be needed there in a single-arm fashion?
>
> Answer: Sure. Yeah. I'm Robert Coffin, and I'm In charge of the R&D at Replimune. So, we have had discussions with the FDA, particularly a type B meeting with the FDA nearly a couple of years ago now, where we discussed whether a single-arm study would be acceptable for accelerated approval. And the feedback from the FDA is – was that as long as the data in its totality was sufficiently compelling that it's certainly a setting where an accelerated approval filing could be accepted by the FDA. So, we have had no indication that anything has changed since and have had to have more recent communications with the FDA, where indeed we haven't heard anything different.
>
> With regard to durability, various discussions with the FDA indicate that responses which last at least six months are deemed to be clinically meaningful as far as the FDA is concerned. And a key secondary endpoint of the study is, therefore, duration of response. And we do think from the data we've already shown both in this most recent data cap and before that our responses tend to be very durable, and therefore, we do expect the vast majority of our responses to last for at least six months, and therefore, easily meet that hurdle. I'd also think that the data we presented in December really does show a level of compelling this, which meets the criteria for overall compelling this which the FDA discussed with us at the Type B meeting.
>
> Question: So, in fact, your confirmatory trials to be completely enrolled? I know regulations are changing... with the – from a regulatory perspective?
>
> Answer: So all of our feedback from the FDA is that as long as we have the confirmatory trial started, when we file for accelerated approval in that indication, then that ticks the box as far as the FDA is concerned. So, we didn't (31:34) and we've got no suggestion from our interactions and have you is different to that.

**E. The FDA Commissioner's Public Statements Confirm Defendants' Scienter**

285. On May 5, 2026, FDA Commissioner Marty Makary appeared on CNBC and was interviewed by CNBC analyst David Farber. During the televised interview, Commissioner Makary made a series of public statements that directly contradict the narrative Defendants

promoted throughout the Class Period and further support a strong inference that Defendants acted with scienter when they made the false and misleading statements alleged herein.[11]




286. ***Commissioner Makary confirmed that the FDA's requirement for a randomized controlled trial was never waived or satisfied.*** In the interview, Commissioner Makary stated unequivocally that the FDA had "***clearly recommended that control group***" and that the Company "***clearly did not do that control group***."[12] Commissioner Makary further stated that, "by law, we can only approve drugs with 'substantial evidence.'" These statements confirm that the FDA's position on the need for a randomized trial—which Defendants knew from their interactions with the agency dating back to March 25, 2021—was never abandoned, modified, or relaxed. Defendants' repeated public assurances that RP1 was on track for approval through a single-arm

[11] As of May _, 2026, CNBC's full interview with FDA Commissioner Marty Makary is available at https://www.youtube.com/watch?v=0E6lqGqbm7o

[12] *Id*. at _:_-_:_.

study were therefore made with knowledge of, or in reckless disregard of, the FDA's longstanding and unambiguous contrary position.

287. ***Commissioner Makary rejected the claim that the FDA changed its position, confirming that the agency maintained meticulous contemporaneous records of its consistent guidance.*** When asked about Defendants' claims that the FDA had "changed the goalposts," Commissioner Makary refuted those claims, stating: "The recommendations of the FDA were clear . . . they saying that they change the goalpost? They don't change the goalpost. We have thorough minutes on all meetings."[13] This statement confirms that contemporaneous FDA records—records that Defendants had access to through their direct interactions with the agency—documented the FDA's consistent position throughout the regulatory process. Defendants' public claims of surprise and shifting FDA standards were therefore made with knowledge that the FDA's internal records told a fundamentally different story.

288. ***Commissioner Makary characterized Defendants' public statements as "corporate spin," further supporting an inference that Defendants knowingly misled investors.*** Commissioner Makary stated that "[w]hat we saw was a lot of corporate spin" and confirmed that "[e]very accept or reject decision at the FDA on my watch has been the accept or reject recommendation of the primary review teams at the agency." When asked specifically whether a particular review team had recommended approval of RP1—a key premise of the so-called "alignment" theory that Defendants promoted—Commissioner Makary was unequivocal: "That's not correct, David. In that case, independent teams arrived to the same recommendation" for a complete response letter.[14] These statements from the head of the FDA directly contradict the core

[13] *Id.* at _:_-_:_.

[14] *Id.* at _:_-_:_.

of Defendants' public narrative: that there had been meaningful support within the FDA for RP1's approval and that the CRL was the product of a minority viewpoint or shifting leadership priorities rather than the agency's consistent scientific assessment.

289. ***Commissioner Makary pointed to the Complete Response Letter as the definitive refutation of Defendants' public narrative.*** Commissioner Makary stated that investors were "not getting the full story" from Defendants and that "[t]he full story is in our complete response letter that we published."[15] He further stated: "If you read our complete response letter, you will see the details of the FDA's logic and you will see some of those things shown not to be correct."[16] This statement confirms that the CRL contained information directly refuting Defendants' public representations—information that Defendants themselves received and reviewed, yet chose to suppress or contradict in their public communications with investors.

290. ***Commissioner Makary described the broader pattern of corporate and media pressure that Defendants employed.*** Commissioner Makary described how "a small set of companies have a trial that doesn't go their way" and then "dial up tremendous pressure in the media to drum up people, spin them up on results that don't match the data that we see."[17] This description is consistent with the pattern alleged herein: Defendants orchestrated a public relations campaign—through press releases, investor calls, analyst conferences, and media appearances—designed to convince investors that RP1 remained on a viable path to approval, despite knowing that the FDA's scientific assessment did not support such a conclusion. Commissioner Makary's characterization of this as a deliberate campaign to "spin" investors on "results that don't match the data" further supports the strong inference that Defendants acted with scienter.

---

[15] *Id*. at _:_-_:_.

[16] *Id*. at _:_-_:_.

[17] *Id*. at _:_-_:_.

291. Taken together, Commissioner Makary's public statements provide powerful, independent confirmation—from the head of the very regulatory agency with which Defendants interacted—that (i) the FDA's guidance was clear and consistent throughout; (ii) Defendants' public representations to the contrary were "corporate spin"; (iii) the Complete Response Letter reiterated the same points made in the meeting minutes that Defendants received and contained the true facts that contradicted their public narrative; and (iv) all independent review teams within the FDA reached the same conclusion that RP1's application should receive a complete response letter. These facts, known to or recklessly disregarded by Defendants, further support the strong inference that Defendants acted with scienter when they made the false and misleading statements alleged herein

## VII. THE SCIENTER OF REPLIMUNE'S SENIOR OFFICERS IS IMPUTED TO THE COMPANY

292. Each of the Individual Defendants served as a high-ranking management-level employee of Replimune. The scienter of each of the Individual Defendants and of all other management-level employees of Replimune, including each high-ranking officer or director, is imputable to Replimune. The knowledge of each of these individuals should therefore be imputed to Replimune for the purposes of assessing corporate scienter.

293. Additionally, corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices and lead drug candidates—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## VIII. LOSS CAUSATION: THE TRUTH EMERGES

### A. Replimune Receives the First Complete Response Letter

294. On July 22, 2025, before the market opened, Replimune issued a press release entitled "Replimune Receives Complete Response Letter from FDA for RP1 Biologics License Application for the Treatment of Advanced Melanoma." It stated the following:

> [Replimune], a clinical stage biotechnology company pioneering the development of novel oncolytic immunotherapies, today announced that the U.S. Food and Drug Administration (FDA) has issued a Complete Response Letter (CRL) regarding the Biologics License Application (BLA) for RP1 (vusolimogene oderparepvec) in combination with nivolumab for the treatment of advanced melanoma.
>
> The CRL indicates that the FDA is unable to approve the application in its present form. The FDA has indicated that the IGNYTE trial is not considered to be an adequate and well-controlled clinical investigation that provides substantial evidence of effectiveness. Furthermore, the FDA said the trial cannot be adequately interpreted due to the heterogeneity of the patient population. The CRL also states that there are items related to the confirmatory trial study design which need to be addressed, including contribution of components. Importantly, no safety issues were raised.
>
> The Company will request a Type A meeting and expects it will be granted within 30 days. Replimune plans to urgently interact with the FDA to find a path forward for the timely accelerated approval of RP1 without which the development of RP1 for advanced cancer patients with limited options will not be viable.

295. On this news, the price of Replimune stock plummeted by $9.52 per share, or 77.24%, to close at $2.80 per share on July 22, 2025.

296. Cantor Fitzgerald, reacting to the news, noted the revelation that without accelerated approval, Replimune could not develop RP1, and downgraded Replimune.

> We are downgrading REPL shares from Overweight to Neutral reflecting the probability that the FDA is going to require a randomized controlled trial in order to support approval of RP1. Our model is under review.
>
> Such a study will likely take years to conduct, and would forfeit RP1's lead time to market. REPL has suggested it does not have the resources to conduct such a Phase 3 trial. As a result, we are

> skeptical that RP1 will make it to market. The company had cash of $484M as of March 31.

297. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

**B. Replimune Receives the Second Complete Response Letter**

298. On April 10, 2026, the FDA publicly released the April 10, 2026 Complete Response Letter. It is attached hereto as Exhibit B and is incorporated by reference as if fully set forth herein.

299. On this news, the price of Replimune fell from to $4.76 until the SEC halted trading, from a previous day's close of $5.91. On April 13, 2026, when trading reopened, the price of Replimune stock fell further to $1.70, a total decline of $4.21, or 71.2%.

300. Also on April 10, 2026, Piper Sandler issued a report stating:

> Downgrading REPL to Neutral following FDA's second rejection of RP1 in anti-PD1 failed melanoma. This follows the first CRL last July, which was largely viewed as a lastminute decision was handed down from leadership at FDA. Today's rather lengthy CRL calls that into question, quoting Agency concerns on trial design dating back to 2021. The letter specifies that today's decision, from a new review team, was unanimous, and makes it clear that FDA's concern on the contribution of components in the single-arm IGNYTE trial were not addressed with REPL's new analyses. It went on to raise new concerns (e.g., uncertainty of response assessments in IGNYTE), and in our view makes it clear that there's no path for accelerated approval. In that the path to approval for RP1 based on the ongoing IGNYTE-3 trial is extremely uncertain, we are stepping to the sidelines
>
> • FDA's concerns were longstanding. Recall, the basis of the BLA for RP1 in combo with nivo was single-arm data from the IGNYTE trial in PD-1 failed melanoma (n=140), and FDA handed down a CRL last July citing issues with IGNYTE (i.e., patient heterogeneity and an inability to isolate RP1's contribution to observed efficacy). At the time of the first CRL, we thought the reported sequence of events indicated that this decision came from higher-ups at FDA. Specifically, FDA's approvability issues were not raised during the mid- and late-cycle review meetings last year, and REPL indicated these topics had been addressed with the Agency early on. However,

> today's CRL detailed FDA's prior communication of concerns with IGNYTE trial design dating back years, quoting feedback from a March 2021 Type B meeting and September 2024 pre-BLA meeting, including explicit feedback that FDA "would not recommend that the Sponsor submit a BLA based on the results of a single-arm study". • Resubmission didn't address FDA concerns. Our sense was that the most critical hang-up to address with FDA was contribution of components, and that additional analyses conducted by REPL addressed this concern. Today's CRL makes it clear that this was not satisfactorily addressed, and that there were other fundamental issues with IGNYTE that precluded approval. These included issues in response assessments (e.g., deviations from standard RECIST v1.1 methodology) that affected reliability of reported results and could confound efficacy results. The resubmission included an early look at ORR data from the confirmatory IGNYTE-3 trial (n=40), which didn't sway FDA due to the small N, local response assessment, lack of DOR data, etc. The Agency indicated plainly that RP1's data package doesn't meet the evidentiary standards required for approval, but expressed willingness to work with REPL on revising the IGNYTE-3 protocol and stats plan to address potential confounding factors (or a new clinical trial).
>
> • Tough to see the way forward. While there may be more to the story than is outlined in today's CRL, the path forward for RP1 is extremely unclear. The confirmatory IGNYTE-3 is enrolling, with an interim OS look guided to 2H27, although it's not clear that this trial will continue given financial constraints and FDA feedback. For now, we are pushing back melanoma launch in our model to FY30, and model significant cost-cutting measures nearterm, but we await clarity from the company on next steps. We note that RP2 is in a registration-directed P2/3 trial in uveal melanoma and a P2 in HCC, and the company may shift focus here, but we don't ascribe credit for RP2. Staying consistent with our valuation methodology (10x FY33E revenue, discounted at 20%), our target decreases to $4/sh on lower RP1 estimates, and we are stepping to the sidelines with a Neutral rating.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

301. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Replimune common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Replimune, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

302. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Replimune securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

303. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

304. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

305. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Replimune;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused Replimune to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of Replimune securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

306. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. PRESUMPTION OF RELIANCE

307. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with over 800,000 shares per day on average during the Class Period;

(e) the Company traded on the Nasdaq, has more than 30 market makers, and was covered by more than 10 analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

308. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

309. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

310. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

311. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

312. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

313. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Replimune securities during the Class Period.

314. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Replimune were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Replimune, their control over, and/or receipt and/or modification of Replimune's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Replimune, participated in the fraudulent scheme alleged herein.

315. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Replimune personnel to members of the investing public, including Plaintiffs and the Class.

316. As a result of the foregoing, the market price of Replimune securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Replimune securities during the Class Period in purchasing

Replimune securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

317. Had Plaintiffs and the other members of the Class been aware that the market price of Replimune securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Replimune securities at the artificially inflated prices that they did, or at all.

318. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

319. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Replimune securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

320. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

321. During the Class Period, the Individual Defendants participated in the operation and management of Replimune, and conducted and participated, directly and indirectly, in the conduct of Replimune's business affairs. Because of their senior positions, they knew the adverse non-public information about Replimune's business practices.

322. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to

Replimune's financial condition and results of operations, and to correct promptly any public statements issued by Replimune which had become materially false or misleading.

323. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Replimune disseminated in the marketplace during the Class Period concerning Replimune's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Replimune to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Replimune within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Replimune securities.

324. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Replimune.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

A. Declaring this action to be a proper class action, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

B. Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

C. Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: May 19, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Stern*
Jonathan Stern, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jstern@rosenlegal.com

Joshua Baker, Esq. (BBO # 695561)
101 Greenwood Ave., Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Raffi Melanson (BBO# 688650)
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 475-1978
Email: raffim@hbsslaw.com

Lucas E. Gilmore (*pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Email: lucasg@hbsslaw.com
*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 19, 2026.

DATED: May 19, 2026 *<u>/s/ Jonathan Stern</u>*